May 24, 2018

U.S. Department of Treasury

Bureau of Fiscal affairs

P.O. Box1686

Birmingham, AL  35201-1686

RE: TOP TRACE number 14823890


Dear IRS Representative:


This letter is to contest the decision to appropriate funds from my tax return for the fiscal year of 2017. This money was taken unlawfully and while in dispute after federal documents have been served regarding this matter.  Return this money promptly or expect that a lawsuit will be filed.

Signed,

Nicole S. Nickerson

- Amendment VI [Criminal Prosecutions - Jury Trial, Right to Confront and to Counsel (1791)] (see explanation)
- Amendment VII [Common Law Suits - Jury Trial (1791)] (see explanation)
- Amendment VIII [Excess Bail or Fines, Cruel and Unusual Punishment (1791)] (see explanation)
- Amendment IX [Non-Enumerated Rights (1791)] (see explanation)
- Amendment X [Rights Reserved to States or People (1791)] (see explanation)
- Amendment XI [Suits Against a State (1795)] (see explanation)
- Amendment XII [Election of President and Vice-President (1804)] (see explanation)
- Amendment XIII [Abolition of Slavery (1865)] (see explanation)
- Amendment XIV [Privileges and Immunities, Due Process, Equal Protection, Apportionment of Representatives, Civil War Disqualification and Debt (1868)] (see explanation)
- Amendment XV [Rights Not to Be Denied on Account of Race (1870)] (see explanation)
- Amendment XVI [Income Tax (1913)] (see explanation)
- Amendment XVII [Election of Senators (1913)] (see explanation)
- Amendment XVIII [Prohibition (1919)] (see explanation)
- Amendment XIX [Women's Right to Vote (1920)] (see explanation)
- Amendment XX [Presidential Term and Succession (1933)] (see explanation)
- Amendment XXI [Repeal of Prohibition (1933)] (see explanation)
- Amendment XXII [Two Term Limit on President (1951)] (see explanation)
- Amendment XXIII [Presidential Vote in D.C. (1961)] (see explanation)
- Amendment XXIV [Poll Tax (1964)] (see explanation)
- Amendment XXV [Presidential Succession (1967)] (see explanation)
- Amendment XXVI [Right to Vote at Age 18 (1971)] (see explanation)
- Amendment XXVII [Compensation of Members of Congress (1992)] (see explanation)

---

- Preamble
- Article I
- Article II
- Article III
- Article IV
- Article V
- Article VI
- Article VII
- Signers
- Bill of Rights
- First Amendment
- Second Amendment
- Third Amendment
- Fourth Amendment
- Fifth Amendment
- Forum Selection Clause
- Sixth Amendment
- Seventh Amendment
- Eighth Amendment
- Ninth Amendment
- Tenth Amendment
- 11th Amendment
- 12th Amendment
- 13th Amendment
- 14th Amendment

No specific procedures or timetables for raising objections to the magistrate's rulings on nondispositive matters are set forth in the Magistrates Act. The rule fixes a 10-day period in order to avoid uncertainty and provide uniformity that will eliminate the confusion that might arise if different periods were prescribed by local rule in different districts. It also is contemplated that a party who is successful before the magistrate will be afforded an opportunity to respond to objections raised to the magistrate's ruling.

The last sentence of subdivision (a) specifies that reconsideration of a magistrate's order, as provided for in the Magistrates Act, shall be by the district judge to whom the case is assigned. This rule does not restrict experimentation by the district courts under 28 U.S.C. §636(b)(3) involving references of matters other than pretrial matters, such as appointment of counsel, taking of default judgments, and acceptance of jury verdicts when the judge is unavailable.

*Subdivision (b)*. This subdivision governs court-ordered referrals of dispositive pretrial matters and prisoner petitions challenging conditions of confinement, pursuant to statutory authorization in 28 U.S.C. §636(b)(1)(B). This rule does not extend to habeas corpus petitions, which are covered by the specific rules relating to proceedings under Sections 2254 and 2255 of Title 28.

This rule implements the statutory procedures for making objections to the magistrate's proposed findings and recommendations. The 10-day period, as specified in the statute, is subject to Rule 6 (e) which provides for an additional 3-day period when service is made by mail. Although no specific provision appears in the Magistrates Act, the rule specifies a 10-day period for a party to respond to objections to the magistrate's recommendation.

Implementing the statutory requirements, the rule requires the district judge to whom the case is assigned to make a de novo determination of those portions of the report, findings, or recommendations to which timely objection is made. The term "de novo" signifies that the magistrate's findings are not protected by the clearly erroneous doctrine, but does not indicate that a second evidentiary hearing is required. See *United States v. Raddatz*, 417 U.S. 667 (1980). See also Silberman, *Masters and Magistrates Part II: The American Analogue*, 50 N.Y.U. L.Rev. 1297, 1367 (1975). When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation. See *Campbell v. United States Dist. Court*, 501 F.2d 196, 206 (9th Cir. 1974), cert. denied, 419 U.S. 879, quoted in House Report No. 94–1609, 94th Cong. 2d Sess. (1976) at 3. Compare *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980). Failure to make timely objection to the magistrate's report prior to its adoption by the district judge may constitute a waiver of appellate review of the district judge's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

### NOTES OF ADVISORY COMMITTEE ON RULES—1991 AMENDMENT

This amendment is intended to eliminate a discrepancy in measuring the 10 days for serving and filing objections to a magistrate's action under subdivisions (a) and (b) of this Rule. The rule as promulgated in 1983 required objections to the magistrate's handling of nondispositive matters to be served and filed within 10 days of entry of the order, but required objections to dispositive motions to be made within 10 days of being served with a copy of the recommended disposition. Subdivision (a) is here amended to conform to subdivision (b) to avoid any confusion or technical defaults, particularly in connection with magistrate orders that rule on both dispositive and nondispositive matters.

This is an automatic e-mail message generated by the CM/ECF system. Please **DO NOT RESPOND** to this e-mail because the mail box is unattended.

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**United States District Court**

**District of Massachusetts**

**Notice of Electronic Filing**

The following transaction was entered on 8/2/2018 at 11:12 AM EDT and filed on 8/2/2018

**Case Name:**   Nickerson v. Child Support Services of N.H. et al

**Case Number:**   1:18-cv-10393-RGS

**Filer:**

**Document Number:** 8(No document attached)

**Docket Text:**
**ELECTRONIC NOTICE of Case Reassignment. Judge Richard G. Stearns assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Donald L. Cabell. (Danieli, Chris)**

**1:18-cv-10393-RGS** Notice has been electronically mailed to:

**1:18-cv-10393-RGS** Notice will not be electronically mailed to:

David Nickerson
91 Lupine Road
Lowell, MA 01850

Cornell Law School

U.S. Code › Title 31 › Subtitle V › Chapter 63 › § 6305

# 31 U.S. Code § 6305 - Using cooperative agreements

An executive agency shall use a cooperative agreement as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when—

**(1)** the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and

**(2)** substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.

(Pub. L. 97–258, Sept. 13, 1982, 96 Stat. 1004.)

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*



GEICO. Proudly serving **Federal employees since 1936.** **Start Quote**

About LII

Contact us

Advertise here

Help

Terms of use

Privacy

[LII]

# Rights Without Remedies:
## Section 1983 Enforcement of Title IV-D of the Social Security Act

*Ashish Prasad†*

Title IV-D of the Social Security Act[1] mandates that states provide specific child support enforcement services in order to receive federal funding under the Aid to Families with Dependent Children (AFDC) program.[2] Most states, however, have not carried out the mandate to locate absent fathers and collect child support payments from them. Out of approximately 9.4 million mothers living without their children's fathers in the spring of 1988, only fifty-one percent of these women had child support awards and only twenty-six percent had received their full child support the previous year.[3]

This Comment argues for allowing mothers of children with absent fathers to bring suit under 42 USC § 1983[4] to compel states to provide child support enforcement services under Title IV-D.[5] A

---

† A.B. 1989, University of Michigan; J.D. Candidate 1993, The University of Chicago.

[1] 42 USC §§ 651-669 (1988).

[2] AFDC is a federal-state cooperative program intended to ensure that needy families with children deprived of parental support due to death, disability, or desertion receive welfare benefits. 42 USC §§ 601-617 (1988). The program requires that "the State [have] in effect a plan approved under [Title IV-D] and operate [ ] a child support program in substantial compliance with such plan." 42 USC § 602(a)(27).

[3] *The State of America's Children 1991* 27 (Children's Defense Fund, 1991).

[4] Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 USC § 1983 (1988).

[5] Only two appellate courts and five district courts have ruled on this issue. Four courts have denied the suits. *Carelli v Howser*, 923 F2d 1208 (6th Cir 1991) (reversing the district court's denial of the defendant's motion to dismiss); *Wehunt v Ledbetter*, 875 F2d 1558 (11th Cir 1989); *Mason v Bradley*, 789 F Supp 273 (N D Ill 1992); *Oliphant v Bradley*, 1992 US Dist LEXIS 8975 (N D Ill 1992). Three courts have permitted the suits. *Behunin v Jefferson County Dept. of Social Services*, 744 F Supp 255 (D Colo 1990); *Beasley v Ginsberg*, 1989 US Dist LEXIS 16682 (D Conn 1989); *Howe v Ellenbecker*, 774 F Supp 1224 (D SD 1991). See text accompanying notes 14-28.

successful § 1983 suit would result in a binding injunction upon the state to enforce Title IV-D or choose between judicial oversight of the state's child support enforcement program and loss of AFDC funds.[6]

A § 1983 remedy is crucial in these cases because families have no other means of compelling the state to provide child support enforcement services. The only alternative would be an *implied* right of action under Title IV-D,[7] but the Supreme Court has adopted a strong presumption against implied rights of action: the plaintiff must affirmatively demonstrate that Congress intended to allow a private right of action under the federal statute.[8] Needy families with children probably could not meet this burden because the text and history of Title IV-D provide no explicit indication of congressional intent to create a private right of action.[9]

Section 1983, on its face, provides a cause of action for any violation of a federal statute. In *Maine v Thiboutot*,[10] the plaintiffs sued under § 1983 claiming they were deprived of AFDC benefits due them under the Social Security Act. Rejecting the state's argument that § 1983 be limited to civil rights or equal protection statutes, the Court held that § 1983 may be triggered whenever a person acting under color of state law violates a federal statute.[11] But the Court in *Thiboutot* did not elaborate a *standard* for determining, in the context of a specific statute, whether § 1983 provides a

---

[6] See *Rosado v Wyman*, 397 US 397, 420 (1970) (remanding with instructions that the state have reasonable time either to conform Title IV-A program with AFDC funding conditions, or to choose to forego federal AFDC funding); *Pennhurst State School & Hospital v Halderman*, 451 US 1, 54 (1981) (White dissenting) ("If [the state prefers not to give up federal funding], it should propose a plan for achieving compliance, in which event, if it satisfied the court, a decree incorporating the plan could be entered and if the plan was unsatisfactory, the further use of federal funds could be enjoined.").

[7] See *Cort v Ash*, 422 US 66, 78 (1975) (outlining four-factor inquiry for implied private right of action).

[8] *Merrell Dow Pharmaceuticals, Inc. v Thompson*, 478 US 804, 812 n 9 (1986) (reviewing post-*Cort* cases that stress strict fidelity to congressional intent in implied right of action analysis).

[9] The silence of the statute and legislative history on the question of a private right of action does not jeopardize the possibility of an action under § 1983. Section 1983 enforcement is available unless the *defendant-state actor* demonstrates that Congress intended to disallow a private right of action. *Wright v Roanoke Redevelopment & Housing Authority*, 479 US 418, 423 (1987). See also *Middlesex County Sewerage Authority v National Sea Clammers Ass'n*, 453 US 1, 27 n 11 (1981) (Stevens concurring) ("[T]he burden is properly placed on the defendant to show that Congress, in enacting the particular substantive statute at issue, intended an exception to the general rule of § 1983."). Because § 1983 is an *express* congressional authorization of private suits, its use does not raise the separation of powers concerns inherent in judicially created remedies.

[10] 448 US 1 (1980).

[11] Id at 6-8.

cause of action. Since *Thiboutot*, the Court has allowed § 1983 enforcement only if the statute meets two requirements. First, the statute must create "enforceable rights."[12] Second, the statute must lack a "comprehensive remedial scheme."[13]

Section I of this Comment discusses how lower courts have approached the issue of § 1983 enforcement of Title IV-D. Section II demonstrates that Title IV-D creates enforceable rights on behalf of needy families with children. Section III demonstrates that Title IV-D does not provide a comprehensive remedial scheme.

## I.  LOWER COURT APPROACHES: *WEHUNT* AND *CARELLI*

In *Wehunt v Ledbetter*,[14] mothers of children with absent fathers brought suit under § 1983 against the Georgia Department of Health and Human Services for its failure to establish the paternity of their children and secure child support on their behalf. The Eleventh Circuit held that Title IV-D does not create enforceable rights on behalf of needy families with children because they are not the intended beneficiaries of the statute.[15] The court reasoned that the primary purpose of Title IV-D was to recoup the state's welfare expenditures on behalf of needy families by collecting child support from absent parents. While the AFDC program itself was intended to benefit needy families with children, Title IV-D was intended to benefit the public treasury and taxpayers by reducing the present and future welfare rolls.[16] The court pointed to the legislative history of Title IV-D:

> The problem of welfare in the United States is, to a considerable extent, a problem of the non-support of children by their absent parents. Of the 11 million recipients who are now receiving [AFDC funds], 4 out of every 5 are on the rolls because they have been deprived of the support of a parent who has absented himself from the home.
>
> The Committee believes that all children have the right to receive support from their fathers. The Committee bill, like the identical provision passed by the Senate (H.R. 3153) last

---

[12] *Suter v Artist M*, 112 S Ct 1360, 1366 (1992); *Wilder v Virginia Hospital Ass'n*, 496 US 498, 508 (1990).

[13] *Sea Clammers*, 453 US at 19-21; *Wright*, 479 US at 423.

[14] 875 F2d 1558 (11th Cir 1989).

[15] Id at 1565-66.

[16] Id at 1565 ("the goal of Title IV-D was to immediately lower the cost to the taxpayer as well as to lessen the number of families enrolling in welfare in the future—benefits to society as a whole rather than specific individuals").

year, is designed to help children attain this right, including the right to have their fathers identified so that support can be obtained. The immediate result will be a lower welfare cost to the taxpayer but, more importantly, as an effective support collection system is established fathers will be deterred from deserting their families to welfare and children will be spared the effects of family breakup.[17]

The court also pointed to the statutory provision requiring AFDC families to assign their child support rights to the state in return for AFDC aid—an indication that Congress intended to give states the ability to recoup welfare funds expended due to the delinquency of absent parents.[18] Having decided that Title IV-D creates no enforceable rights for needy families because they are not the intended beneficiaries of the statute, the court found it unnecessary to determine whether the statute provides a comprehensive remedial scheme.[19]

Two years later, in *Carelli v Howser*,[20] the Sixth Circuit rejected a § 1983 suit against the state of Ohio for its failure to locate absent parents, establish paternity, establish support obligations, and enforce existing support orders. After reviewing the legislative history of Title IV-D, the court rejected the *Wehunt* view and concluded that Congress intended to "protect both needy families with children and the public fisc."[21] The court nonetheless rejected the § 1983 remedy because it found that Title IV-D already provided a comprehensive remedial scheme. First, the court noted, Title IV-D and the implementing regulations issued by the Office of Child Support Enforcement establish an elaborate system for providing mandated services, recapturing funds, meeting performance indicators, and auditing state compliance.[22] Second, the auditing system appeared to be working: the state was audited and assessed a penalty by the Secretary, which led to the institution of a new

---

[17] Id, quoting Social Services Amendments of 1974, S Rep No 93-1356, 93d Cong, 2d Sess 42 (1974).

[18] Id at 1565-66, referring to the requirements set out in Title IV-A of the Social Security Act, codified at 42 USC § 602(a)(26)(A) (1988).

[19] Id at 1563. The dissent in *Wehunt* rejected the majority's view that enforceable rights were not created, and so went on to analyze the remedial scheme provided by Title IV-D. Judge Clark found the statute's remedial scheme insufficiently comprehensive to foreclose a § 1983 action. Id at 1577 (Clark dissenting). For a description of the available remedies, see text accompanying notes 148-51.

[20] 923 F2d 1208, 1209 (6th Cir 1991).

[21] Id at 1211.

[22] Id at 1213-15, referring to 45 CFR § 305 (1991).

Case 1:18-cv-10393-RGS   Document 9-1   Filed 08/15/18   Page 10 of 148

collective action program.[23] A court order in this case would have duplicated the Secretary's efforts to bring the state plan into compliance, and the court concluded that Congress could not have intended such redundancy.[24]

The district courts that have considered these questions are also deeply divided. At least three district court judges have concluded, like the Sixth Circuit in *Carelli*, that Title IV-D creates enforceable rights,[25] while two have concluded that it does not.[26] Three of the district court opinions maintain, like the *Wehunt* dissent, that Title IV-D does not provide a comprehensive remedial scheme,[27] while one holds that it does.[28] The conflicting resolutions adopted by these various courts suggest that the current status of § 1983 jurisprudence as it applies to Title IV-D needs clarification.

## II.   TITLE IV-D CREATES ENFORCEABLE RIGHTS ON BEHALF OF NEEDY FAMILIES WITH CHILDREN

Section 1983 is only available for violations of federal statutes that create enforceable rights. The Supreme Court outlined the test for enforceable rights in *Wilder v Virginia Hospital Ass'n*[29] and *Suter v Artist M.*[30] Part A of this Section examines this three-part test. Part B describes the statutory language and legislative history of Title IV-D. Part C shows that Title IV-D satisfies the Court's test for the creation of an enforceable right.

### A.   Requirements for Enforceable Rights Under *Wilder* and *Artist M*

In *Wilder*, the plaintiff was a nonprofit corporation of hospitals that sued under § 1983 for violations of the Boren Amendment to the Medicaid Act. The Boren Amendment provides that a State plan for medical assistance must provide for payment

---

[23] Id at 1215. The new program was to set time limits on responses to requests for service and establish priorities for providing service. Id.

[24] Id at 1216.

[25] *Behunin v Jefferson County Dept. of Social Services*, 744 F Supp 255, 258 (D Colo 1990); *Howe v Ellenbecker*, 774 F Supp 1224, 1230 (D SD 1991).

[26] *Mason v Bradley*, 789 F Supp 273, 277 (N D Ill 1992); *Oliphant v Bradley*, 1992 US Dist LEXIS 8975, *23 (N D Ill 1992).

[27] *Beasley v. Ginsberg*, 1989 US Dist LEXIS 16682 at *22 (D Conn 1989); *Behunin*, 744 F Supp at 257-58; *Howe*, 774 F Supp at 1230.

[28] *Oliphant*, 1992 US Dist LEXIS 8975 at *26-27.

[29] 496 US 498, 508 (1990).

[30] 112 S Ct 1360, 1371 (1992).

> of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded . . . through the use of rates . . . which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities.[31]

The Court concluded that the amendment grants health care providers enforceable rights to reimbursement rates that are reasonable and adequate. Writing for the majority, Justice Brennan asserted three primary grounds for this conclusion. First, health care providers are the intended beneficiaries of the Boren Amendment.[32] The Court focused on whether the statute provided benefits *in fact* to plaintiffs, and whether the language indicated an intent to do so: "[T]here can be little doubt that health care providers are the intended beneficiaries of the Boren Amendment. The provision establishes a system for reimbursement of providers and is phrased in terms benefitting health care providers."[33]

Second, the Boren Amendment imposes a "binding obligation" on states to adopt rates of reimbursement that are reasonable and adequate.[34] The Amendment would not be satisfied if the state made findings that its rates are "reasonable and adequate" and made assurances to that effect to the Secretary, but did not actually adopt such rates. The Court explicitly rejected that argument: "[Petitioner's] argument that the requirements of findings and assurances are procedural requirements only . . . would render . . . the entire reimbursement provision, essentially meaningless."[35]

The Court employed a two-factor analysis to reach its conclusion that the Boren Amendment provided a binding obligation: (1) it is cast in mandatory rather than precatory terms,[36] and (2) the receipt of federal funds is expressly conditioned on compliance with the Amendment (the Secretary is authorized to withhold

---

[31] Medicaid Act, 42 USC § 1396a(a)(13)(A) (1988).

[32] *Wilder*, 496 US at 509-10, quoting *Golden State Transit Corp. v Los Angeles*, 493 US 103, 106 (1989).

[33] Id at 510. The Court in *Golden State* suggested in dictum that a statute does not create enforceable rights if the benefit to the plaintiffs is merely incidental. 493 US at 109. Even if the Court were to adopt such an exception to the enforceable rights analysis it would not affect the determination of whether Title IV-D creates enforceable rights on behalf of needy families with children. See text accompanying notes 92-101.

[34] *Wilder*, 496 US at 512.

[35] Id at 513-14.

[36] Id at 512, citing 42 USC § 1396a(a)(13)(A) (1987 Supp).

funds for noncompliance).[37] The Court reasoned that these factors distinguished the Boren Amendment from the Developmentally Disabled Assistance and Bill of Rights Act (DDABRA),[38] which it had held did not create enforceable rights in *Pennhurst State School and Hospital v Halderman*.[39] Section 6010 of the DDABRA provided in part that:

> Congress makes the following findings respecting the rights of persons with developmental disabilities:
> (1) Persons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities.
> (2) The treatment, services and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty.[40]

The Court concluded that this provision was meant merely to assist or encourage states to improve care and treatment of the mentally retarded.[41] The provision "is simply a general statement of 'findings' and, as such, is too thin a reed to support the [creation of] rights"[42] and "[i]f funds cannot be terminated for a State's failure to comply with § 6010, § 6010 can hardly be considered a 'condition' of the grant of federal funds."[43] For a statute to impose binding obligations, the Court reasoned, states must be provided clear notice that by accepting funds they are obligated to comply with the provisions of the DDABRA.[44] The *Wilder* Court applied this test to the Boren Amendment, where the Secretary was authorized to withhold funds for noncompliance,[45] and concluded that "a State is on notice that it cannot adopt any rates it chooses and that the requirement that it make 'findings' is not a mere formality."[46]

---

[37] Id, citing 42 USC § 1396a(a)(13)(A). Note that relevant statutory language includes 42 USC § 1396a(a) and (a)(13).

[38] 42 USC §§ 6000 et seq (1988).

[39] 451 US 1, 15-27 (1981).

[40] 42 USC § 6010 (1976), now codified as 42 USC § 6009 (1988, Supp 1990).

[41] 451 US at 18.

[42] Id at 19.

[43] Id at 23.

[44] Id at 17.

[45] 496 US at 512, quoting 42 CFR § 430.35(c) (1989).

[46] Id at 514.

Third, the *Wilder* Court found the language of the Boren Amendment not too "vague and amorphous" to render the Amendment unenforceable by a court.[47] "While there may be a range of reasonable rates, there certainly are *some* rates outside that range that no State could ever find to be reasonable and adequate under the Act. Although some knowledge of the hospital industry might be required to evaluate a State's findings with respect to the reasonableness of its rates, such an inquiry is well within the competence of the judiciary."[48]

The majority in *Artist M* also adopted an enforceable rights analysis,[49] though slightly different from that found in *Wilder*. The plaintiffs were children who brought suit against the state for failure to make "reasonable efforts" to preserve and reunite families as required by the AACWA. The statute provides that:

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which . . . provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home.[50]

The Court concluded that the reasonable efforts provision of the AACWA does not create enforceable rights on behalf of children.[51]

Writing for the Court, Justice Rehnquist concluded that states were given "a great deal of discretion" in complying with the statute, despite the fact that the language of the AACWA was

---

[47] Id at 519.

[48] Id at 519-20. Justice Blackmun elaborated on this "vague and amorphous" standard in his dissent in *Artist M*. 112 S Ct at 1373-74 (Blackmun dissenting). He concluded that the Adoption Assistance and Child Welfare Act (AACWA), 42 USC §§ 670 et seq (1988), which requires that the state make "reasonable efforts" to preserve and reunite families, 42 USC § 671(a)(15), was within judicial competence to enforce because state efforts *could* in some circumstances be deemed to violate the statute.

> There may be a "range" of "efforts" to prevent unnecessary removals or secure beneficial reunifications that are "reasonable." It may also be that a court, in reviewing a State's strategies of compliance with the "reasonable efforts" clause, would owe substantial deference to the State's choice of strategies. That does not mean, however, that *no* State's efforts could *ever* be deemed "unreasonable."

*Artist M*, 112 S Ct at 1374, citing *Wilder*, 496 US at 520. See also *Golden State*, 493 US at 106 (stating, but not explaining, that the plaintiff's interest must not be "too vague and amorphous" for the judiciary to enforce).

[49] 112 S Ct at 1366-67.

[50] 42 USC § 671(a)(15).

[51] 112 S Ct at 1370.

mandatory rather than precatory, and that the Secretary was authorized to withhold funds for noncompliance.[52] In the Court's view, the AACWA only requires the state *to have a plan* approved by the Secretary and containing sixteen enumerated features; it does not require the state to actually *obey* particular provisions of the plan.[53] Justice Rehnquist noted three grounds for this conclusion. First, the AACWA and subsequent regulations were general and offered no guidance as to what would constitute "reasonable efforts" at compliance.[54] The particular statutory provision at issue suggested only that such plan as there was had to apply to all political subdivisions of the state, not that it actually had to operate in a specific manner.[55] States were thus not provided notice that "failure to do anything other than submit a plan with the requisite features, to be approved by the Secretary, is a further condition on the receipt of funds from the Federal Government."[56] The *Wilder* Court had found, by contrast, that the Boren Amendment and its attendant regulations elaborated specific factors for determining the method for calculating rates, so states were given the requisite notice for the imposition of a binding obligation.[57]

Second, in *Artist M*, Justice Rehnquist found that the legislative history of the AACWA revealed that Congress had confidence in the ability and competence of state courts to discharge their duties under the statute.[58] Third, a grant of substantial discretion to the states would not render the "reasonable efforts" clause "a dead letter." The Secretary retains the authority to reduce or eliminate payments upon a finding that the state is not making "reasonable

---

[52] Id at 1369.

[53] Id.

[54] Id at 1368-69. See for example, 42 USC § 671(a)(15), (b); 45 CFR § 1356.21(d)(4) (1991).

[55] Id at 1368 ("This section states that the state plan shall 'provid[e] that the plan shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them.' But we think that 'in effect' is directed to the requirement that the plan apply to all political subdivisions of the State, and is not intended to otherwise modify the word 'plan.' ").

[56] Id at 1369.

[57] 496 US at 512-14.

[58] The Senate Finance Committee Report stated that:

The committee is aware of allegations that the judicial determination requirement can become a mere *pro forma* exercise in paper shuffling to obtain Federal funding. While this could occur in some instances, the committee is unwilling to accept as a general proposition that the judiciaries of the States would so lightly treat a responsibility placed upon them by Federal statute for the protection of children.

Adoption Assistance and Child Welfare Act of 1979, S Rep No 96-336, 96th Cong, 1st Sess 16 (1979).

efforts," for example; if it is not even complying with its own plan.[59]

Lower courts are divided over whether the analysis in *Artist M* modifies or replaces the three-pronged analysis articulated in *Wilder*.[60] Given that the Court did not explicitly overrule *Wilder*, principles of legal interpretation would suggest that the cases should be harmonized so as to minimize the effect of *Artist M* upon § 1983 jurisprudence.[61] The different results in *Artist M* and *Wilder* can be explained by the fact that the statute in *Wilder* (the Boren Amendment) required the state to operate in compliance with its plan, while the statute in *Artist M* (the AACWA) merely required the state to have a plan in place. Thus, the effect of *Artist M* is to modify the "binding obligation" analysis from *Wilder* by adding another factor. In addition to looking for mandatory rather than precatory terms and assessing whether the receipt of federal funds is expressly conditioned on compliance,[62] a court must now also examine whether the statute or regulations elaborate specific factors to guide states regarding compliance with the mandate before concluding that the statute places a binding obligation on the states.[63]

*Wilder* and *Artist M* thus require that inquiry into whether a federal statute creates enforceable rights focus primarily upon three issues: first, whether plaintiffs are the intended beneficiaries of the statute; second, whether the statute imposes binding obligations upon states; and third, whether the statute is too vague and

---

[59] 112 S Ct at 1368-9. The impact of the Secretary's power to audit state programs and cut off federal funding is explored more fully in the text accompanying notes 148-57.

[60] Compare *Chan v City of New York*, 1992 US Dist LEXIS 8341 at *7 (S D NY) (applying *Wilder* framework "with the modifications suggested by [*Artist M*]" to the Housing and Community Development Act of 1974) with *City of Chicago v Smith*, 1992 US Dist LEXIS 15068 at *8-9 (N D Ill) (rejecting *Wilder* analysis of Older Americans Act since "such readings do not survive" *Artist M*).

[61] See generally Cass R. Sunstein, *After the Rights Revolution* 170, 186-89 (Harvard, 1990).

[62] See text accompanying notes 36-37.

[63] For an example of the relevancy of regulations, see *Artist M*, 112 S Ct at 1369, citing 45 CFR §§ 1356.21(d)(4), 1357.15(e)(1) (1991) ("The regulations promulgated by the Secretary to enforce the Adoption Act do not evidence a view that § 671(a) places any requirement for state receipt of federal funds other than the requirement that the State submit a plan to be approved by the Secretary."). See also *Chevron U.S.A., Inc. v Natural Resources Defense Council, Inc.*, 467 US 837 (1984) (reasonable agency interpretations entitled to judicial deference). It is unlikely that agency regulations are *by themselves* sufficient to create enforceable rights because Congressional intent has always been the linchpin of enforceable rights analysis. The Court has not yet ruled on this issue, but see *Wright*, 479 US at 438 (O'Connor dissenting) ("Such a result, where determination of § 1983 'rights' has been unleashed from any connection to congressional intent, is troubling indeed.").

amorphous to be enforced by the judiciary. The question that arises, then, is whether Title IV-D meets these requirements.

## B.  Title IV-D Provisions Relating to Creation of Enforceable Rights

Title IV-D requires that states pay child support collections to AFDC and non-AFDC families. In order to receive benefits, AFDC families must "assign [to] the State any rights to support from any other person such applicant may have"[64] and "cooperate with the State (i) in establishing the paternity of a child born out of wedlock with respect to whom aid is claimed, and (ii) in obtaining support payments for such applicant . . . ."[65] The purpose of the assignment provision is to "reimburse [state governments] for assistance payments to the family."[66] The first fifty dollars of child support collected each month, however, is paid to the AFDC family, and does not affect the family's AFDC eligibility or otherwise decrease any amount payable to it as state assistance.[67] If the state is able to collect support in excess of the family's AFDC grant, then it must treat the collection as family income and determine if the family has become ineligible for assistance payments.[68] Families who are not on AFDC receive the entire amount of child support that the state collects.[69]

The legislative history of Title IV-D reveals that Congress intended to provide benefits to needy families with children. Congress enacted Title IV-D in 1974 for the purpose of

> enforcing the support obligations owed by absent parents to their children and the spouse (or former spouse) with whom such children are living, locating absent parents, establishing paternity, obtaining child and spousal support, and assuring that assistance in obtaining support will be available under this part to all children (whether or not eligible for aid under [Title IV-A]) for whom such assistance is requested.[70]

Congress stated that: "all children have the right to receive support from their fathers . . . . [Title IV-D is] designed to help chil-

---

[64] 42 USC § 602(a)(26)(A) (1988).
[65] 42 USC § 602(a)(26)(B). The applicant need not cooperate, however, if she can establish "good cause" for failing to do so. Id.
[66] 42 USC § 657(b)(2).
[67] 42 USC §§ 602(a)(8)(A)(vi), 657(b)(1).
[68] 45 CFR § 232.20(b)(1) (1991).
[69] 42 USC § 657(b)(4)(B).
[70] 42 USC § 651.

dren attain this right, including the right to have their fathers
identified so that support can be obtained."[71]

A series of increasingly strict amendments over the past sev-
eral decades demonstrates congressional concern with strengthen-
ing child support enforcement by states. In 1967 Congress added
amendments requiring states to establish formal programs for
child support recovery from deserting parents, with half the fund-
ing to be provided by the federal government.[72] Amendments
passed in 1984 require states to implement specific enforcement
mechanisms in order to increase the effectiveness of state pro-
grams.[73] Congress further strengthened enforcement mechanisms
in the 1988 amendments to Title IV-D.[74]

The regulations promulgated by the Secretary of Health and
Human Services pursuant to Title IV-D's mandate establish ex-
tremely specific requirements for state child support enforcement
plans. For example, states must respond to requests for service
within precise time limits.[75] A state must apply these procedures in

---

[71] Social Security Amendments of 1984, S Rep No 93-1356, 93d Cong, 2d Sess 42
(1974). Congress was concerned with strengthening state child support enforcement
programs:

> In view of the fact that most States have not implemented in a meaningful way the
> provisions of present law relating to the enforcement of child support and establish-
> ment of paternity, the Committee believes that new and stronger legislative action is
> required in this area which will create a mechanism to require compliance with the
> law."

Social Security Amendments of 1973, S Rep No 93-553, 93d Cong, 1st Sess 43 (1973).

[72] Social Security Act Amendment of 1967, 42 USC § 602(a)(17) (Supp 1968), repealed
by the Social Services Amendments of 1974, § 6305(c)(8), Pub L No 93-647, 88 Stat 2337,
2360 (1975).

[73] Social Security Act Amendment of 1984, 42 USC §§ 654(20), 666 (a), (b) (1988). The
amendment requires that state programs include wage withholding for the automatic recov-
ery of child support and arrearages, posting of security or a bond, garnishments and volun-
tary wage assignments, liens on real or personal property, withholding from tax returns, and
reporting of significant arrearages to credit agencies.

[74] Family Support Act of 1988, Pub L No 100-485, 102 Stat 2352 (1988). The Act con-
tains amendments to Title IV-D requiring states to: provide mechanisms for facilitating the
periodic updating of child support awards, 42 USC § 667(a) (1988); revise the system of
immediate wage withholding, 42 USC § 666(b)(3) (Supp 1990); establish a commission on
interstate enforcement of child support, 42 USC § 666 (1988); and establish an automated
tracking and monitoring system, 42 USC § 654(24) (1988).

[75] See 42 USC § 652(h) (1988). The regulations promulgated under the Act require
states to: access all appropriate sources for locating an absent parent and ensure that loca-
tion information is sufficient to take the next appropriate action in a case within seventy-
five calendar days of determining that location is necessary, 45 CFR § 303.3(b)(3)(1991);
establish an order for support or complete service of process necessary to commence pro-
ceedings to establish a support order within ninety calendar days of locating an absent par-
ent or establishing paternity, 45 CFR § 303.4(d); file for paternity establishment or complete
service of process to establish paternity within ninety calendar days of locating the alleged

at least seventy-five percent of cases reviewed by the Secretary to achieve substantial compliance with Title IV-D requirements.[76] Lack of substantial compliance will lead to a loss of up to five percent of the state's federal funding.[77]

## C. Title IV-D Creates Enforceable Rights on Behalf of Needy Families with Children

As this Comment has noted, the *Wilder* and *Artist M* inquiry into enforceable rights focuses on three issues.[78] First, whether plaintiffs are the intended beneficiaries of the statute—does the statute benefit the plaintiffs, and is it phrased in terms of benefitting them? Second, whether the statute imposes binding obligations upon states—is the statute cast in mandatory rather than precatory terms, and is the provision of federal funds expressly conditioned on compliance with the statute? After *Artist M* this turns also on whether the statute and regulations provide specific guidance to states as to how such compliance may be achieved. Third, whether the statute is too vague and amorphous to be enforced by the judiciary—could state efforts *ever* be deemed to violate the statute? Analysis of Title IV-D produces affirmative answers to each of these inquiries.

1. Needy families with children are the intended beneficiaries of Title IV-D.

Needy families with children are the intended beneficiaries of Title IV-D because the statute provides them with specific benefits and is phrased in terms of benefitting them.[79] First, Title IV-D provides needy families with monetary benefits. The state pays AFDC families the first fifty dollars of child support that it collects each month from absent parents, in addition to their AFDC grants.[80] It pays non-AFDC families the full amount of such sup-

---

father, 45 CFR § 303.5(a)(1); establish paternity or exclude the alleged father within one year of the later of successful service of process or the child's reaching six months of age, 45 CFR § 303.5(a)(2); and take appropriate enforcement action within thirty calendar days of identification of a delinquency or support-related noncompliance, or location of an absent parent, 45 CFR § 303.6(c)(2).

[76] 45 CFR § 305.20(d)(2).

[77] 42 USC § 603(h)(1).

[78] See text accompanying notes 32-63.

[79] See *Wilder*, 496 US at 510 ("The [Boren Amendment] establishes a system *for* reimbursement of providers and is phrased in terms benefiting health care providers . . . .") (emphasis added).

[80] 42 USC § 657(b)(1).

port.[81] Title IV-D also mandates an increase in federal matching funds from fifty to sixty-six percent of state administrative costs,[82] and thus allows states to provide more services to needy families with children. Second, Title IV-D provides the benefits of paternity determination. These benefits include establishment of a personal relationship with the parent, establishment of an economic relationship with the parent, increased access to family medical histories, inheritance rights, and eligibility for Social Security benefits.[83] These benefits are in keeping with Title IV-D's purpose of "assuring that assistance in obtaining support will be available under [Title IV-D] to all children."[84]

Despite this evidence, the Eleventh Circuit in *Wehunt* concluded that needy families with children are not the intended beneficiaries of Title IV-D, and thus held that Title IV-D does not create enforceable rights on their behalf.[85] The court argued that Congress intended Title IV-D to benefit the public treasury and society as a whole rather than needy families with children.[86] This argument is inconsistent with the stated purposes of Title IV-D. The legislative history of Title IV-D strongly suggests that Congress intended to benefit *both* needy families with children and the public treasury:

> A major focus in the child-support debate during the 98th Congress has been the underlying purpose and intent behind the child-support enforcement program. Some maintained that it should aim primarily at recovering AFDC expenses incurred because families without child support must rely on welfare. Others contended that this Federal program ought to be available as a service to all families in need of assistance in securing child support, regardless of whether they receive welfare or not. This conference agreement reflects the rationale stated in both House and Senate bills which reaffirms that the program should be available to all who need services. This is an important statement of our intent that the Federal Government should assist in the costs of putting into place a nationwide efficient and effective child-support enforcement sys-

---

[81] 42 USC §§ 602(a)(8)(A)(vi), 657(b)(4)(B).
[82] 42 USC § 655(a)(2)(C).
[83] *Wehunt*, 875 F2d at 1574 (Clark dissenting).
[84] 42 USC § 651.
[85] See text accompanying notes 14-19.
[86] *Wehunt*, 875 F2d at 1565 ("the goal of Title IV-D was to immediately lower the cost to the taxpayer as well as to lessen the number of families enrolling in welfare in the future—benefits to society as a whole *rather than* specific individuals") (emphasis added).

tem that enables all children in need of support to receive timely and expedient assistance.[87]

The very language of the legislative history cited by the *Wehunt* court suggests that Title IV-D has two beneficiaries.[88]

The Sixth Circuit in *Carelli* examined this same legislative history and concluded that Congress intended Title IV-D to benefit both needy families with children and the public treasury: "We see no reason to conclude that the statute must be read to protect needy families with children to the exclusion of protecting the public fisc or vice versa. It seems eminently reasonable that Congress intended both purposes to be served."[89] The specific implementation of Title IV-D also supports the conclusion that it has two intended beneficiaries. Congress would not have provided benefits to non-AFDC families[90]—who are not otherwise a drain on the public treasury—if it intended Title IV-D to benefit the public treasury exclusively. Similarly, Congress would not have provided that AFDC families who assign their support rights to the state receive the first fifty dollars of support collected each month on their behalf[91] if it had intended Title IV-D to benefit the public treasury alone.

In response to the dual beneficiary theory, one could argue that needy families with children are not entitled to private relief because they are not the *primary* beneficiaries of Title IV-D. Six months after *Wehunt*, in *Golden State Transit Corp v City of Los Angeles*,[92] the Supreme Court held that the National Labor Relations Act (NLRA)[93] creates an enforceable right on behalf of taxicab franchisees to exert economic pressure on a union during the collective bargaining process. The Court held that the city could not interfere with that right by conditioning renewal of the franchise on settlement of the pending labor dispute.[94] The Court in dictum suggested one circumstance in which a statute would not create enforceable rights:

---

[87] 130 Cong Rec 23040 (Aug 8, 1984) (statement of Rep. Conable).

[88] See the court's quotation from legislative history, reproduced in the text accompanying note 17—especially the last sentence.

[89] 923 F2d at 1211.

[90] 42 USC §§ 602(a)(8)(A)(vi), 657(b)(4)(B).

[91] 42 USC § 657(b)(1).

[92] 493 US 103 (1989).

[93] 29 USC §§ 151 et seq (1988).

[94] 493 US at 111 ("the Act protects certain rights of labor and management against governmental interference").

In the NLRA, Congress has not just "occupied the field" with legislation that is passed solely with the interests of the general public in mind. In such circumstances, when congressional pre-emption benefits particular parties *only as an incident of the federal scheme of regulation*, a private damages remedy under § 1983 may not be available.[95]

This language from *Golden State* suggests that enforceable rights may exist only in a statute's primary beneficiaries and not in incidental ones.[96] On this view, § 1983 action would be unavailable to needy families if Title IV-D was *primarily* intended to benefit the public treasury and benefits to needy families with children arose incidentally.[97]

This argument is not convincing because neither of the conditions elaborated in *Golden State* obtain in the Title IV-D context. Title IV-D was not passed "solely with the interests of the general public in mind."[98] At least *one* of the interests Congress had in mind in passing Title IV-D must have been that of needy families with children.[99] Also, needy families with children are not benefitted "only as an incident to a federal scheme of regulation."[100] Rather, they reap economic and non-economic gains from specific statutory provisions.[101] In the absence of these two conditions, it would be premature to conclude, without further elaboration by the Court, that needy families with children must be the "primary" beneficiaries in order to be intended beneficiaries of the statute.

Thus, the first factor for the creation of an enforceable right—an intent to benefit the class—is fulfilled. The next question that arises is whether Title IV-D meets the second requirement for enforceable rights: the imposition of binding obligations upon the states.

---

[95] Id at 109.
[96] Henry Paul Monaghan, *Federal Statutory Review Under Section 1983 and the APA*, 91 Colum L Rev 233, 248 (1991) ("may not" indicates that whether a plaintiff is categorized as an intended or an incidental beneficiary determines whether or not that plaintiff has a primary federal right, redressable under § 1983).
[97] For similar reasoning in a pre-*Golden State* case, see *Wehunt*, 875 F2d at 1565 ("in enacting Title IV-D Congress was primarily concerned with collecting child support in order to reduce the welfare rolls").
[98] *Golden State*, 493 US at 109.
[99] See text accompanying notes 79-91.
[100] *Golden State*, 493 US at 109.
[101] See text accompanying notes 80-83.

### 2.   Title IV-D imposes binding obligations upon states.

Title IV-D contains the three factors that the Supreme Court uses to determine whether a statute imposes binding obligations upon states.[102] First, the statute is cast in mandatory rather than precatory terms. A "State plan for aid and services to needy families with children *must* . . . provide that the State has in effect a plan approved under [Title IV-D] and operates a child support program in substantial compliance with such plan."[103] The state plan for child and spousal support "*must* . . . provide that such State will undertake . . . to establish the paternity of [the] child"[104] and take certain specific measures to ensure effective collection and disbursement of child support.[105]

Second, the receipt of federal AFDC funds is expressly conditioned on compliance with Title IV-D.[106] "[I]f a State's program operated under [Title IV-D] is found as a result of a review . . . not to have complied substantially with the requirements of [Title IV-D] . . . the amounts otherwise payable to the State under this part . . . shall be reduced."[107] The reductions range from one to five percent depending on whether the state has been found not in substantial compliance on previous occasions, and are suspended if the state implements a corrective action plan within an appropriate time period.[108]

While it is true that state participation in the AFDC program is voluntary—a state could elect to not comply with Title IV-D requirements simply by foregoing federal AFDC funding[109]—the same is true of the Boren Amendment in *Wilder* and the DDABRA in *Pennhurst*. Both of these statutes concerned voluntary programs but the Court did not analyze either statute in those

---

[102] See text accompanying notes 62-63.

[103] 42 USC § 602(a)(27) (emphasis added).

[104] 42 USC § 654(4)(A) (emphasis added).

[105] The statute requires that states: notify families at least annually of the amount of child support collected on their behalf, 42 USC § 654(5); give families the first fifty dollars of child support collected each month, 42 USC § 657(b)(1); pass laws creating specific remedial devices to ensure effective child support, 42 USC § 666(a)(1)-(9); and comply with other requirements that the Secretary deems necessary to the establishment of an effective Title IV-D program, 42 USC § 654(13), such as the provision of support enforcement services within specified time frames, 45 CFR § 303.6(c)(2) (1991).

[106] *Wilder*, 496 US at 512 (Boren Amendment imposes binding obligations upon states because provision of federal funds is expressly conditioned on compliance with Amendment).

[107] 42 USC § 603(h)(1).

[108] 42 USC §§ 603(h)(1), 603(h)(2)(A).

[109] *Oliphant v Bradley*, 1992 US Dist LEXIS 8975 at *23 (N D Ill 1992) ("states are not obligated to participate in the AFDC program at all").

terms.[110] Instead, the Court looked to the mandatory language of the statute and the express conditioning of federal funds on compliance.[111] Where these factors were present (as in *Wilder*) the Court concluded that the statute imposed a binding obligation, where they were not (as in *Pennhurst*) the Court found no such obligation. This reflects an assumption that states will not choose to forego federal funding and that the voluntary nature of state participation in the program does not render Title IV-D's obligations nonbinding.[112]

Third, Title IV-D's obligations are binding because the statute and regulations elaborate specific factors to guide states toward "substantial compliance" with the statutory requirements.[113] The Secretary's regulations require that a state meet detailed audit criteria, employ the required procedures in seventy-five percent of the cases reviewed,[114] and keep to precise time frames in the performance of various services.[115] States are left with little or no discretion in deciding how to comply with Title IV-D. In this sense, Title IV-D more closely resembles the Boren Amendment in *Wilder* than the AACWA in *Artist M.* The Boren Amendment and its regulations elaborated factors for determining "reasonable and adequate" reimbursement rates, and the Court held that a binding obligation was created for states to adopt rates which actually were "reasonable and adequate."[116] The AACWA and its regulations, by contrast, did not elaborate factors for determining what were "reasonable efforts" at compliance, and the Court held that compliance with the statute was left to the discretion of individual states.[117]

On the other hand, one could argue that Title IV-D's obligations are not binding because the statute requires only "substantial" compliance, defined by the Secretary as compliance in only seventy-five percent of the cases reviewed. If a state is free to ignore fully one quarter of those families entitled to services, this might suggest that it also has a fair amount of flexibility in the implementation of Title IV-D. Other provisions of the statute also

---

[110] *Wilder*, 496 US at 502; *Pennhurst*, 451 US at 11.

[111] See text accompanying notes 42-46.

[112] Compare *Rosado v Wyman*, 397 US 397, 420 (1970) (remanding suit to enforce compliance with Title IV-A by instructing state to comply with AFDC conditions or forego funding).

[113] 42 USC § 602(a)(27).

[114] 45 CFR § 305.20(d).

[115] See note 75.

[116] 496 US at 519 n 17, citing 42 USC § 1396a(a)(13)(A) (1982, Supp 1987).

[117] 112 S Ct at 1369.

support this view.[118] Title IV-D lacks any language mandating that a state actually achieve any of the statute's goals or even comply with its own plan in order to receive federal AFDC funding. The Court in *Artist M* held that analogous language in the AACWA did not create enforceable rights on behalf of children.[119]

This argument is flawed on two grounds. First, substantial state flexibility in the implementation of child support programs contradicts the very purpose of Title IV-D. Title IV-D was enacted to address the problems of state non-compliance that had arisen under older, discretionary systems: "[N]ew and stronger legislative action is required in this area which will create a mechanism to require compliance with the law."[120] Congress intended to provide actual services to needy families with children through Title IV-D; it did not intend merely to encourage states to provide services. "[O]ur intent [is] that the Federal Government should assist in the costs of putting into place a nationwide efficient and effective child-support enforcement system that enables all children in need of support *to receive* timely and expedient service."[121] In the AACWA, by contrast, Congress expressed confidence in the ability and competence of states to perform their duties under the statute. This suggested to the Court in *Artist M* that states retained discretion to decide on compliance mechanisms.[122]

Second, the requirement that the state operate in "substantial compliance" with Title IV-D[123] is rendered meaningless if the statute authorizes flexibility in the implementation of the child support enforcement program. If the statute requires only that the state have a child support enforcement program in place and places no restrictions on the implementation of the program, the Secretary cannot exercise the enforcement power which the statute so carefully grants.[124] The state can *always* claim that it is in seventy-five percent compliance, because it is at least attempting to employ the required procedures in seventy-five percent of the cases reviewed; the Secretary's determination that the state must actu-

---

[118] For example, a state must "undertake" to establish paternity and secure support, rather than simply "establish paternity" or "secure support." 42 USC § 654(4).

[119] 112 S Ct at 1370, citing 42 USC § 671(a)(15) (1988).

[120] S Rep No 93-553 at 43 (cited in note 71).

[121] 130 Cong Rec 23040 (Aug 8, 1984) (statement of Rep. Conable) (emphasis added).

[122] 112 S Ct at 1369 n 15.

[123] 42 USC § 602(a)(27).

[124] 42 USC §§ 603(h)(1), 652(a)(4).

ally comply with the required procedures would itself not be sufficient to create a "binding obligation" upon states.[125]

Even assuming that the Secretary could enforce compliance, a state would always be able to argue that it was in compliance generally and that specific cases of noncompliance the Secretary might uncover were merely part of the excluded twenty-five percent. Congress would not simultaneously create an elaborate mechanism for child support enforcement and then add a provision which would eviscerate its own system of oversight.[126] The "substantial compliance" provision is better read not as a desire to preserve state flexibility in complying with Title IV-D requirements, but rather as a congressional recognition that the Secretary's review of cases cannot be expected to be accurate one hundred percent of the time.

Title IV-D, therefore, imposes binding obligations on states: the statute is cast in mandatory rather than precatory terms, the provision of federal AFDC funds is expressly conditioned upon state compliance with Title IV-D, and Title IV-D and its regulations elaborate specific factors to provide guidance in how to comply with the statute. The next and final question in the enforceable rights analysis is whether Title IV-D is too vague and amorphous to be enforced by the judiciary.

### 3.   Title IV-D is not too vague and amorphous to be enforced by the judiciary.

Title IV-D satisfies the vague and amorphous standard articulated in *Wilder* because a court *could* in some circumstances deem that state efforts violated the statute. Given the extensive and elaborate requirements articulated in Title IV-D and its attendant regulations, a court need only inquire whether the state is employing the required procedures to locate absent fathers, establish paternity, and collect child support within the specified time frames.[127] If not, the court would conclude that state child support enforcement efforts were in violation of Title IV-D.

Title IV-D is even less vague and amorphous than the Boren Amendment provision that provides that states reimburse health care providers at rates "reasonable and adequate" to meet the

---

[125] See note 63.
[126] See *Wilder*, 496 US at 514 (rejecting state argument that Boren Amendment does not create enforceable right to rates that actually are reasonable and adequate because such argument would render provision meaningless).
[127] See notes 73-75.

costs of an "efficiently and economically" operated facility.[128] The Court in *Wilder* held that this language was not too vague and amorphous for judicial enforcement where the statute outlined three factors for choosing a method of determining rate reasonableness and adequacy.[129] With its specific percentage requirements and detailed regulations, the "substantial compliance" provision in Title IV-D gives far greater guidance than the "reasonable and adequate" provision at issue in *Wilder*.[130]

Thus, since Title IV-D satisfies all three of the Supreme Court's requirements for the creation of an enforceable right, Title IV-D should be read as creating enforceable rights on behalf of needy families with children. However, one more hurdle remains: a § 1983 action is available for federal statutory violations only if the statute itself does not provide a comprehensive remedial scheme.[131]

### III. TITLE IV-D DOES NOT PROVIDE A COMPREHENSIVE REMEDIAL SCHEME

After *Middlesex County Sewerage Authority v National Sea Clammers Ass'n*[132] and *Wright v Roanoke Redevelopment & Housing Authority*[133] two issues determine whether a federal statute provides a comprehensive remedial scheme: (1) whether the statute provides for private judicial remedies, and (2) whether the statute provides a procedure by which plaintiffs can address state failures to abide by statutory provisions. Where these factors are present, the Court regards the statutory remedies as exclusive and will not allow additional enforcement through § 1983. The test ensures plaintiffs a remedy for violations of federal statutory rights.[134] The presumption is that Congress would not deprive statutory beneficiaries of a means of redress (as provided by § 1983) without providing for comparable remedies within the statute itself.[135]

---

[128] 42 USC § 1396a(a)(13)(A) (1988).

[129] 496 US at 519 & n 17.

[130] 45 CFR § 305.20(d)(1)-(2) (1992).

[131] See, for example, *Smith v Robinson*, 468 US 992, 1009-13 (1984) (section 1983 enforcement of Education of the Handicapped Act (EHA) not available because statute contains carefully tailored administrative and judicial enforcement mechanisms).

[132] 453 US 1 (1981).

[133] 479 US 418 (1987).

[134] See Note, *Comprehensive Remedies and Statutory Section 1983 Actions: Context as a Guide to Procedural Fairness*, 67 Tex L Rev 627, 644-53 (1989) (reviewing cases suggesting importance of leaving plaintiffs with judicial remedies).

[135] See, for example, *Smith*, 468 US at 1011 (finding EHA remedial scheme to be comprehensive where it ensured "that each child's individual educational needs be worked out

Part A of this Section examines the two-factor test in *Sea Clammers* and *Wright* for analyzing whether a statute has a comprehensive remedial scheme. Part B applies the *Sea Clammers/Wright* analysis to Title IV-D and shows that neither factor suggesting a comprehensive remedial scheme is present.

## A. *Sea Clammers* and *Wright*

In *Sea Clammers*, fishermen brought suit against federal, state, and local officials under the Federal Water Pollution Control Act (FWPCA)[136] and the Marine Protection, Research, and Sanctuaries Act (MPRSA)[137] for their alleged failure to prevent discharges and ocean dumping of waste materials. The Court held that enforcement mechanisms in the acts were sufficiently comprehensive to reveal congressional intent to preclude an implied right of action.[138] The acts contained provisions that granted government officials the authority to pursue civil and criminal penalties for violations,[139] permitted any "interested person" to seek judicial review of certain administrative actions taken under the acts (within 90 days),[140] and authorized citizens to sue for injunctions to enforce the acts.[141] While the plaintiffs did not seek a § 1983 remedy, the Court sua sponte addressed the issue and concluded that Congress intended the statutory remedies in the FWPCA and MPRSA to preclude use of § 1983.

The Court turned the dictum of *Sea Clammers* into law six years later in *Wright*. Tenants of low income housing projects brought suit under § 1983 for alleged overbilling for utilities, in violation of rent ceilings imposed by the Brooke Amendment to the Housing Act of 1937[142] and the implementing regulations of the Department of Housing and Urban Development (HUD).[143] Writing for the majority, Justice White concluded that the statute lacked a comprehensive remedial scheme on three grounds. First,

---

through a process that begins on the local level and includes ongoing parental involvement, detailed procedural safeguards, and a right to judicial review").

[136] 33 USC §§ 1251 et seq (1988).

[137] 33 USC §§ 1401 et seq (1988).

[138] *Sea Clammers*, 453 US at 15 ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.").

[139] 33 USC § 1319.

[140] 33 USC § 1369(b).

[141] 33 USC §§ 1365(a), 1415(g).

[142] 42 USC § 1437a.

[143] *Wright*, 479 US at 420 n 3, citing 24 CFR § 860.403 (1982).

the Brooke Amendment and Housing Act made no provision for private judicial remedies:[144] the only remedial scheme provided within the statute was HUD's authority to conduct audits, enforce annual contribution contracts, and cut off federal funds from Public Housing Authorities (PHA). These mechanisms were thoroughly inadequate for HUD to oversee effectively the performance of over 3,000 local PHAs across the country.[145] Second, the PHA grievance procedures for the resolution of tenant disputes did not provide any means for tenants to complain about alleged failures of PHAs to abide by their annual contribution contracts, the Brooke Amendment, or HUD regulations.[146] There would thus be few occasions on which HUD would be motivated to sue individual PHAs for such contractual violations. Third, HUD had apparently expressed the view that tenants could bring private suits to challenge PHA calculations of utility allowances: the grievance procedure regulations stipulated that a decision terminating a grievance proceeding would not affect a tenant's right to seek "judicial review," and proposed HUD regulations that would have limited federal judicial review were not adopted.[147]

## B.  Title IV-D Lacks a Comprehensive Remedial Scheme

Title IV-D does not provide the sort of means of private judicial redress necessary to satisfy the comprehensive remedial scheme test articulated in *Sea Clammers* and *Wright*. Title IV-D requires that a participating state develop and implement a plan to provide enforcement services; the Secretary is required to approve the plan,[148] conduct an audit of the program at least once every three years to determine if the actual operation of the program complies with Title IV-D,[149] and (if there is not substantial compliance) reduce the state's AFDC funding by one to five per cent.[150] The regulations also require that states locate absent parents, es-

---

[144] Id at 427.

[145] Id at 428-29.

[146] Id at 426.

[147] Id at 426-27, citing 24 CFR §§ 966.57(c), 965.473(3) (1985), 49 Fed Reg 31402 (1984).

[148] 42 USC § 652(a)(3).

[149] 42 USC § 652(a)(4).

[150] 42 USC § 603(h)(1). Funding reductions are suspended if: (1) the state submits a corrective action plan to achieve substantial compliance within a time period found to be appropriate by the Secretary, (2) the Secretary approves the plan, and (3) the Secretary finds that the plan is being fully implemented and the state is progressing according to the specified timetable to achieve substantial compliance. 42 USC § 603(h)(2).

tablish paternity, and establish support orders within specific time frames.[151]

Absent from the statute, however, are such private judicial remedies as citizens' suits or judicial review of administrative procedures. Also absent is any procedure under which needy families might complain about state failures to abide by Title IV-D. Absent § 1983 enforcement, the only remedy available to needy families with children for state violations of Title IV-D is a generally ineffectual complaint filed with the Secretary. Yet the Secretary's only enforcement tool is reduction of federal AFDC funding, and even that is available only after an audit and a finding of substantial noncompliance.[152] This mechanism simply is not adequate to the Secretary's task of enforcing state compliance with Title IV-D, especially given the widespread failure of states to provide effective child support enforcement services.[153] Without a § 1983 remedy, needy families are left essentially without any means of securing state compliance with the provisions of Title IV-D.[154]

While the Secretary has not expressed a view as to whether needy families may bring private suits to enforce Title IV-D, the remedial scheme of Title IV-D is even less comprehensive than that of the Brooke Amendment, which the Court in *Wright* held did not foreclose § 1983 enforcement.[155] Under the Brooke Amendment, tenants were at least provided with grievance procedures for resolution of disputes arising out of PHA regulations, although these procedures did not extend to utility allowances, and HUD itself could sue PHAs to enforce the annual contribution contracts.[156] There are no comparable procedures in Title IV-D—needy families simply cannot voice complaints regarding the failure to enforce support obligations, and the Secretary is not authorized to sue state agencies for noncompliance with Title IV-D requirements. If the Brooke Amendment lacks a comprehensive re-

---

[151] See note 75.

[152] 42 USC § 603(h); 45 CFR § 305.20(d) (1992).

[153] See text accompanying note 3.

[154] Needy families with children may have a cause of action under the Administrative Procedure Act (APA) against the Secretary for failure to enforce timeframes for service established by Title IV-D implementing regulations. 5 USC §§ 701 et seq (1988). See, for example, *Clarke v Securities Industry Ass'n*, 479 US 388, 394-96 (1987) (standing under APA requires injury in fact and within zone of interests protected or regulated by statute). However, a successful APA action could at most produce a cut-off of federal AFDC funding; the Secretary cannot actually compel states to provide child support enforcement services.

[155] *Wright*, 479 US at 427-28.

[156] Id.

medial scheme, then the more inadequate provisions of Title IV-D must lack one too.

Notwithstanding these arguments, the Sixth Circuit in *Carelli* concluded that Title IV-D does provide a comprehensive remedial scheme, and thus held that needy families with children may not bring suit under § 1983 to enforce Title IV-D.[157] The *Carelli* argument is flawed because it misconstrues the analysis required by *Sea Clammers* and *Wright*. Instead of analyzing Title IV-D in terms of whether it provided private judicial remedies or complaint procedures for statutory violations, the court simply noted the highly complex nature of the auditing scheme and examined how "effective" the process was in practice: "[Were relief to be granted,] the court's order would address all the shortcomings the Secretary has already ordered corrected."[158] The *Sea Clammers/Wright* analysis, however, is concerned with the extent of the remedial scheme *from the perspective of the statutory beneficiaries*; it focuses on whether they are left without a means of redress for violations of federal statutes.[159] While a more effective auditing process might ultimately lead to provision of more services to needy families with children, *Sea Clammers* and *Wright* do not suggest that a court examine whether granting private enforcement would further the efficient system-wide management of the Title IV-D program.[160]

Therefore, since Title IV-D does not provide for private judicial remedies or complaint procedures about state violations, the statute lacks a comprehensive remedial scheme. Since Title IV-D also creates enforceable rights on behalf of needy families with children, these plaintiffs must be granted the right to sue under § 1983 for state violations of Title IV-D.

## CONCLUSION

Without a § 1983 remedy, needy families with children are completely deprived of access to the federal courts to secure child support enforcement services granted them by Title IV-D. This result is deeply at odds with the *Thiboutot* presumption that § 1983 is available for federal statutory violations and the line of cases applying the presumption to particular statutes. *Wilder, Artist M, Sea Clammers,* and *Wright* suggest that the § 1983 remedy is

[157] See text accompanying notes 20-24.
[158] *Carelli,* 923 F2d at 1216.
[159] Note, 67 Tex L Rev at 645 (cited in note 134).
[160] See text accompanying notes 132-35.

222     *The University of Chicago Law Review*

available if the statute creates enforceable rights and itself lacks a comprehensive remedial scheme. Title IV-D meets both of these requirements. Permitting § 1983 enforcement in these circumstances would be true to the Supreme Court's § 1983 jurisprudence and would provide redress of these families' grievances through the injunction power of the federal courts.

Office of the Law Revision Counsel
# UNITED STATES CODE

Search & Browse

Currency and Updating

Classification Tables

Popular Name Tool

Other Tables and Tools

Understanding the Code

Positive Law Codification

Editorial Reclassification

Downloads

CONGRESS.GOV

FDsys

## POSITIVE LAW CODIFICATION

Positive law codification by the Office of the Law Revision Counsel is the process of preparing and enacting a codification bill to restate existing law as a positive law title of the United States Code. The restatement conforms to the policy, intent, and purpose of Congress in the original enactments, but the organizational structure of the law is improved, obsolete provisions are eliminated, ambiguous provisions are clarified, inconsistent provisions are resolved, and technical errors are corrected.

Links to Current and Recently Completed Positive Law Codification Projects

### The Term "Positive Law"

The term "positive law" has a long-established meaning in legal philosophy but has a narrower meaning when referring to titles of the Code. More

### Positive Law Titles vs. Non-Positive Law Titles

The Code is divided into titles according to subject matter. Some are called positive law titles and the rest are called non-positive law titles.

A positive law title of the Code is itself a Federal statute. A non-positive law title of the Code is an editorial compilation of Federal statutes. For example, Title 10, Armed Forces, is a positive law title because the title itself has been enacted by Congress. For the enacting provision of Title 10, see first section of the Act of August 10, 1956, ch. 1041 (70A Stat. 1). By contrast, Title 42, The Public Health and Welfare, is a non-positive law title. Title 42 is comprised of many individually enacted Federal statutes—such as the Public Health Service Act and the Social Security Act—that have been editorially compiled and organized into the title, but the title itself has not been enacted.

The distinction is legally significant. Non-positive law titles are prima facie evidence of the law, but positive law titles constitute legal evidence of the law in all Federal and State courts (1 U.S.C. 204).

Having, on one hand, non-positive law titles as prima facie evidence of the law, and on the other hand, positive law titles as legal evidence of the law, means that both types of titles contain statutory text that can be presented to a Federal or State court as evidence of the wording of the law. The difference between "prima facie" and "legal" is a matter of authoritativeness.

Statutory text appearing in a non-positive law title may be rebutted by showing that the wording in the underlying statute is different. Typically, statutory text appearing in the Statutes at Large is presented as proof of the words in the underlying statute. The text of the law appearing in the Statutes at Large prevails over the text of the law appearing in a non-positive law title.

Statutory text appearing in a positive law title is the text of the statute and is presumably identical to the statutory text appearing in the Statutes at Large. Because a positive law title is enacted as a whole by Congress, and the original enactments are repealed, statutory text appearing in a positive law title has Congress's "authoritative imprimatur" with respect to the wording of the statute. See Washington-Dulles Transp., Ltd. v. Metro. Wash. Airports Auth., 263 F.3d 371, 378 n.2 (4th Cir. Va. 2001); see generally NORMAN J. SINGER & J.D. SHAMBIE SINGER, STATUTES AND STATUTORY CONSTRUCTION, § 36A.10, (7th ed. 2009). Recourse to other sources such as the Statutes at Large is unnecessary when proving the wording of the statute unless proving an unlikely technical error in the publication process.

Non-positive law titles and positive law titles both contain laws, but the two types of titles result from different processes. A non-positive law title contains numerous separately enacted statutes that have been editorially arranged into the title by the editors of the Code. The organization, structure, and designations in the non-positive law title necessarily differ from those of the incorporated statutes, and there are certain technical, although non-substantive, changes made to the text for purposes of inclusion in the Code. A positive law title is basically one law enacted by Congress in the form of a title of the Code. The organization, structure, designations, and text are exactly as enacted by Congress. In the case of a positive law title prepared by the Office of the Law Revision Counsel, the title is enacted as a restatement of existing statutes that were previously contained in one or more of the non-positive law titles. In such a restatement, the meaning and effect of the laws remain unchanged; only the text is repealed and restated. In preparing a codification bill, the Office uses the utmost caution to ensure that the restatement conforms to the understood policy, intent, and purpose of Congress in the original enactments.

### Importance of Positive Law Codification

The Code is useful for researching and proving the general and permanent laws of the United States. Positive law codification improves the usefulness of the Code in a number of significant ways:

The original 1926 Code fit into a single volume and reflected the focus and size of the body of law then in effect. Since that time, the Code has become a multivolume compilation because of the addition of a great deal of new laws. Many of those new laws have been shoehorned into the original 50 titles, the subject matters of which are sometimes unsuited as descriptive titles for the new laws. Closely related laws that were enacted decades apart may appear in different volumes of the Code. Chapters based on statutes that have been amended many times may have cumbersome numbering schemes with section numbers such as 16 U.S.C. 460zzz-7 and 42 U.S.C. 300ff-111. Positive law codification provides an opportunity to greatly improve the organization of existing law and create a flexible framework that can accommodate new legislation in the future.

The non-positive law titles contain various laws enacted far apart in time during a span of more than a century. Laws in non-positive law titles reflect drafting styles and word choices in use at the time of enactment. Positive law codification provides an opportunity to restate the laws using a consistent drafting style and consistent word choices.

Certain provisions are written with expiration dates so that non-positive law titles contain many obsolete provisions. Positive law codification provides an opportunity to eliminate those provisions.

A non-positive law title of the Code is prima facie evidence of the statutes it contains; it can be rebutted by showing that the wording in an underlying statute is different. A positive law title constitutes legal evidence of the law; it is considered to be more authoritative in Federal and State courts.

Laws are sometimes inconsistent or duplicative and may contain ambiguities. Positive law codification resolves inconsistent laws, eliminates duplicate provisions, and clarifies ambiguities.

When a provision of a statute is included in a non-positive law title, certain technical changes are made in the wording and organization to integrate the provision into the Code. See the Detailed Guide to the Code. These changes enable the reader to navigate more easily within the Code, but they can make navigating between the statutes and the Code more complicated, particularly when amendments and cross references are involved. With positive law codification, the organization and wording of the Code are exactly as enacted by statute, so there are no editorial changes to complicate the transition between statute and Code.

Legislation sometimes contains technical errors such as typographical errors, misspellings, defective cross references, and grammatical mistakes. Positive law codification provides an opportunity to correct those errors.


## Authority for Positive Law Codification

Section 205(c) of House Resolution No. 988, 93d Congress, as enacted into law by Public Law 93-554 (2 U.S.C. 285b), provides the mandate for positive law codification. Under that section, one of the functions of the Office of the Law Revision Counsel is "[t]o prepare, and submit to the Committee on the Judiciary one title at a time, a complete compilation, restatement, and revision of the general and permanent laws of the United States which conforms to the understood policy, intent, and purpose of the Congress in the original enactments, with such amendments and corrections as will remove ambiguities, contradictions, and other imperfections both of substance and of form, separately stated, with a view to the enactment of each title as positive law."


## Process of Positive Law Codification

In drafting a codification bill, the Office of the Law Revision Counsel carefully considers the state of existing laws on a subject matter and aims for the improvement of those laws without changing their meaning or effect. To achieve this result, the Office actively seeks input from Federal agencies, congressional committees, experts in the area of law being codified, and other interested persons. That input is essential in ensuring that the laws are restated correctly and in identifying obsolete, ambiguous, or inconsistent provisions and reaching a consensus on how those provisions should be handled. Because much research, consultations, and consensus-building are essential in correctly restating the laws, the process of positive law codification is inherently time consuming.

An explanation of the bill is prepared along with the codification bill. The explanation contains the following:

Disposition table—The disposition table lists each Code section affected by the bill (referred to as "former sections"). For each former section, a disposition is provided. If the former section is restated as a section of the new positive law title, the new section number is given. If the former section is repealed, or not repealed but omitted, an explanation is given. Example

Section-by-section analysis—The section-by-section analysis contains source credit tables and revision notes for each section of the new title:

Source credit tables—Source credit tables provide source credit information for restated provisions in a codification bill.

In a source credit table for each section of a new title, the first column provides the new section number (which is sometimes broken down into smaller units), the second column provides the former section number (broken down into smaller units, if applicable), and the third column provides the Public Law source credit. If the Office of the Law Revision Counsel believes that it would be helpful, the third column may provide all of the credits including the base law and each provision of law that has amended the base law. Otherwise, the third column may provide the credit only for the base law, in which case, the complete source credits will be provided in a single source credit table following the section-by-section analysis. Examples

A source credit table following the section-by-section analysis provides the source credits (that is, citations to each law by which a section was enacted or amended) for each section of the base law, any part of which is being restated in the new title. Example

For an explanation of source credit information in the Code (including concepts such as base law), which is similar to source credit information in a source credit table, see the Detailed Guide to the Code.

Revision notes—Revision notes are written for technical revisions that require explanation. Revision notes are located under the source credit table for each section of the new title. See <u>sample revision notes in the source credit table examples</u>.

After the codification bill and explanation are finalized, they are submitted to the Committee on the Judiciary of the House of Representatives for introduction of the bill. Once the bill is introduced, a formal review and comment period begins. At the conclusion of the comment period, an amendment that reflects corrections and comments is prepared by the Office of the Law Revision Counsel and transmitted to the Committee on the Judiciary for Committee action. The explanation of the bill is converted into a report that accompanies the bill. Typically, the bill is passed by the House of Representatives under suspension of the rules and by the Senate by unanimous consent.

Once enacted, the new title is a positive law title of the Code. The disposition table, source credit tables, revision notes, and other relevant information from the report that accompanied the codification bill are included with the title in the Code.

For an example of a codification bill enacted as a Public Law, see Public Law 111-314 (<u>available here</u>) which enacted Title 51, National and Commercial Space Programs.

There are currently 27 positive law titles in the Code. Those titles are identified with an asterisk on the <u>Search & Browse</u> page.

## Links to Current and Recently Completed Positive Law Codification Projects

<u>Title 5, Government Organization and Employees</u>
<u>Title 6, Domestic Security</u>
<u>Title 35, Patents, Trademarks, and Other Intellectual Property</u>
<u>Title 41, Public Contracts</u>
<u>Title 49, Railroad Rehabilitation and Improvement Financing</u>
<u>Title 51, National and Commercial Space Programs</u>
<u>Title 54, National Park System</u>
<u>Title 55, Environment</u>
<u>Title 56, Wildlife</u>
<u>Title 57, Small Business</u>

## Additional Information

<u>Positive Law Codification Brochure</u>



About the Office          Privacy Policy          Sitemap

# Franconia Associates v. United States, 536 U.S. 129 (2002)

**Opinions**   Audio & Media

**Syllabus**   Case

**Syllabus**   Case

OCTOBER TERM, 2001

Syllabus

FRANCONIA ASSOCIATES ET AL. *v.* UNITED STATES

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 01-455. Argued April 15, 2002-Decided June 10,2002*

Under §§ 515 and 521 of the Housing Act of 1949, the Farmers Home Administration (FmHA) makes direct loans to private, nonprofit entities to develop and/or construct rural housing for the elderly and low- or middle-income individuals and families. Petitioners are property owners who entered into such loans before December 21, 1979. The promissory notes petitioners executed authorized "[p]repaymen[t] of scheduled installments, or any portion thereof, ... at any time at the option of Borrower." On February 5, 1988, concerned about the dwindling supply of low- and middle-income rural housing in the face of increasing prepayments of mortgages by § 515 borrowers, Congress enacted the Emergency Low Income Housing Preservation Act of 1987 (ELIHPA), which amended the Housing Act of 1949 to impose permanent restrictions upon prepayment of § 515 mortgages entered into before December 21, 1979. On May 30, 1997, the *Franconia* petitioners filed suit under the Tucker Act, 28 U. S. C. § 1491, charging that ELIHPA abridged the absolute prepayment right set forth in their promissory notes and thereby effected, *inter alia,* a repudiation of their contracts. In dismissing petitioners' contract claims as untimely under § 2501-which provides that a claim "shall be barred unless the petition thereon is filed within six years after such claim first accrues" -the Court of Federal Claims concluded that the claims first

accrued on the ELIHPA regulations' effective date. In affirming on statute of limitations grounds, the Federal Circuit ruled that, if the Government's continuing duty to allow petitioners to prepay their loans was breached, the breach occurred immediately upon ELIHPA's enactment date, over nine years before petitioners filed their suit. The court rejected petitioners' argument that ELIHPA's passage qualified as a repudiation, so that their suit would be timely if filed within six years of either the date performance fell due (the date they tendered prepayment) or the date on which they elected to treat the repudiation as a present breach. On September 16, 1998, the *Grass Valley* petitioners filed an action that was virtually identical to the *Franconia* suit. The Court of Federal Claims dismissed for the

*Together with *Grass Valley Terrace et al.* v. *United States* (see this Court's Rule 12.4), also on certiorari to the same court.

130

reasons it had dismissed the *Franconia* claims, and the Federal Circuit affirmed without opinion.

*Held:* Because ELIHPA's enactment qualified as a repudiation of the parties' bargain, not a present breach of the loan agreements, breach would occur, and the six-year limitations period would commence to run, when a borrower tenders prepayment and the Government then dishonors its obligation to accept the tender and release its control over use of the property securing the loan. Pp. 141-149.

(a) Resolution of two threshold matters narrows the scope of the controversy. First, the requirement that the Government unequivocally waive its sovereign immunity is satisfied here because, once the United States waives immunity and does business with its citizens, it does so much as a party never cloaked with immunity. Cf. *Clearfield Trust Co.* v. *United States,* 318 U. S. 363, 369. Second, the Court, like the Government, accepts for purposes of this decision that the loan contracts guaranteed the absolute prepayment right petitioners allege. P. 141.

(b) Under applicable general contract law principles, whether petitioners' claims were filed "within six years after [they] first accrue[d]," § 2501, depends upon when the Government breached the prepayment undertaking stated in the promissory notes. In declaring ELIHPA a present breach of petitioners' loan contracts, the Federal Circuit reasoned that the Government had but one obligation under those agreements: to continue to allow borrowers the unfettered right to prepay their loans at any time. If that continuing duty was breached, the court maintained, the breach occurred *immediately,* totally, and definitively, when ELIHPA took away the borrowers' unfettered right to prepay. In so ruling, the court incorrectly characterized the performance allegedly due from the Government under the promissory notes. The Government's pledged performance is properly comprehended as an obligation to accept prepayment. Once the Government's obligation is thus correctly characterized, the decisions below lose force. A promisor's failure to perform at the time indicated for performance in the contract establishes an immediate breach. But the promisor's renunciation of a contractual duty *before* the time fixed in the contract for performance is a repudiation, which ripens into a breach prior to the time for performance only if the promisee elects to treat it as such, see *Roehm* v. *Horst,* 178 U. S. 1, 13. Viewed in this light, ELIHPA effected a repudiation of the FmHA loan contracts, not an immediate breach. ELIHPA conveyed the Government's announcement that it would not perform as represented in the promissory notes if and when, at some point in the future, petitioners

attempted to prepay their mortgages. Unless petitioners treated ELIHPA as a present breach by filing suit prior to the

131
**Full Text of Opinion**

**Disclaimer:** Official Supreme Court case law is only found in the print version of the United States Reports. Justia case law is provided for general informational purposes only, and may not reflect current legal developments, verdicts or settlements. We make no warranties or guarantees about the accuracy, completeness, or adequacy of the information contained on this site or information linked to from this site. Please check official sources.

Justia Annotations is a forum for attorneys to summarize, comment on, and analyze case law published on our site. Justia makes no guarantees or warranties that the annotations are accurate or reflect the current state of law, and no annotation is intended to be, nor should it be construed as, legal advice. Contacting Justia or any attorney through this site, via web form, email, or otherwise, does not create an attorney-client relationship.

Cornell Law School

Federal Rules of Civil Procedure › TITLE IX. SPECIAL PROCEEDINGS › Rule 72. Magistrate Judges: Pretrial Order

# Rule 72. Magistrate Judges: Pretrial Order

(a) NONDISPOSITIVE MATTERS. When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision. A party may serve and file objections to the order within 14 days after being served with a copy. A party may not assign as error a defect in the order not timely objected to. The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.

(b) DISPOSITIVE MOTIONS AND PRISONER PETITIONS.

(1) *Findings and Recommendations.* A magistrate judge must promptly conduct the required proceedings when assigned, without the parties' consent, to hear a pretrial matter dispositive of a claim or defense or a prisoner petition challenging the conditions of confinement. A record must be made of all evidentiary proceedings and may, at the magistrate judge's discretion, be made of any other proceedings. The magistrate judge must enter a recommended disposition, including, if appropriate, proposed findings of fact. The clerk must promptly mail a copy to each party.

(2) *Objections.* Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy. Unless the district judge orders otherwise, the objecting party must promptly arrange for transcribing the record, or whatever portions of it the parties agree to or the magistrate judge considers sufficient.

(3) *Resolving Objections.* The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

## NOTES

(As added Apr. 28, 1983, eff. Aug. 1, 1983; amended Apr. 30, 1991, eff. Dec. 1, 1991; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009.)

### NOTES OF ADVISORY COMMITTEE ON RULES—1983

*Subdivision (a).* This subdivision addresses court-ordered referrals of nondispositive matters under 28 U.S.C. §636(b)(1)(A). The rule calls for a written order of the magistrate's disposition to preserve the record and facilitate review. An oral order read into the record by the magistrate will satisfy this requirement.


United States Department of Justice

———— OFFICES *of* THE ————
# UNITED STATES ATTORNEYS

U.S. Attorneys » Resources » U.S. Attorneys' Manual » Criminal Resource Manual » CRM 1500-1999 » Criminal Resource Manual 1901-1999

## 1950. Federal Enforcement Of Child Support

Title 18, United States Code, Section 228, the Child Support Recovery Act of 1992 (CSRA), makes the willful failure to pay a past due support obligation with respect to a child residing in another State a Federal offense. A first violation of the CSRA is punishable by a maximum six months imprisonment and/or a fine. Subsequent violations are punishable by a maximum two years imprisonment and/or a fine.

Title IV-D of the Social Security Act, 42 U.S.C. §§ 651 *et seq.*, requires states to establish programs for the enforcement of child support. The agencies operating these programs are known as IV-D agencies and must pursue child support on behalf of individuals who are receiving public assistance as well as at the request of individuals who are not. IV-D agencies have a great deal of information concerning violations of the CSRA. U.S. Attorneys are encouraged to coordinate with IV-D officials or their designees and other appropriate officials on local and state levels to establish and/or update referral procedures, and may wish to establish local committees to develop guidelines and procedures, or draft and execute a Memorandum of Understanding to define the referral procedures and guidelines.

Complaints and referrals for investigation may also come from private lawyers, advocacy groups, or from individuals. These complainants should be strongly encouraged to pursue their available remedies, and to seek any subsequent referral for prosecution through the IV-D agency or other appropriate state or local agency.

It is recommended that U.S. Attorneys in multi-district states work together to develop a uniform state-wide approach to avoid marked differences in referral procedures and guidelines within the same state.

[cited in USAM 9-74.100]

‹ 1949. Nationality And Citizenship Offenses          up          1951. Elements Of The Offense Of Failure To Pay Child Support ›

Cornell Law School

U.S. Constitution › 11th Amendment

## 11th Amendment

# Amendment XI

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.

# Taxonomy upgrade extras

constitution

| ‹ Tenth Amendment | up | 12th Amendment › |

▷ ✕

About LII

Contact us

Advertise here

Help

Terms of use

Privacy

[LII]

8-1

## SECTION 8-CHILD SUPPORT ENFORCEMENT PROGRAM

## CONTENTS

**Background**
  **Overview**
  **Demographic Trends**
  **Program Trends**
**The Federal Role**
**The State Role**
**The Child Support Enforcement Process**
  **Locating Absent Parents**
  **Establishing Paternity**
  **Establishing Orders**
  **Reviewing and Modifying Orders**
  **Establishing and Enforcing Medical Support**
  **Collecting Child Support**
  **Interstate Enforcement**
  **Private Collection Activities**
**State Collection and Disbursement of Support Payments**
**Bankruptcy and Child Support Enforcement**
**Automated Systems**
**Audits and Financial Penalties**
**Assignment and Distribution of Child Support Collections**
  **Distribution of Payments While the Family Receives Public Assistance**
  **Distribution of Payments After the Family Leaves Public Assistance**
**Funding of State Programs**
**How Effective is Child Support Enforcement?**
  **Impact on Taxpayers**
  **Impact on Poverty**
  **Impact on National Child Support Payments**
**Legislative History**
  **104th Congress**
  **105th Congress**
  **106th Congress**
**Statistical Tables**
**References**



8-2
**BACKGROUND**

OVERVIEW

In 1950, when only a small minority of children were in female-headed families, the Federal Government took its first steps into the child support arena. Congress amended the Aid to Families with Dependent Children (AFDC) law by requiring State welfare agencies to notify law enforcement officials when benefits were being furnished to a child who had been abandoned by one of his or her parents. Presumably, local officials would then undertake to locate nonresident parents and make them pay child support. From 1950 to 1975, the Federal Government confined its child support efforts to these welfare children. With this exception, most Americans thought that child support establishment and collection was a domestic relations issue that should be dealt with at the State level by the courts.

By the early 1970s, however, Congress recognized that the composition of the AFDC caseload had changed drastically. In earlier years the majority of children needed financial assistance because their fathers had died; by the 1970s, the majority needed aid because their parents were separated, divorced, or never married. The Child Support Enforcement (CSE) and Paternity Establishment program, enacted in 1975, was a response by Congress to reduce public expenditures on welfare by obtaining support from noncustodial parents on an ongoing basis, to help non-AFDC families get support so they could stay off public assistance, and to establish paternity for children born outside marriage so child support could be obtained for them.

The 1975 legislation (Public Law 93-647) added a new part D to title IV of the Social Security Act. This statute, as amended, authorizes Federal matching funds to be used for enforcing support obligations by locating nonresident parents, establishing paternity, establishing child support awards, and collecting child support payments. Since 1981, child support agencies have also been permitted to collect spousal support on behalf of custodial parents, and in 1984 they were required to petition for medical support as part of most child support orders.

Basic responsibility for administering the program is left to States, but the Federal Government plays a major role in: dictating the major design features of State programs; funding, monitoring and evaluating State programs; providing technical assistance; and giving assistance to States in locating absent parents and obtaining support payments. The program requires the provision of child support enforcement (CSE) services for both welfare and nonwelfare families and requires States to publicize frequently, through public service announcements, the availability of child support enforcement services, together with information about the application fee and a telephone number or address to obtain additional information. Local family and domestic courts and administrative agencies handle

8-3

the actual establishment and enforcement of child support obligations according to Federal, State, and local laws.

The child support program generally does not provide services aimed at other issues between parents, such as property settlement, custody, and access to children. These issues are handled by local courts with the help of private attorneys.

Any parent who needs help in locating an absent parent, establishing paternity, establishing a support obligation, or enforcing a support obligation may apply for CSE services. Parents receiving benefits (or who formerly received benefits) under the successor program to AFDC (Temporary Assistance for Needy Families or TANF), the federally assisted foster care program, or the Medicaid Program, automatically receive CSE services. Services are free to such recipients, but others (i.e., nonwelfare clients) are charged up to $25 for services. States can charge fees based on a sliding scale, pay fees out of State funds, or recover the fees from the noncustodial parent.

In 1996, Public Law 104-193, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, abolished AFDC and related programs and replaced them with the TANF block grant program. Under the new law, each State must operate a CSE Program meeting Federal requirements in order to be eligible for TANF funds. In addition to abolishing AFDC, Public Law 104-193 made about 50 changes to the CSE Program, many of them major. These changes include requiring States to increase the percentage of noncustodial parents identified, establishing an integrated, automated network linking all States to information about the location and assets of parents, requiring States to implement more enforcement techniques, and revising the rules governing the distribution of past due (arrearage) child support payments to former recipients of public assistance.

## DEMOGRAPHIC TRENDS

The need for an effective child support program is clearly supported by a brief review of the demographic trends of the American family. By 2001, there were an estimated 11.5 million single-parent families with children under age 18; about 9.2 million (80 percent) were maintained by the mother and roughly 2.3 million by the father (Bureau of Labor Statistics and Census Bureau, 2002, Table 17). It appears that the rate of growth in the number of single parents has stabilized. The average annual percent increase in the number of one-parent families was 2.1 percent from 1990 to 2000 and 2.8 percent from 1980 to 1990 as compared with 8.9 percent from 1970 to 1980. In 2001, one-parent families comprised nearly 30 percent of all families. The corresponding share of single-parent families in 1970 was 11 percent. In 2000, about 43 percent of the mothers had never been married, 35 percent were divorced, 18 percent were separated from their spouse, and about 4 percent were widowed (U.S. Census Bureau, 2001, p. 8).

8-4

Of equal concern, dynamic estimates indicated that at least half of all children born in the United States during the late 1970s and early 1980s would live with a single parent before reaching adulthood. For black children, the projection was about 80 percent (Bumpass, 1984). Currently, about 27 percent of the 72 million children under age 18 living in the United States reside in a one-parent family. Although the number of families with a mother who has divorced has tripled since 1970, the number with a mother who has never married has increased almost sixteen-fold from 248,000 to 4,181,000. In these latter cases, paternity must be determined before the other parent has a legal obligation to financially support the child. The nearly 4.2 million families maintained by a never-married mother in 2000 represent a major concern because only about two-thirds of the children in these families have had their paternity established; for the other one-third, a child support obligation cannot be established until a paternity determination is made. Poverty is endemic among mother-headed families. In 2001, 33.6 percent of the 9.2 million families maintained solely by a mother with children under 18 had incomes below the poverty threshold (Bureau of Labor Statistics and Census Bureau, 2002, Table 17). About 11 percent of these families were poor despite the fact that the mother worked year round, full time. In sum, an unprecedented number of children live in single-parent homes, about 34 percent are poor, and many lack adequate or any support from the nonresident parent.

## PROGRAM TRENDS

In response to these demographic trends, the Federal-State child support program grew rapidly. By 2001, about 60 percent of all child support eligible families were actually receiving government funded child support services. Most of the information in this chapter applies to the families receiving these government services. Table 8-1 summarizes trends for the child support program since 1978. In 2002, $5.2 billion was spent by State child support programs to collect $20.1 billion in child support. The combined Federal-State program had 61,797 employees. A sum of $3.88 was collected for every dollar of administrative expense, up by about 34 percent from the low point of only $2.89 in 1982. In addition, in 2002 1.5 million paternities were established or acknowledged; almost 1.2 million support orders were established; and 7.8 million cases had collections. Moreover, in 2001 330,000 families were removed from TANF because of child support collections (Office of Child Support, 2003a).

These program trends demonstrate that more and more positive child support outcomes have been achieved by the Federal-State program. But whether these trends indicate program success is a complex matter that will be discussed in more detail below. We turn now to a detailed explanation of the Federal-State program and both its achievements and problems.

8-5
## THE FEDERAL ROLE

The Federal statute requires the national child support program to be administered by a separate organizational unit under the control of a person designated by and reporting directly to the Secretary of the U.S. Department of Health and Human Services (HHS). Presently, this office is known as the Federal Office of Child Support Enforcement (OCSE). The Family Support Act of 1988 required the appointment of an Assistant Secretary for Family Support within HHS to administer a number of programs, including the Child Support Enforcement program. Currently, this position is entitled the Assistant Secretary for the Administration for Children and Families.  A primary responsibility of the Assistant Secretary is to establish standards for State programs for locating absent parents, establishing paternity, and obtaining child support and support for the spouse (or former spouse) with whom the child is living. In addition to this broad statutory mandate, the Assistant Secretary is required to establish minimum organizational and staffing requirements for State child support agencies, and to review and approve State plans.

The statute also requires the Assistant Secretary to provide technical assistance to States to help them establish effective systems for collecting support and establishing paternity. To fulfill this requirement, OCSE operates a National Child Support Enforcement Reference Center as a central location for the collection and dissemination of information about State and local programs. OCSE also provides, under a contract with the American Bar Association Child Support Project, training and information dissemination on legal issues to persons working in the field of child support enforcement. Special initiatives, such as assisting major urban areas in improving program performance, also have been undertaken by OCSE.

The Child Support Enforcement Amendments of 1984 (Public Law 98-378) extended the research and demonstration authority in section 1115 of the Social Security Act to the Child Support Enforcement program. This authority makes it possible for States to test innovative approaches to support enforcement so long as the modification does not disadvantage children in need of support nor result in an increase in Federal TANF costs. The 1984 amendments also authorize $15 million for each fiscal year after 1986 for special project grants to promote improvement in interstate enforcement. In fiscal year 1999, 38 States had section 1115 grants or waivers which directly impacted child support: 6 States had waivers to implement models of collaboration among the CSE agency, Head Start Programs, and child care programs; 4 States had waivers to test new ways of reviewing and modifying orders; 4 States had waivers designed to improve CSE for Native Americans; 3 States had waivers to test different approaches to handling CSE cases with a history of domestic violence; 3 States had waivers to measure and improve CSE Program performance; and other States had waivers related to access and visitation,

TABLE 8-1--SUMMARY OF NATIONAL CHILD SUPPORT PROGRAM STATISTICS,
SELECTED FISCAL YEARS 1978-2002

[Numbers in Thousands, Dollars in Millions]

| Measure | 1978 | 1982 | 1986 | 1990 | 1994 | 1996 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total child support collections | 1,047 | 1,770 | 3,246 | 6,010 | 9,850 | 12,019 | 14,347 | 15,901 | 17,854 | 18,958 | 20,137 |
| In 2002 dollars [1] | 2,629 | 3,158 | 5,081 | 8,018 | 11,823 | 13,716 | 15,808 | 17,159 | 18,644 | 19,260 | 20,137 |
| Total TANF collections [2] | 472 | 786 | 1,225 | 1,750 | 2,550 | 2,855 | 2,649 | 2,482 | 2,593 | 2,592 | 2,893 |
| Federal | 311 | 311 | 369 | 533 | 762 | 888 | 960 | 922 | 968 | 895 | 950 |
| State | 148 | 354 | 424 | 620 | 891 | 1,013 | 1,089 | 1,048 | 1,080 | 1,004 | 1,180 |
| Total non-TANF collections | 575 | 984 | 2,019 | 4,260 | 7,300 | 9,164 | 11,698 | 13,419 | 15,261 | 16,366 | 17,244 |
| Total administrative expenditures | 312 | 612 | 941 | 1,606 | 2,556 | 3,049 | 3,584 | 4,039 | 4,526 | 4,835 | 5,183 |
| Federal | 236 | 459 | 633 | 1,061 | 1,741 | 2,040 | 2,385 | 2,680 | 3,006 | 3,222 | 3,432 |
| State | 76 | 153 | 308 | 545 | 816 | 1,015 | 1,199 | 1,359 | 1,519 | 1,613 | 1,752 |
| Federal incentive payments to States and localities | 54 | 107 | 173 | 258 | 374 | 410 | 385 | 361 | 391 | 413 | 450 |
| Average number of TANF cases in which a collection was made | 458 | 597 | 582 | 701 | 926 | 940 | 790 | 912 | 822 | 774 | 806 |
| Average number of non-TANF cases in which a collection was made | 249 | 448 | 786 | 1,363 | 3,169 | 2,618 | 3,071 | 5,688 | 6,409 | 6,687 | 7,013 |
| Number of parents located | 454 | 779 | 1,046 | 2,062 | 4,204 | 5,808 | 6,585 | NA | NA | NA | NA |
| Number of paternities established | 111 | 173 | 245 | 393 | 592 | 733 | 848 | 845 | 867 | 777 | 697 |
| Number of support obligations established | 315 | 462 | 731 | 1,022 | 1,025 | 1,093 | 1,148 | 1,220 | 1,175 | 1,181 | 1,220 |
| Percent of TANF assistance payments recovered through child support collections | NA | 6.8 | 8.6 | 10.3 | 12.5 | 15.5 | 20.0 | NA | NA | NA | NA |
| Total child support collections per dollar of total administrative expenses | 3.4 | 2.9 | 3.5 | 3.7 | 3.9 | 3.9 | 4.0 | 3.9 | 3.9 | 3.9 | 3.9 |

[1] Adjusted for inflation using the Consumer Price Index, research series for urban consumers (CPI-U-RS).

[2] TANF collections are divided into State/Federal shares and incentives are taken from the Federal share thereby reducing the Federal amounts.

NA - Not available.

Note-Paternities established do not include the paternities established through the In-Hospital Paternity Acknowledgment Program. In fiscal year 1994, 84,411 paternities were established in hospitals; 324,595 in fiscal year 1996; 614,081 in fiscal year 1998; 754,774 in fiscal year 1999; 687,349 in fiscal year 2000; 790,595 in fiscal year 2001; and 829,988 in fiscal year 2002.

Source:  Office of Child Support Enforcement, U.S. Department of Health and Human Services.  Data converted into 2002 dollars by the Congressional Research Service.

8-7

child support assurance, fatherhood initiatives, job training, parenting, interviewing and client referral, paternity establishment, and staffing standards.

The Assistant Secretary for Children and Families has full responsibility for the evaluation of the CSE Program. Pursuant to Public Law 104-193, States must annually review and report to the Secretary of HHS information adequate to determine the State's compliance with Federal requirements for expedited procedures, timely case processing, and improvement on the performance indicators. To measure the quality of the data reported by States and to assess the adequacy of financial management of the State program, the Secretary must conduct an audit of every State at least once every 3 years and more often if a State fails to meet Federal requirements. Under the audit's penalty provision, a State's TANF Block Grant must be reduced by an amount equal to at least 1 but not more than 2 percent for the first failure to comply substantially with the standards and requirements, at least 2 but not more than 3 percent for the second failure, and at least 3 but not more than 5 percent for the third and subsequent failures.

The 1996 welfare reform law set aside 1 percent of the Federal share of retained child support collections for information dissemination and technical assistance to States (including technical assistance related to automated systems), training of State and Federal staff, staffing studies, and related activities needed to improve the CSE Program, and research, demonstration, and special projects of regional or national significance relating to the operation of the CSE Program. An additional 2 percent of the Federal share of retained child support collections is set aside for the operation of the Federal Parent Locator Service (FPLS).

The statute creates several Federal mechanisms to assist States in performing their paternity and child support enforcement functions. These include use of the Internal Revenue Service (IRS), the Federal courts, and the FPLS. The Assistant Secretary must approve a State's application for permission to use the courts of the United States to enforce orders upon a finding that either another State has not enforced the court order of the originating State within a reasonable time or Federal courts are the only reasonable method of enforcing the order. Although Congress authorized the use of Federal courts to enforce interstate cases, this mechanism has gone unused, apparently because States view it as costly and complex.

Finally, the CSE statute requires the establishment of a FPLS to be used to find absent parents in order to secure and enforce child support obligations. The role of the FPLS was expanded by the 1996 welfare reform law. For purposes of establishing parentage; establishing, setting the amount of, modifying, or enforcing child support obligations; or enforcing child custody or visitation; the FPLS is to provide information to locate any individual: (1) who is under an obligation to pay child support or provide child custody or visitation rights; (2) against whom such an obligation is sought; or (3) to whom such an obligation is owed. Upon request, the Secretary of HHS must provide to an authorized person the most recent address and place of employment of any noncustodial parent if the information is contained

8-8

in the records of HHS or can be obtained from any other department or agency of the United States or of any State. Public Law 105-33, which was enacted in 1997 and made numerous changes to the 1996 welfare reform law, allows FPLS information to be disclosed to noncustodial parents except in cases where there is evidence of domestic violence or child abuse and the local court determines that disclosure may result in harm to the custodial parent or child. The Secretary also must make available the services of the FPLS to any State that wishes to locate a missing parent or child for the purpose of enforcing any Federal or State law involving the unlawful taking or restraint of a child or the establishment or maintenance of a child custody or visitation order.

Historically, the Federal Government held the view that visitation (also referred to as child access) and child support should be legally separate issues, and that only child support should be under the purview of the CSE Program. Both Federal and State policymakers have maintained that denial of visitation rights should be treated separately and should not be considered a reason for stopping support payments. Nonetheless, Census Bureau data indicate that it was more likely for noncustodial parents to make payments of child support if they had either joint custody or visitation rights. Thus, in order to promote visitation and better relations between custodial and noncustodial parents, the 1996 welfare reform law provided $10 million per year for grants to States for access and visitation programs, including mediation, counseling, education, and supervised visitation. In addition, as mentioned above, the 1996 law also expanded the scope of the FPLS to allow certain noncustodial parents to obtain information regarding the location of the custodial parent.

All States and territories applied for and received funding for access and visitation grants in fiscal year 2002. According to a preliminary report on the grant program (Office of Child Support, 2002b), most participating individuals received parenting education, help in developing parenting plans, and mediation services. Based on FY1999 data, nearly 47,000 individuals were served by the grant program in its first year of operation.

## THE STATE ROLE

The Social Security Act requires every State operating a TANF program to conduct a Child Support Enforcement program. Federal law requires applicants for, and recipients of, TANF to assign their support rights to the State in order to receive benefits. In addition, each applicant or recipient must cooperate with the State to establish the paternity of a child born outside marriage and to obtain child support payments.

TANF recipients or applicants may be excused from the requirement of cooperation if the CSE agency determines that good cause for noncooperation exists, taking into consideration the best interests of the child on whose behalf aid

8-9

is claimed. If good cause is found not to exist and if the relative with whom a child is living still refuses to cooperate, then the State must reduce the family's TANF benefit by at least 25 percent and may remove the family from the TANF program. (Federal law also stipulates that no TANF funds may be used for a family that includes a person who has not assigned child support rights to the State). Before the 1996 welfare reform law, cooperation could have been found to be against the best interests of the child if cooperation could be anticipated to result in physical or emotional harm to the child or caretaker relative; if the child was conceived as a result of incest or rape; or if legal procedures were underway for the child's adoption.

Unlike previous law, the 1996 welfare reform law provides States rather than the Federal Government with the authority to define "good cause" The law now requires States to develop both "good cause" and "other exceptions" to the cooperation requirement. The only restriction is that both the "good cause" and "other exceptions" must be based on the "best interests of the child." In addition to defining good cause and other exceptions, States must establish the standard for proving a claim. States also will have to decide which State agency will inform TANF caretaker relatives about the cooperation exemptions, and which agency will make the decision about the validity of a given claim. These responsibilities can be delegated to the State TANF agency, the CSE agency, or the Medicaid agency.

Each State is required to designate a single and separate organizational unit of State government to administer its child support program. Earlier child support legislation, enacted in 1967, had required that the program be administered by the welfare agency. The 1975 act deleted this requirement in order to give each State the opportunity to select the most effective administrative mechanism. Most States have placed the child support agency within a social or human services umbrella agency which also administers the TANF program. However, Alaska, Arkansas, Florida, and Massachusetts have placed the agency in the department of revenue and Guam, Hawaii, Texas, and the Virgin Islands have placed the agency in the office of the attorney general. The law allows the programs to be administered either at the State or local level. Ten programs are locally administered. A few programs are State administered in some counties and locally administered in others.

States must have plans, approved by the director of OCSE, which set forth the details of their child support program. States also must enter into cooperative arrangements with courts and law enforcement officials to assist the child support agency in administering the program. These agreements may include provision for reimbursing courts and law enforcement officials for their assistance. States also must operate a parent locator service to find absent parents, and they must maintain full records of collections and disbursements and otherwise maintain an adequate reporting system.

8-10

In order to facilitate the collection of support in interstate cases, a State must cooperate with other States in establishing paternity, locating absent parents, and securing compliance with an order issued by another State.

States are required to use several enforcement tools. They must use the IRS tax refund offset procedure for welfare and nonwelfare families, and they also must determine periodically whether any individuals receiving unemployment compensation owe child support. The State Employment Security Agency (part of the Federal-State Unemployment Compensation System), is required to withhold unemployment benefits, and to pay the child support agency any outstanding child support obligations established by an agreement with the individual or through legal processes.

Other enforcement techniques States must use include:

1. Imposing liens against real and personal property for amounts of overdue support;

2. Withholding State tax refunds payable to a parent who is delinquent in support payments;

3. Reporting the amount of overdue support to a consumer credit bureau upon request;

4. Requiring individuals who have demonstrated a pattern of delinquent payments to post a bond or give some other guarantee to secure payment of overdue support;

5. Establishing expedited processes within the State judicial system or under administrative processes for obtaining and enforcing child support orders and determining paternity. These expedited procedures include giving States authority to secure assets to satisfy payment of past-due support by seizing or attaching unemployment compensation, workers' compensation, judgments, settlements, lotteries, assets held in financial institutions, and public and private retirement funds;

6. Withholding, suspending, or restricting the use of driver's licenses, professional and occupational licenses, and recreational and sporting licenses of noncustodial parents who owe past-due support;

7. Denying passports to persons owing more than $5,000 in past-due support;

8. Requiring unemployed noncustodial parents who owe child support to a child receiving TANF benefits to participate in appropriate work activities;

9. Performing quarterly data matches with financial institutions; and

10. Voiding fraudulent transfers of assets to avoid payment of child support.

Each State's plan must provide that the child support agency will attempt to secure support for all TANF children. The State also must provide in its plan that it will undertake to establish the paternity of a TANF child born out of wedlock. These requirements apply to all cases except those in which the State finds, in

8-11

accordance with standards established by the Secretary of HHS, the best interests of the child would be violated. For families whose TANF eligibility ends due to the receipt of or an increase in child support, States must continue to provide CSE services without imposing the application fee.

Foster care agencies are required to take steps, where appropriate, to secure an assignment to the State of any rights to support on behalf of a child receiving foster care maintenance payments under title IV-E of the Social Security Act. State child support agencies also are required to petition to include medical support as part of any child support order whenever health care coverage is available to the noncustodial parent at a reasonable cost. And, if a family loses TANF eligibility as the result of increased collection of support payments, the State must continue to provide Medicaid benefits for 4 calendar months beginning with the month of ineligibility. In addition, States must provide services to families covered by Medicaid who are referred to the State IV-D agency from the State Medicaid agency.

With respect to non-TANF families, States must provide, once an application is filed with the State agency, the same child support collection and paternity determination services which are provided for TANF families. The State must charge non-TANF families an application fee of up to $25. States may charge the fee against the custodial parent, pay the fee out of State funds, or recover it from the noncustodial parent.

States also have the option of charging a late payment fee equal to between 3 and 6 percent of the amount of overdue support. Late payment fees may be charged to noncustodial parents and are to be collected only after the full amount of the support has been paid to the child. States also may recover costs in excess of the application fee from either the custodial or noncustodial parent. If a State chooses to make recovery from the custodial parent, it must have in effect a procedure whereby all persons in the State who have authority to order support are informed that such costs are to be collected from the custodial parent.

Child support enforcement services must include the enforcement of spousal support, but only if a support obligation has been established with respect to the spouse, the child and spouse are living in the same household, and child support is being collected along with spousal support. Finally, each State must comply with any other requirements and standards that the Secretary of HHS determines to be necessary to the establishment of an effective child support program.

## THE CHILD SUPPORT ENFORCEMENT PROCESS

The goal of the child support program is to combine these Federal and State responsibilities and activities into an efficient process that provides seven basic services: locating absent parents, establishing paternity, establishing child support orders, reviewing and modifying orders, establishing and enforcing medical

8-12

support, collecting and distributing support, and enforcing child support across State lines. Each of these services deserves extensive discussion.

## LOCATING ABSENT PARENTS

In pursuing cases, child support officials try to obtain a great deal of information and several documents from the custodial parent or other sources. These include the name and address of the noncustodial parent; the noncustodial parent's Social Security number (SSN); children's birth certificates; the child support order; the divorce decree or separation agreement; the name and address of the current or most recent employer of the noncustodial parent; the names of friends and relatives or organizations to which the noncustodial parent might belong; information about income and assets; and any other information about noncustodial parents that might help locate them. Once this information is provided, it is used in strictest confidence.

If the Child Support Enforcement program cannot locate the noncustodial parent with the information provided by the custodial parent, it must try to locate the noncustodial parent through the State parent locator service. The State uses various information sources such as telephone directories, motor vehicle registries, tax files, and employment and unemployment records. The State also can ask the FPLS to locate the noncustodial parent. The FPLS can access data from the Social Security Administration, the IRS, the Selective Service System, the Department of Defense, the Veterans Administration, the National Personnel Records Center, and State Employment Security Agencies. The FPLS provides SSNs, addresses, and employer and wage information to State and local child support agencies to establish and enforce child support orders.

The FPLS obtains employer addresses and wage and unemployment compensation information from the State employment security agencies. This information is very useful in helping child support officials work cases in which the custodial parent and children live in one State and the noncustodial parent lives or works in another State. Employment data are updated quarterly by employers reporting to their State employment security agency; unemployment data are updated continually from State unemployment compensation payment records.

The FPLS conducts weekly or biweekly matches with most of the agencies listed above. Each agency runs the cases against its data base and the names and SSNs that match are returned to FPLS and through FPLS to the requesting State or local child support office. During fiscal year 2001, the FPLS sent employment and address information to States on more than 4.8 million noncustodial parents and putative fathers.

Since October 1984, OCSE has participated in Project 1099 which provides State child support agencies access to all of the earned and unearned income information reported to IRS by employers and financial institutions. Project 1099,

8-13

named after the IRS form on which both earned and unearned income is reported, is a cooperative effort involving State child support agencies, the OCSE, and the IRS. Examples of reported earned and unearned incomes include: interest paid on savings accounts, stocks and bonds, and distribution of dividends and capital gains; rent or royalty payments; prizes, awards, or winnings; fees paid to directors or subcontractors; and unemployment compensation. The Project 1099 information is used to locate noncustodial parents and to verify income and employment. Project 1099 also helps locate additional nonwage income and assets of noncustodial parents who are employees as well as income and asset sources of self-employed and nonwage earning obligors. Project 1099 operations were suspended in 2002 as a result of escalating IRS costs for Project 1099 processing. OCSE indicated that given the benefits of the National Directory of New Hires and the Financial Institution Data Match program, States should re-evaluate their continuing need to obtain Project 1099 information and, if appropriate, revise the criteria they use to select cases for Project 1099 requests. OCSE recommended that cases not be submitted for Project 1099 matching until National Directory of New Hires and Financial Institution Data Match program comparisons were conducted and any hits received are reviewed for action. OCSE indicated that it would continue to analyze the costs and benefits of the Project 1099 data (OSCE, 2002a).

The SSN is the key piece of information around which the child support information system is constructed. Most computer searches need the SSN in order to operate effectively. Thus, in the 1996 welfare reform law and the amendments in the 1997 Balanced Budget Act (Public Law 105-33), Congress gave CSE agencies access to new sources for obtaining SSNs. Federal CSE law required States to implement procedures requiring that the SSN of any applicant for a professional, driver's, occupational, recreational, or marriage license be recorded on the application (but not on the face of the license itself). In addition, the 1996 law required that the SSN of any individual subject to a divorce decree, support order, or paternity determination or acknowledgment be placed in the records relating to the matter and that the SSN of any individual who has died be placed in the death records and recorded on the death certificate.

To further improve CSE's ability to locate absent parents, the 1996 law also required States to have automated registries of child support orders containing records of each case in which CSE services are being provided and each support order established or modified on or after October 1, 1998. Local registries could be linked to form the State registry. The State registry includes a record of the support owed under the order, arrearages, interest or late penalty charges, amounts collected, amounts distributed, child's date of birth, and any liens imposed. The registry also includes standardized information on both parents, such as name, SSN, date of birth, and case identification number.

8-14

In one of the most important child support reforms in recent years, the 1996 law required States, by October 1, 1997, to establish an automated directory of new hires containing information from employers, including Federal, State, and local governments and labor organizations, for each newly hired employee. The directory must include the name, address and SSN of the employee and the employer's name, address, and tax identification number. This information is to be supplied by employers to the State new hires directory within 20 days after the employee is hired. Within 3 business days after receipt of new hire information, the State directory of new hires is required to furnish the information to the National directory of new hires. The 1996 law also required the establishment of a Federal Case Registry of child support orders and a National Directory of New Hires. The Federal directories consist of abstracts of information from the State directories and are located in the FPLS. According to HHS, during fiscal year 2000 more than 642 million records were posted to the National Directory of New Hires, which matches child support orders to employment records. The Federal Case Registry maintained records involving more than 30 million individuals. The National Directory of New Hires information is compared with the Federal Case Registry to locate individuals who are involved in child support cases and live in a different State than their children. In fiscal year 2001, over 4 million noncustodial parents and putative fathers were located through the National Directory of New Hires.

The 1996 reforms allow all States to link up to an array of data bases and permits the FPLS to be used for the purpose of establishing parentage; establishing, setting the amount of, modifying, or enforcing child support obligations; or enforcing child custody or visitation orders. By May 1, 1998, a designated State agency must directly or by contract conduct automated comparisons of the SSNs reported by employers to the State directory of new hires and the SSNs of CSE cases that appear in the records of the State registry of child support orders. The Secretary of HHS is required to conduct similar comparisons of the Federal directories. When a match occurs, the State directory of new hires is required to report to the State CSE agency the name, date of birth, and SSN of the employee, and the name, address, and identification number of the employer. The CSE agency must, within 2 business days, instruct appropriate employers to withhold child support obligations from the employee's paycheck, unless the employee's income is not subject to withholding.

There are two exceptions to the immediate income withholding rule: (1) if one of the parties demonstrates, and the court (or administrative process) finds, that there is good cause not to require immediate withholding; or (2) if both parties agree in writing to an alternative arrangement. Employers must remit to the State disbursement unit income withheld within 7 business days after the employee's payday. States also are required to operate a centralized collection and disbursement unit that sends child support payments to custodial parents within 2 business days.

8-15
## ESTABLISHING PATERNITY

Paternity establishment is a prerequisite for obtaining a child support order. In 2002, 33.8 percent of children born in the United States were born to unmarried women. According to the OCSE, in fiscal year 2002 paternity was established for about 74 percent of the children who needed paternity established. Nonetheless, the CSE Program has made great strides in establishing paternity. Between 1994 and 2002, the number of paternities established or acknowledged increased from 592,000 to 1.5 million, a jump of about 156 percent.

Experts agree that the CSE Program must continue to improve paternity establishment. Without paternity established, children have no legal claim on their fathers' income. In addition to financial benefits, establishing paternity can provide social, psychological, and emotional benefits and in some cases the father's medical history may be needed to give a child proper care.

In the 1980s, legislation was enacted that contained provisions aimed at increasing the number of paternities established. Public Law 98-378, the Child Support Enforcement Amendments of 1984, required States to implement laws that permitted paternity to be established until a child's 18th birthday. Under the Family Support Act of 1988 (Public Law 100-485), States are required to initiate the establishment of paternity for all children under the age of 18, including those for whom an action to establish paternity was previously dismissed because of the existence of a statute of limitations of less than 18 years. The 1988 law encouraged States to create simple civil procedures for establishing paternity in contested cases, required States to have all parties in a contested paternity case take a genetic test upon the request of any party, required the Federal Government to pay 90 percent of the laboratory costs of these tests, and permitted States to charge persons not receiving Aid to Families with Dependent Children (AFDC) for the cost of establishing paternity. The 1988 law also set paternity establishment standards for the States and stipulated that each State was required, in administering any law involving the issuance of birth certificates, to require both parents to furnish their SSN unless the State found good cause for not doing so.

Congress took additional action to improve paternity establishment in the Omnibus Budget Reconciliation Act of 1993. This law required States to have in effect, by October 1, 1993, the following:

1.  A simple civil process for voluntarily acknowledging paternity under which the State must explain the rights and responsibilities of acknowledging paternity and afford due process safeguards. Procedures must include a hospital-based program for the voluntary acknowledgment of paternity during the period immediately preceding or following the birth of a child;

8-16

2. A law under which the voluntary acknowledgment of paternity creates a rebuttable, or at State option, conclusive presumption of paternity, and under which such voluntary acknowledgments are admissible as evidence of paternity;

3. A law under which the voluntary acknowledgment of paternity must be recognized as a basis for seeking a support order without requiring any further proceedings to establish paternity;

4. Procedures which provide that any objection to genetic testing results must be made in writing within a specified number of days prior to any hearing at which such results may be introduced in evidence; if no objection is made, the test results must be admissible as evidence of paternity without the need for foundation testimony or other proof of authenticity or accuracy;

5. A law which creates a rebuttable or, at the option of the State, conclusive presumption of paternity upon genetic testing results indicating a threshold probability of the alleged father's being the father of the child;

6. Procedures which require default orders in paternity cases upon a showing that process has been served on the defendant and whatever additional showing may be required by State law; and

7. Expedited processes for paternity establishment in contested cases and full faith and credit to determinations of paternity made by other States.

The 1993 reforms also revised the mandatory paternity establishment requirements imposed on States by the Family Support Act of 1988. The most notable provision increased the mandatory paternity establishment percentage, which was backed up by financial penalties linked to a reduction of Federal matching funds for the State's AFDC (now TANF) Program (see Audits and Financial Penalties section). The welfare reform law of 1996 further strengthened the Nation's paternity establishment system. More specifically, the 1996 law streamlined the paternity determination process; raised the paternity establishment requirement from 75 to 90 percent; implemented a simple civil process for establishing paternity; required a uniform affidavit to be completed by men voluntarily acknowledging paternity and entitled such affidavit to full faith and credit in any State; stipulated that a signed acknowledgment of paternity be considered a legal finding of paternity unless rescinded within 60 days and thereafter may be challenged in court only on the basis of fraud, duress, or material mistake of fact; and provided that no judicial or administrative action is needed to ratify an acknowledgment that is not challenged. The new law also required States to publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support.

Paternity acknowledgments must be filed with the State birth records agency. However, before a mother or alleged father can sign a paternity acknowledgment, each must be given notice (both orally and in writing) of the alternatives to, legal

8-17

consequences of, and rights and responsibilities arising from the signed acknowledgment. Moreover, in the case of unmarried parents, the father's name shall not appear on the birth certificate unless he has signed a voluntary acknowledgment or a court has issued an adjudication of paternity.

While employing these laws and procedures to establish paternity, States follow a predictable sequence of events. In cases for which paternity is not voluntarily acknowledged, the child support agency locates the alleged father and brings him to court or before an administrative agency where he can either acknowledge or dispute paternity. If he claims he is not the father, the court can require that he submit to parentage blood testing to establish the probability that he is the father. If the father denies paternity, a court usually decides the issue based on scientific and testimonial evidence. Through the use of testing techniques, a man may be excluded as a possible natural father, in which case no further action against him is warranted. Most States use one or more of several scientific methods for establishing paternity. These include: ABO blood typing system, human leukocyte antigen testing, red cell enzyme and serum protein electrophoresis, and deoxyribonucleic acid (DNA) testing.

The State CSE agency has the power (without the need for permission from a court or administrative tribunal) to order genetic tests in appropriate CSE cases. These CSE agencies also must recognize and enforce the ability of other State CSE agencies to take such actions. Moreover, genetic test results must be admissible as evidence so long as they are of a type generally acknowledged as reliable by accreditation bodies recognized by the U.S. Department of Health and Human Services (HHS) and performed by an entity approved by such an accredited body. Finally, in any case in which the CSE agency ordered the tests, the State must pay the initial costs. The State is allowed to recoup the cost from the father if paternity is established. If the original test result is contested, further testing can be ordered by the CSE agency if the contestant pays the cost in advance.

There are two types of testing procedures for paternity cases: (1) probability of exclusion tests, and (2) probability of paternity tests. Most laboratories perform probability of exclusion tests. This type of testing can determine with 90-99 percent accuracy that a man is "not" the father of a given child. There is a very high probability the test will exonerate a falsely accused man (Office of Child Support Enforcement, 1990).

Since the question of paternity is essentially a scientific one, it is important that the verification process include available advanced scientific technology. Experts now agree that use of the highly reliable DNA test greatly increases the likelihood of correct identification of putative fathers. DNA tests can be used either to exclude unlikely fathers or to establish a high likelihood that a given man is the father (Office of Child Support Enforcement, 1990, see pp. 59-74). One expert, speaking at a child support conference, summed up the effectiveness of DNA testing as follows:

8-18

The DNA fingerprinting technique promises far superior reliability than current blood grouping or human leukocyte antigen analyses. The probability of an unrelated individual sharing the same patterns is practically zero. The "DNA fingerprinting" test, developed in England in 1985, refines the favorable statistics to an even greater degree, reducing the probability that two unrelated individuals will have the same DNA fingerprint to one in a quadrillion (Georgeson, 1989, p. 568).

If the putative father is not excluded on the basis of the scientific test results, authorities may still conclude on the basis of witnesses, resemblance, and other evidence that they do not have sufficient evidence to establish paternity and, therefore, will drop charges against him. Tests resulting in nonexclusion also may serve to convince the putative father that he is, in fact, the father. If this occurs, a voluntary admission often leads to a formal court order. When authorities believe there is enough evidence to support the mother's allegation, but the putative father continues to deny the charges, the case proceeds to a formal adjudication of paternity in a court of law (McKillop, 1981, pp. 22-23). Using the results of the blood test and other evidence, the court or the child support agency, often through an administrative process, may dismiss the case or enter an order of paternity, a prerequisite to obtaining a court order requiring a noncustodial parent to pay support (U.S. General Accounting Office, 1987).

In recent years, a new phenomenon has occurred in the paternity establishment area called the "disestablishment" of paternity. New genetic testing capabilities have made identification of a biological father more accurate than ever before, prompting some parties to attempt to overcome presumptions or previous determinations of paternity by using genetic test results (OCSE, 2002c). During the last several years, advances in genetic testing have resulted in more instances of putative fathers substantiating their claim that they in fact are not the biological father of the child in question. In divorce cases in which the mother contends that her husband is not the father of her child and genetic tests verify her claim, but the husband nevertheless wants to maintain a parent-child relationship and continue the emotional and financial responsibilities of fatherhood, many courts considering the best interests of the child and the public have ruled in the ex-husbands favor, arguing that there is more to fatherhood than biology. In divorce cases in which the husband alleges that children of the marriage are not his and can substantiate his allegation with genetic testing results, some courts have ruled on behalf of the ex-husband, arguing that it is not fair to force a man to assume responsibility for a child to whom he has no biological connection. Other courts have not allowed husbands to raise the paternity issue at divorce, especially if the husband suspected adultery and failed to act, contending that it would not be in the best interest of the child or the public. Outcomes of such paternity disestablishment cases are varied among jurisdictions; so far, no national consensus has emerged.

8-19

In fiscal year 2002, 1,527,103 paternities were established or acknowledged. For the second time, paternity acknowledgments exceeded paternity establishments. In fiscal year 2002, 697,115 paternities were established or acknowledged through the CSE agencies and 829,988 paternities were acknowledged primarily through hospitals (see Table 8-1). While the percentage of children in the Child Support Enforcement program for whom paternity was established or acknowledged averaged 74.3 percent nationally in 2002, huge disparities exist among States. For example, the percentage of children in the CSE program for whom paternity was established or acknowledged in 2002 ranged from 32.4 percent in the District of Columbia to 101.2 percent in Utah (some paternities established are for children born in previous years).

## ESTABLISHING ORDERS

A child support order legally obligates noncustodial parents to provide financial support for their children and stipulates the amount of the obligation (current weekly obligation plus arrearages, if any) and how it is to be paid. Many States have statutes that provide that, in the absence of a child support award, the payment of Temporary Assistance for Needy Families (TANF) benefits to the child of a noncustodial parent creates a debt due from the parent or parents in the amount of the TANF benefit. Other States operate under the common law principle, which maintains that a father is obligated to reimburse any person who has provided his child with food, shelter, clothing, medical attention, or education. States can establish child support obligations either by judicial or administrative process.

*Judicial and administrative systems*

The courts have traditionally played a major role in the child support program. Judges establish orders, establish paternity, and provide authority for all enforcement activity. The child support literature generally concludes that the judicial process offers several advantages, especially by providing more adequate protection for the legal rights of the noncustodial parent and by offering a wide range of enforcement remedies, such as civil contempt and possible incarceration. A major problem of using courts, however, is that they are often cumbersome, expensive, and time consuming.

Thus, the advantages of an administrative process are very compelling. These include offering quicker service because documents do not have to be filed with the court clerk nor await the signature of the judge, eliminating time consuming problems in scheduling court appearances, providing a more uniform and consistent obligation amount, and saving money because of reduced court costs and attorney fees.

8-20

The 1984 child support amendments required States to limit the role of the courts significantly by implementing administrative or judicial expedited processes. States are required to have quasi-judicial or administrative systems to expedite the process for obtaining and enforcing a support order. Since 1993, States have been required to extend these expedited processes to paternity establishment.

Most child support officials view the growth of expedited administrative processes as an improvement in the child support program. An expedited judicial process is a legal process in effect under a State's judicial system that reduces the processing time of establishing and enforcing a support order. To expedite case processing, a "judge surrogate" is given authority to: take testimony and establish a record, evaluate and make initial decisions, enter default orders if the noncustodial parent does not respond to "notice" or other State "service of process" in a timely manner, accept voluntary acknowledgment of support liability and approve stipulated agreements to pay support. In addition, if the State establishes paternity using the expedited judicial process, the surrogate can accept voluntary acknowledgment of paternity. Judge surrogates are sometimes referred to as court masters, referees, hearing officers, commissioners, or presiding officers.

The purpose of an expedited administrative process is to increase effectiveness and meet specified processing times in child support cases and paternity actions. Federal regulations specify that 90 percent of cases must be processed within 3 months, 98 percent within 6 months, and 100 percent within 12 months.

The Federal regulations also contain additional requirements related to the expedited process. Proceedings conducted pursuant to either the expedited judicial or expedited administrative process must be presided over by an individual who is not a judge of the court. Orders established by expedited process must have the same force and effect under State law as orders established by full judicial process, although either process may provide that a judge first ratify the order. Within these broad limitations, each State is free to design an expedited process that is best suited to its administrative needs and legal traditions.

Under the 1996 welfare reform law, the expedited procedure rules were broadened to cover modification of support orders. The new law also required that State tribunals--whether quasijudicial or administrative--must have statewide jurisdiction over the parties and permit intrastate case transfers from one tribunal to another without the need to refile the case or reserve the respondent. In addition, once a support/paternity order is entered, the tribunal must require each party to file and periodically update certain information with both the tribunal and the State's child support case registry. This information includes the parent's SSN, residential and mailing addresses, telephone number, driver's license number, and employer's name, address, and telephone number.

8-21

Moreover, the 1996 reforms required States to adopt laws that give the CSE agency authority to initiate a series of expedited procedures without the necessity of obtaining an order from any other administrative agency or judicial tribunal. These actions include: ordering genetic testing; issuing subpoenas; requiring public and private employers and other entities to provide information on employment, compensation, and benefits or be subject to penalties; obtaining access to vital statistics, State and local tax records, real and personal property records, records of occupational and professional licenses, business records, employment security and public assistance records, motor vehicle records, corrections records, customer records of utilities and cable television companies pursuant to an administrative subpoena, and records of financial institutions; directing the obligor to make payments to the child support agency in public assistance or income withholding cases; ordering income withholding; securing assets to satisfy judgments and settlements; and increasing the monthly support due to make payments on arrearages.

*Determining the amount of support orders*

Before October 1989, the decision of how much a parent should pay for child support was left primarily to the discretion of the court. Typically, judges examined financial statements from mothers and fathers and established awards based on children's needs. The resulting awards varied greatly. Moreover, this case-by-case approach resulted in very low awards. As late as 1991, the average amount of child support received by custodial parents was $2,961, less than $250 per month.

In an attempt to increase the use of objective criteria, the 1984 child support amendments required each State to establish, by October 1987, guidelines for determining child support award amounts "by law or by judicial or administrative action"[1] and to make the guidelines available "to all judges and other officials who have the power to determine child support awards within the State." Federal regulations made the provision more specific: State child support guidelines must be based on specific descriptive and numeric criteria and result in a computation of the support obligation. The 1984 provision did not make the guidelines binding on judges and other officials who had the authority to establish child support obligations. However, the Family Support Act of 1988 required States to pass legislation making the State child support guidelines a "rebuttable presumption" in any judicial or administrative proceeding and establishing the amount of the order which results from the application of the State-established guidelines as the correct amount to be awarded.

---

[1] Fitzgerald v. Fitzgerald, No. 87-1259 (DC Ct. App. October 10, 1989): In October 1989, the District of Columbia Court of Appeals struck down child support guidelines adopted in October 1987 in response to the Federal requirement. The court held that the superior court committee that drafted the guidelines lacked authority to do so. It did not rule on the fairness of the guidelines, which awarded children a fixed fraction of the gross income of the noncustodial parent.

8-22

By requiring the States to establish child support guidelines, the Federal Government hoped to accomplish four main goals, each goal corresponding to the perceived problems of the common law method of determining child support: (1) increase the adequacy of child support awards; (2) increase the consistency and predictability of child support awards; (3) increase compliance through perceived fairness of child support awards; and (4) increase the ease of administration of child support cases (Morgan, 1996).

States generally use one of three basic types of guidelines to determine award amounts: "Income shares," which is based on the combined income of both parents (34 States); "percentage of income," in which the number of eligible children is used to determine a percentage of the noncustodial parents' income to be paid in child support (12 States); and "Melson-Delaware," which provides a minimum self-support reserve for parents before the cost of rearing the children is prorated between the parents to determine the award amount (Delaware, Hawaii, West Virginia). Two jurisdictions (the District of Columbia and Massachusetts) use variants of one or more of these three approaches (Williams, 1994; www.supportguidelines.com/links.html; see Table 8-23 below).

The income shares approach is designed to ensure that the children of divorced parents suffer the lowest possible decline in standard of living. The approach is intended to ensure that the child receives the same proportion of parental income that he would have received if the parents lived together. The first step in the income shares approach is to determine the combined income of the two parents. A percentage of that combined income, which varies by income level, is used to calculate a "primary support obligation." The percentages decline as income rises, although the absolute amount of the primary support obligation increases with income. Many States add child care costs and extraordinary medical expenses to the primary support obligation. The resulting total child support obligation is apportioned between the parents on the basis of their incomes. The noncustodial parent's share is the child support award (Office of Child Support, 1987, pp. 11 67-80).

Proponents of the income shares approach note that it reflects the economic presumption that as income increases, the percentage of income devoted to child care decreases, and explicitly considers the income of both parents in determining the support of the child.  They claim that the income share approach, more easily than the flat percentage model, can take into consideration adjustments for shared and split custody, health care needs, child care expenses, serial family development, and children's ages by the manipulation of income, add-ons and deductions and by then allocating these costs between the parents. Because these factors can be built into the income shares formula, there is less reason for deviation from the guideline's presumptive award. Limiting deviation meets the ideal of perceived fairness, as well as the Federal requirement that the number of cases in which deviation is granted be limited. Limited deviation also meets the goals of

8-23

consistency and predictability. Given that the ultimate goal of child support guidelines is increased compliance through perceived fairness, the income shares approach meets this goal (Morgan, 1996).

The percentage of income approach is based on the noncustodial parent's gross income and the number of children to be supported (the child support obligation is not adjusted for the income of the custodial parent). The percentages vary by State. In Wisconsin, child support is based on the following proportions of the noncustodial parent's gross income: one child--17 percent; two children--25 percent; three children--29 percent; four children--31 percent; and five or more children--34 percent. There is no self support reserve in this approach nor is there separate treatment for child care or extraordinary medical expenses. The States that use a percentage of income approach are Alaska, Arkansas, Georgia, Illinois, Iowa, Minnesota, Mississippi, Nevada, New York, North Dakota, Tennessee, Texas, and Wisconsin.

Proponents of the percentage of income approach contend that it is simpler, easier to learn, easier to explain, easier to computerize, and less prone to error. They note that although the percentage of income approach does not consider the custodial parent's income, neither does it impute income to the custodial parent (Morgan, 1996, Child Support Guidelines: Interpretation and Application).

The Melson-Delaware formula starts with net income.[2] After determining net income for each parent, a primary support allowance is subtracted from each parent's income. This reserve represents the minimum amount required for adults to meet their own subsistence requirements. The next step is to determine a primary support amount for each dependent child. Work-related child care expenses and extraordinary medical expenses are added to the child's primary support amount. The child's primary support needs are then apportioned between the parents. To ensure that children share in any additional income the parents might have, a percentage of the parents' remaining income is allocated among the children (the percentage is based on the number of dependent children). The States that use the Melson-Delaware approach are Delaware, Hawaii, and West Virginia.

Proponents of the Melson-Delaware approach claim that it is fairer than the other approaches because it is internally consistent. They contend that it takes into consideration not only special custody arrangements and health care needs, but each parent's needs as well. They maintain that the Melson-Delaware approach is consistent and predictable and not as complex as it appears at first glance (Morgan, 1996).

---

[2] Net income equals income from employment and other sources plus business expense accounts if they provide the parent with an automobile, lunches, etc., minus income taxes based on maximum allowable exemptions, other deductions required by law, deductions required by an employer or union, legitimate business expenses, and benefits such as medical insurance maintained for dependents.

8-24

Pirog, Klotz, and Buyers (1997) have examined the differences in child support guidelines across States. Their approach was to define five hypothetical cases of custodial mothers and noncustodial fathers that capture a range of differences in income, expenses, and other factors that influence the amount of child support payments computed under the guidelines adopted by the various States. State 1997 guidelines were then applied to each of the five cases to compute the amount of child support that would be due. In each of the five cases, the mother and father are divorced. The father lives alone while the mother lives with the couples' two children, ages 7 and 13. The father pays union dues of $30 per month and health insurance for the children of $25 per month. The mother incurs monthly employment-related child care expenses of $150. The monthly income of the fathers and mothers is:

Case A: father--$530; mother--$300
Case B: father--$720; mother--$480
Case C: father--$2,500; mother--$1,000
Case D: father--$4,400; mother--$1,760
Case E: father--$6,300; mother--$4,200.

Arguably, the most striking generalization that emerges from Table 8-2 is the remarkable differences across States in the amount of the child support obligation established by the guidelines, particularly at the lower income levels.

There is some agreement that there is no evidence that any one approach is superior to any other approach in terms of achieving the goals of increased compliance, consistency and predictability, and ease of administration. However, there is some evidence concerning adequacy of awards. One study indicates that the income shares model produces the highest awards for low-income families, the Melson-Delaware model produces the highest award for middle-income families, and the percentage of income model produces the highest awards in upper-income families (Morgan, 1996).

*Award rates*

In 2002, of the 13.5 million custodial parents of children under the age of 21 whose other parent was not living in the household, only 7.9 million or 59 percent had a child support award. Of all custodial parents, 84 percent were mothers and 16 percent were fathers. About 63 percent of custodial mothers and 39 percent of custodial fathers had child support awards. About 40 percent of the 5.9 million custodial parents without awards chose not to pursue a child support award. In other cases, custodial parents were unable to locate the noncustodial parent, had a nonlegal agreement with the noncustodial parent, or believed that the noncustodial parent was unable to pay.

Never-married custodial parents were the group least likely to have a child support award. Only 52 percent of never-married custodial mothers had support awards compared with 72 percent of divorced custodial mothers. Moreover, black

8-25

custodial mothers and custodial mothers of Hispanic origin were much less likely than their white counterparts to have child support awards. About 67 percent of whites had child support awards, compared with 54 percent of blacks and 52 percent of Hispanics (U.S. Census Bureau, 2003).

*Unresolved issues*

As noted by Garfinkel, Melli, and Robertson (1994), there are a host of controversial issues associated with child support awards. These include whether child care costs, extraordinary medical expenses, and college costs are taken into account in determining the support order; how the income of the noncustodial parent is allocated between first and subsequent families;[3] how the income of stepparents is treated; whether a minimum child support award level regardless of age or circumstance of the noncustodial parent should be imposed; and the duration of the support order (i.e., does the support obligation end when the child reaches age 18; what happens to arrearages).

[3]Traditionally, the courts have taken the position that the father's prior child support obligations take absolute precedence over the needs of the new family. They have disregarded the father's plea that his new responsibilities are a "change in circumstance" justifying a reduction in a prior child support award or at east averting an increase.

TABLE 8-2--AMOUNT OF CHILD SUPPORT AWARDED BY STATE GUIDELINES IN VARIOUS CASES

| State | Case | | | | |
|---|---|---|---|---|---|
| | A | B | C | D | E |
| Alabama | $216 | $280 | $433 | $634 | 1 |
| Alaska | 38 | 38 | 312 | 546 | $1,193 |
| Arizona | 1 | 75 | 482 | 628 | 1,061 |
| Arkansas | 1 | 150 | 305 | 475 | 1,025 |
| California | 236 | 278 | 478 | 770 | 1,457 |
| Colorado | 231 | 261 | 409 | 610 | 1,066 |
| Connecticut | 0 | 0 | 404 | 703 | 1,198 |
| Delaware | 91 | 91 | 467 | 626 | 1,157 |
| District of Columbia | 50 | 208 | 458 | 821 | 1,495 |
| Florida | 135 | 261 | 463 | 721 | 1,186 |
| Georgia | 210 | 210 | 383 | 673 | 1,607 |
| Hawaii | 100 | 100 | 470 | 610 | 1,260 |
| Idaho | 122 | 166 | 345 | 566 | 913 |
| Illinois | 102 | 136 | 294 | 485 | 1,020 |
| Indiana | 215 | 327 | 692 | 899 | 1,462 |
| Iowa | 50 | 189 | 358 | 566 | 1,047 |
| Kansas | 188 | 227 | 390 | 582 | 1,195 |
| Kentucky | 221 | 293 | 445 | 637 | 1,017 |
| Louisiana | 207 | 292 | 451 | 667 | 1,052 |
| Maine | 52 | 290 | 437 | 619 | 1,031 |
| Maryland | 249 | 295 | 449 | 655 | 1,060 |
| Massachusetts | 1 | 137 | 471 | 789 | 1 |
| Michigan | 128 | 141 | 468 | 657 | 1,078 |
| Minnesota | 62 | 84 | 376 | 606 | 1,228 |
| Mississippi | 92 | 124 | 251 | 427 | 908 |

8-26

TABLE 8-2--AMOUNT OF CHILD SUPPORT AWARDED BY STATE
GUIDELINES IN VARIOUS CASES-continued

| State | Case | | | | |
|-------|------|------|------|------|------|
| | A | B | C | D | E |
| Missouri | 149 | 265 | 447 | 609 | 1,032 |
| Montana | 6 | 15 | 26 | 456 | 908 |
| Nebraska | 50 | 50 | 390 | 677 | 1,035 |
| Nevada | 200 | 180 | 375 | 660 | 1,575 |
| New Hampshire | 50 | 50 | 424 | 667 | 1,473 |
| New Jersey | 112 | 267 | 452 | 710 | [1] |
| New Mexico | 183 | 291 | 468 | 588 | 1,095 |
| New York | 25 | 50 | 436 | 699 | 1,548 |
| North Carolina | 50 | 57 | 463 | 600 | 1,012 |
| North Dakota | 68 | 126 | 356 | 582 | 1,231 |
| Ohio | 150 | 278 | 465 | 609 | 1,045 |
| Oklahoma | 171 | 171 | 295 | 415 | 801 |
| Oregon | 73 | 159 | 343 | 587 | 1,027 |
| Pennsylvania | [1] | 257 | 415 | 554 | [1] |
| Rhode Island | 252 | 315 | 480 | 677 | 1,170 |
| South Carolina | 58 | 183 | 463 | 574 | 1,000 |
| South Dakota | 275 | 275 | 486 | 652 | 1,032 |
| Tennessee | 153 | 200 | 393 | 665 | 1,422 |
| Texas | 109 | 147 | 298 | 517 | 1,114 |
| Utah | 83 | 131 | 447 | 616 | [1] |
| Vermont | [1] | [1] | 428 | 642 | 1,025 |
| Virginia | 231 | 289 | 446 | 641 | 1,042 |
| Washington | 50 | 50 | 412 | 641 | 1,054 |
| West Virginia | 50 | 117 | 364 | 539 | 1,742 |
| Wisconsin | 133 | 180 | 375 | 660 | 1,575 |
| Wyoming | 105 | 200 | 348 | 519 | 882 |

[1] In these cases, courts have the discretion to set the amount that seems appropriate to the court.
Note: See text for explanation of cases A, B, C, D, and E.
Source: Pirog, Klotz, & Buyers, 1997.

## REVIEWING AND MODIFYING ORDERS

Without periodic modifications, child support obligations can become inadequate and inequitable. Historically, the only way to modify a child support order was to require a party to petition the court for a modification based on a "change in circumstances." What constituted a change in circumstances sufficient to modify the order depended on the State and the court. The person requesting modification was responsible for filing the motion, serving notice, hiring a lawyer, and proving a change in circumstances of sufficient magnitude to satisfy statutory standards. The modification proceeding was a two step process. First the court determined whether a modification was appropriate. Next, the amount of the new obligation was determined.

Because this approach to updating orders was so cumbersome, the Family Support Act of 1988 required States both to use guidelines as a rebuttable presumption in all proceedings for the award of child support and to review and

8-27

adjust child support orders in accordance with the guidelines. These provisions reflected congressional intent to simplify the updating of support orders by requiring a process in which the standard for modification was the State child support guidelines. They also reflect a recognition that the traditional burden of proof for changing the amount of the support order was a barrier to updating. Finally, the 1988 law signaled a need for States to at least expand, if not replace, the traditional "change in circumstances" test as the legal prerequisite for updating support orders by making State guidelines the presumptively correct amount of support to be paid (Federal Register, 1992, p. 61560).

The Family Support Act also required States to review guidelines at least once every 4 years and have procedures for review and adjustment of orders, consistent with a plan indicating how and when child support orders are to be reviewed and adjusted. Review may take place at the request of either parent subject to the order or at the request of a State child support agency. Any adjustment to the award must be consistent with the State's guidelines, which must be used as a rebuttable presumption in establishing or adjusting the support order. The Family Support Act also required States to review all orders being enforced under the child support program within 36 months after establishment or after the most recent review of the order and to adjust the order in accord with the State's guidelines.

Review is required in child support cases in which support rights are assigned to the State, unless the State has determined that review would not be in the best interests of the child and neither parent has requested a review. This provision applies to child support orders in cases in which benefits under the TANF, foster care, or Medicaid Programs are currently being provided, but does not include orders for former TANF, foster care, or Medicaid cases, even if the State retains an assignment of support rights for arrearages that accumulated during the time the family was on welfare. In child support cases in which there is no current assignment of support rights to the State, review is required at least once every 36 months only if a parent requests it. If the review indicates that adjustment of the support amount is appropriate, the State must proceed to adjust the award accordingly.

The Family Support Act also required States to notify parents in cases being enforced by the State of their right to request a review, of their right to be informed of the forthcoming review at least 30 days before the review begins, and of any proposed adjustment or determination that there should be no change in the award amount. In the latter case, the parent must be given at least 30 days after notification to initiate proceedings to challenge the proposed adjustment or determination.

The 1996 welfare reform law somewhat revised the review and modification requirements. The mandatory 3-year review of child support orders was slightly modified to permit States some flexibility in determining which reviews of welfare

8-28

cases should be pursued and in choosing methods of review. States must review orders every 3 years (or more often at State option) if either parent or the State requests a review in welfare cases or if either parent requests a review in nonwelfare cases. States must notify parents of their review and adjustment rights at least once every 3 years. States can use one of three different methods for adjusting orders: (1) the child support guidelines (i.e., current law); (2) an inflation adjustment in accordance with a formula developed by the State; or (3) an automated method to identify orders eligible for review followed by an appropriate adjustment to the order, not to exceed any threshold amount determined by the State. If either an inflation adjustment or an automated method is used, the State must allow either parent to contest the adjustment.

Especially during the early 1980s, a major issue in the modification of awards was the practice of retroactive modifications. The vast majority of such retroactive modifications had the effect of reducing the amount of child support ordered. Thus, for example, an order for $200 a month for child support, which was unpaid for 36 months, should accumulate an arrearage of $7,200. Yet, if the obligor was brought to court, having made no prior attempt to modify the order, the order might be reduced to $100 a month retroactive to 36 months prior to the date of modification. This retroactive modification would reduce the arrearage from $7,200 to $3,600. Cases such as this, which had serious impacts on custodial parents and their children, convinced Congress to take action.

Thus, in 1986 Congress enacted section 9103 of Public Law 99-509 (section 466(a)(9) of the Social Security Act) to change State practices involving modification of child support arrears. The provision required States to change their laws so that any payment of child support, on and after the date due, is a "judgment" (the official decision or finding of a court on the respective rights and claims of the parties to an action) by operation of law. The provision also required that the judgment be entitled to full faith and credit in the originating State and in any other State. Full faith and credit is a constitutional principle that the various States must recognize the judgments of other States within the United States and accord them the force and effect they would have in their home State.

The 1986 provision also greatly restricted retroactive modification to make it more difficult for courts and administrative entities to forgive or reduce arrearages. More specifically, orders can be retroactively modified only for a period during which there is pending a petition for modification and only from the date that notice of the petition has been given to the custodial or noncustodial parent.

8-29

## ESTABLISHING AND ENFORCING MEDICAL SUPPORT

Medical support is the legal provision of payment of medical, dental, prescription, and other health care expenses. The requirement for medical child support is a part of all child support orders (administered by CSE agencies), and it only pertains to the parent's dependent children. It can include provisions to cover health insurance costs as well as cash payments for unreimbursed medical expenses. Medical support can take several forms. The noncustodial parent may be ordered to: (1) provide health insurance if available through the noncustodial parent's employer; (2) pay for private health insurance (health care coverage) premiums or reimbursement to the custodial parent for all or a portion of the costs of health insurance obtained by the custodial parent; or (3) pay additional amounts to cover a portion of ongoing medical bills as reimbursement for uninsured medical costs.

The first connection between medical support and child support came as an attempt to recoup the costs of Medicaid provided to public assistance families under Title XIX of the Social Security Act. Two years after creation of the IV-D program, the Medicare/Medicaid Antifraud and Abuse Amendments of 1977 established a medical support enforcement program that allowed States to require that Medicaid applicants assign their rights to medical support. Further, in an effort to cover children by private insurance instead of public programs, when available, it permitted IV-D and Medicaid agencies to enter into cooperative agreements to pursue medical child support assigned to the State. Also, State IV-D agencies were required to notify Medicaid agencies when private family health coverage was either obtained or discontinued for a Medicaid-eligible person.

Section 16 of Public Law 98-378, enacted in 1984, required the Secretary of HHS to issue regulations to require that State child support agencies petition for the inclusion of medical support as part of any child support order whenever health care coverage is available to the noncustodial parent at reasonable cost. According to Federal regulations, any employment-related or other group coverage is considered reasonable, under the assumption that health insurance is inexpensive to the employee/noncustodial parent. A 1993 study by Cooper and Johnson that analyzed 1987 data from the Center for Health Expenditures and Insurance Studies indicated that for workers with income below the poverty line and employer-provided family health insurance coverage, 77 percent of the premium was paid for by the employer.

On October 16, 1985, the OCSE published regulations amending previous regulations and implementing section 16 of Public Law 98-378. The regulations required State child support agencies to obtain basic medical support information and provide this information to the State Medicaid agency. The purpose of medical support enforcement is to expand the number of children for whom private health insurance coverage is obtained by increasing the availability of third party

8-30

resources to pay for medical care and thereby reduce Medicaid costs for both the States and the Federal Government. If the custodial parent does not have satisfactory health insurance coverage, the child support agency must petition the court or administrative authority to include medical support in new or modified support orders and inform the State Medicaid agency of any new or modified support orders that include a medical support obligation. The regulations also required child support agencies to enforce medical support that has been ordered by a court or administrative process. States receive child support matching funds at the 66-percent rate for required medical support activities. Before these regulations were issued, medical support activities were pursued by child support agencies only under optional cooperative agreements with Medicaid agencies.

Some of the functions that the child support agency may perform under a cooperative agreement with the Medicaid agency include: receiving referrals from the Medicaid agency, locating noncustodial parents, establishing paternity, determining whether the noncustodial parent has a health insurance policy or plan that covers the child, obtaining sufficient information about the health insurance policy or plan to permit the filing of a claim with the insurer, filing a claim with the insurer or transmitting the necessary information to the Medicaid agency, securing health insurance coverage through court or administrative order, and recovering amounts necessary to reimburse medical assistance payments.

On September 16, 1988, OCSE issued regulations expanding the medical support enforcement provisions. These regulations required the child support agency to develop criteria to identify existing child support cases that have a high potential for obtaining medical support, and to petition the court or administrative authority to modify support orders to include medical support for these cases even if no other modification is anticipated. The child support agency also is required to provide the custodial parent with information regarding the health insurance coverage obtained by the noncustodial parent for the child. Moreover, the regulation deleted the condition that child support agencies may secure health insurance coverage under a cooperative agreement only when it will not reduce the noncustodial parent's ability to pay child support.

Before late 1993, employees covered under their employer's health care plans generally could provide coverage to children only if the children lived with the employee. However, as a result of divorce proceedings, employees often lost custody of their children but were nonetheless required to provide their health care coverage. While the employee would be obliged to follow the court's directive, the employer that sponsored the employee's health care plan was under no similar obligation. Even if the court ordered the employer to continue health care coverage for the nonresident child of their employee, the employer would be under no legal obligation to do so (Shulman, 1994, pp. 1-2). Aware of this situation, Congress took the following legislative action in the Omnibus Budget Reconciliation Act of 1993:

8-31

1. Insurers were prohibited from denying enrollment of a child under the health insurance coverage of the child's parent on the grounds that the child was born out of wedlock, is not claimed as a dependent on the parent's Federal income tax return, or does not reside with the parent or in the insurer's service area;

2. Insurers and employers were required, in any case in which a parent is required by court order to provide health coverage for a child and the child is otherwise eligible for family health coverage through the insurer: (a) to permit the parent, without regard to any enrollment season restrictions, to enroll the child under such family coverage; (b) if the parent fails to provide health insurance coverage for a child, to enroll the child upon application by the child's other parent or the State child support or Medicaid agency; and (c) with respect to employers, not to disenroll the child unless there is satisfactory written evidence that the order is no longer in effect or the child is or will be enrolled in comparable health coverage through another insurer that will take effect not later than the effective date of the disenrollment;

3. Employers doing business in the State, if they offer health insurance and if a court order is in effect, were required to withhold from the employee's compensation the employee's share of premiums for health insurance and to pay that share to the insurer. The Secretary of HHS may provide by regulation for such exceptions to this requirement (and other requirements described above that apply to employers) as the Secretary determines necessary to ensure compliance with an order, or with the limits on withholding that are specified in section 303(b) of the Consumer Credit Protection Act;

4. Insurers were prohibited from imposing requirements on a State agency acting as an agent or assignee of an individual eligible for medical assistance that are different from requirements applicable to an agent or assignee of any other individual;

5. Insurers were required, in the case of a child who has coverage through the insurer of a noncustodial parent to: (a) provide the custodial parent with the information necessary for the child to obtain benefits; (b) permit the custodial parent (or provider, with the custodial parent's approval) to submit claims for covered services without the approval of the noncustodial parent; and (c) make payment on claims directly to the custodial parent, the provider, or the State agency; and

6. The State Medicaid agency was permitted to garnish the wages, salary, or other employment income of, and to withhold State tax refunds to, any person who: (a) is required by court or administrative order to provide health insurance coverage to an individual eligible for Medicaid; (b) has received payment from a third party for the costs of medical services to

8-32

that individual; and (c) has not reimbursed either the individual or the provider. The amount subject to garnishment or withholding is the amount required to reimburse the State agency for expenditures for costs of medical services provided under the Medicaid Program. Claims for current or past due child support take priority over any claims for the costs of medical services.

These provisions do not appear to be having much of an impact on the number of children in single-parent families with medical coverage. According to OCSE data, in 2001, only 49 percent of child support orders included health insurance coverage and the health insurance order was complied with in only 18 percent of the cases. These figures indicate that many children still lack coverage. One way to increase medical support may be to require withholding of health insurance premiums in all cases with medical support orders (Gordon, 1994).

Under the 1996 welfare reform legislation, the definition of "medical child support order" in the Employee Retirement Income Security Act (ERISA) was expanded to clarify that any judgment, decree, or order that is issued by a court or by an administrative process has the force and effect of law. In addition, the new law stipulates that all orders enforced by the State CSE agency must include a provision for health care coverage. If the noncustodial parent changes jobs and the new employer provides health coverage, the State must send notice of coverage to the new employer; the notice must serve to enroll the child in the health plan of the new employer.

Public Law 105-200, enacted in 1998, provided for a uniform manner for States to inform employers about their need to enroll the children of noncustodial parents in employer-sponsored health plans. It required the CSE agency to use a standardized national medical support notice (developed by HHS and the Department of Labor) to communicate to employers the issuance of a medical support order. Employers are required to accept the form as a "qualified medical support order" under ERISA. States were required to begin using the national medical support notice in October 2001, although many States had to delay implementation until enactment of required State enabling legislation. (In April 2003 only about half of the States were using the national medical support notice.) An appropriately completed national medical support notice is considered to be a "Qualified Medical Child Support Order" and as such must be honored by the employers group health plan.

## COLLECTING CHILD SUPPORT

Local courts and child support enforcement agencies attempt to collect child support when the noncustodial parent does not pay. The most important collection method is wage withholding. Other techniques for enforcing payments include regular billings; delinquency notices; liens on property; offset of unemployment

8-33

compensation payments; seizure and sale of property; reporting arrearages to credit agencies; garnishment of wages; seizure of State and Federal income tax refunds; revocation of various types of licenses (drivers', business, occupational, recreational) to persons who are delinquent in their child support payments; attachment of lottery winnings and insurance settlements of debtor parents; and Federal imprisonment, fines or both.

In addition to approaches authorized by the Federal Government through the child support program, States use a variety of other collection techniques. In fact, States have been at the forefront in implementing innovative approaches. Some States hire private collection agencies to collect child support payments. Some States bring charges of criminal nonsupport or civil or criminal contempt of court against noncustodial parents who fail to pay child support. These court proceedings are usually lengthy because of court backlogs, delays, and continuances. Once a court decides the case, noncustodial parents are often given probation or suspended sentences, and occasionally they are even awarded lower support payments and partial payment of arrearages. To combat problems associated with court delays, the child support statute requires States to implement expedited processes under the State judicial system or State administrative processes for obtaining and enforcing support orders.

Given the pivotal role of collections in the child support process, this section now turns to detailed discussion of the most effective collections procedures. Summary data on the effectiveness of four top collection methods are presented in Table 8-3.

*Wage withholding*

The Family Support Act of 1988 greatly expanded wage withholding by requiring immediate withholding to begin in November 1990 for all new or modified orders being enforced by States. Equally important, States were required, with some exceptions, to implement immediate wage withholding in all support orders initially issued on or after January 1, 1994, regardless of whether a parent has applied for child support services.

The child support amendments of 1984 also required that States have in effect two distinct procedures for withholding wages of noncustodial parents. First, for existing cases enforced through the child support agency, States were required to impose wage withholding whenever an arrearage accrued that was equal to the amount of support payable for 1 month. Second, for all child support cases, all new or modified orders were required to include a provision for wage withholding when an arrearage occurs. The intent of the second procedure was to ensure that orders not enforced through the child support agency contain the authority necessary to permit wage withholding to be initiated by someone other than the child support agency if and when an arrearage occurs.

TABLE 8-3–CHILD SUPPORT COLLECTIONS MADE BY VARIOUS ENFORCEMENT TECHNIQUES,
SELECTED FISCAL YEARS 1989-2002

[In Millions of Dollars]

| Enforcement Technique | Child Support Collections | | | | | | Percent of Total Collections | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1989 | 1995 | 1997 | 2000 | 2001 | 2002 | 1989 | 1995 | 1997 | 2000 | 2001 | 2002 |
| Income withholding | $2,144 | $6,111 | $7,472 | $12,968 | $14,583 | $15,467 | 40.9 | 56.9 | 55.9 | 62.0 | 64.8 | 65.0 |
| Federal income tax offset | 411 | 734 | 1,015 | 1,328 | 1,485 | 1,497 | 7.9 | 6.8 | 7.6 | 6.3 | 6.6 | 6.3 |
| State income tax offset | 62 | 97 | 120 | 208 | 216 | 210 | 1.2 | 0.9 | 0.9 | 1.0 | 1.0 | 0.9 |
| Unemployment compensation intercept | 54 | 187 | 207 | 260 | 338 | 577 | 1.0 | 1.7 | 1.5 | 1.2 | 1.5 | 2.4 |
| Other [1] | 2,570 | 3,624 | 4,549 | 5,109 | 5,900 | 6,044 | 49.0 | 33.7 | 34.0 | 29.5 | 26.2 | 25.4 |
| Total collections | 5,241 | 10,753 | 13,363 | 19,873 | 22,522 | 23,795 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

[1] The Office of Child Support Enforcement (OCSE) does not designate the source of most of these collections. According to the OCSE, the majority of collections in the "other" category came from noncustodial parents who were complying with their support orders by sending their payments to the child support agency. OCSE officials maintain that reliability of collection data lessen when specified by techniques of collection.

Note: Income withholding includes CSE and non-CSE collections. In 2002, approximately $3.7 billion were non-CSE collections from income withholding.

Source: Office of Child Support Enforcement, U.S. Department of Health and Human Services.

8-34

8-35

According to the Federal statute, State due process requirements govern the scope of notice that must be provided to an obligor (i.e. noncustodial parent) when withholding is triggered. As a general rule, the noncustodial parent is entitled to advance notice of the withholding procedure. This notice, where required, must inform the noncustodial parent of the following: the amount that will be withheld; the application of withholding to any current or subsequent period of employment; the procedures available for contesting the withholding and the sole basis for objection (i.e., mistake of fact); the period allotted to contest the withholding and the result of failure to contact the State within this timeframe (i.e., issuance of notification to the employer to begin withholding); and the steps the State will take if the noncustodial parent contests the withholding, including the procedure to resolve such contests.

If the noncustodial parent contests the withholding notice, the State must conduct a hearing, determine if the withholding is valid, notify the noncustodial parent of the decision, and notify the employer to commence the deductions if withholding is upheld. All of this must occur within 45 days of the initial notice of withholding. Whether a State uses a judicial or an administrative process, the only basis for a hearing is a factual mistake about the amount owed (current, arrearage or both) or the identity of the noncustodial parent.

When withholding is uncontested or when a contested case is resolved in favor of withholding, the administering agency must serve a withholding notice on the employer. The employer is required to withhold as much of the noncustodial parent's wages as is necessary to comply with the order, including the current support amount plus an amount to be applied toward liquidation of any arrearage. In addition, the employer may retain a fee to offset the administrative cost of implementing withholding. Employer fees per wage withholding transaction range from nothing to $2 per month to $2 per pay period to $5 per remittance to $10 per month to 2 percent of the remittance (Automatic Data Processing, Inc., 2001).

The Federal Consumer Credit Protection Act limits garnishment to 50 percent of disposable earnings for a noncustodial parent who is the head of a household, and 60 percent for a noncustodial parent who is not supporting a second family. These percentages increase by 5 percentage points, to 55 and 65 percent respectively, when the arrearages represent support that was due more than 12 weeks before the current pay period.

Upon receiving a withholding notice, the employer must begin withholding the appropriate amount of the obligor's wages no later than the first pay period that occurs after 14 days following the date the notice was mailed. The 1984 amendments regulate the language in State statutes on the other rights and liabilities of the employer. For instance, the employer is subject to a fine for discharging a noncustodial parent or taking other forms of retaliation as a result of a withholding order. In addition, the employer is held liable for amounts not withheld as directed.

8-36

In addition to being able to charge the noncustodial parent a fee for the administrative costs associated with wage withholding, the employer can combine all support payments required to be withheld for multiple obligors into a single payment and forward it to the child support agency or court with a list of the cases to which the payments apply. The employer need not vary from the normal pay and disbursement cycle to comply with withholding orders; however, support payments must be forwarded to the State or other designated agency within 10 days of the date on which the noncustodial parent is paid.

When the noncustodial parent changes jobs, the previous employer must notify the court or agency that entered the withholding order. The State must then notify the new employer or income source to begin withholding from the obligor's wages. In addition, States must develop procedures to terminate income withholding orders when all of the children are emancipated and no arrearage exists.

Federal law provides three exceptions to the income withholding rule: (1) if one of the parents demonstrates, and the court (or administrative process) finds, that there is good cause not to require immediate income withholding, (2) if both parents agree in writing to an alternative payment arrangement, or (3) at the HHS Secretary's discretion, if a State can demonstrate that the rule will not increase the effectiveness or efficiency of the State's CSE Program. For income withholding purposes, ``income'' means any periodic form of payment due an individual, regardless of source, including wages, salaries, commissions, bonuses, workers' compensation, disability, payments from a pension or retirement program, and interest.

As shown in Table 8-3, the congressional emphasis on wage withholding has paid off handsomely. The total amount of support collected through wage withholding has increased each year, reaching $15.5 billion in 2002 (however, about $3.7 billion was from non-CSE collections from wage withholding); the percentage of total collections achieved through wage withholding has also increased, reaching 65 percent in 2002.

*Federal income tax refund offset*

Under this program, the Internal Revenue Service (IRS), operating on request from a State filed through the Secretary of HHS, simply intercepts tax returns and deducts the amount of certified child support arrearages. The money is then sent to the State for distribution. Since the enactment of the Omnibus Budget Reconciliation Act of 1981 (Public Law 97-35), IRS has been able to withhold past due support from Federal tax refunds upon a simple showing by the State that an individual owes at least $150 in past due support which has been assigned to the State as a condition of Aid to Families with Dependent Children (AFDC), now TANF, eligibility. The withheld amount is sent to the State agency, together with notice of the taxpayer's current address.

8-37

The 1984 amendments (P.L. 98-378) created a similar IRS Offset Program for non-AFDC families owed child support. States must submit to the IRS for withholding the names of absent parents who have arrearages of at least $500 and who, on the basis of current payment patterns and the enforcement efforts that have been made, are unlikely to pay the arrearage before the IRS offset can occur. The law established specific notice requirements and mandated that the noncustodial parent and his spouse (if any) be informed of the impending use of the tax offset procedure. The purpose of this notice is to protect the unobligated spouse's portion of the tax refund. The 1988 provision applied to refunds payable after December 31, 1985, and before January 1, 1991. Public Law 101-508, enacted in 1990, made permanent the IRS Offset Program for non-AFDC families.

In tax year 2002, according to HHS, more than 1.4 million cases were offset. The total amount intercepted was about $1.5 billion, up by a factor of well over four since 1986 ($308 million).

*State income tax refund offset*

The child support amendments of 1984 mandated that States increase the effectiveness of the child support program by, among other things, enacting several collection procedures. Among the required procedures is the interception of State income tax refunds payable to noncustodial parents up to the amount of overdue support. As in the case of liens and bonds, this procedure need not be used in cases found inappropriate under State guidelines.

In order for the State tax refund offset to work effectively, cooperation between the State's department of revenue and the child support agency is crucial. The names and Social Security numbers (SSNs) of delinquent noncustodial parents are submitted to the department of revenue for matching with tax return forms. If a match occurs and a refund is due, the refund or a portion of it is transferred from the State department of revenue to the child support agency and then credited to the appropriate noncustodial parent to offset his support debt. The child support agency must give advance notice of the impending offset to the noncustodial parent and also must inform him of the process for contesting and resolving the proposed action. If the custodial parent does not respond to the notice, the money is intercepted and forwarded to the child support agency for distribution.

In fiscal year 2002, the State Tax Intercept Program collected $210 million (Table 8-3). Unlike the Federal program, which requires that States certify a specified amount before the offset can be applied ($150 for TANF families and $500 for non-TANF families), States choose their own level for certification. In many States, the amount is the same for both TANF and non-TANF families. Although the amounts vary greatly from State to State, the certification amount in the typical State is about $100.

8-38

*Unemployment compensation intercept*

Public Law 97-35, the Omnibus Budget Reconciliation Act of 1981, required State child support agencies to determine on a periodic basis whether individuals receiving unemployment compensation owe support obligations that are not being met. The act also required child support agencies to enforce support obligations in accord with State-developed guidelines for obtaining an agreement with the individual to have a specified amount of support withheld from unemployment compensation or, in the absence of an agreement, for bringing legal proceedings to require the withholding. The child support agency must reimburse the State employment security agency for the administrative costs attributable to withholding unemployment compensation. The unemployment compensation intercept collected $577 million in fiscal year 2002 (Table 8-3). A number of States, especially those with high levels of unemployment, are finding that the unemployment offset procedure can raise collections significantly.

*Property liens*

A lien is a legal claim on someone's property as security against a just debt. The use of liens for child support enforcement was characterized during congressional debate on the child support amendments of 1984 as "simple to execute and cost effective and a catalyst for an absent parent to pay past due support in order to clear title to the property in question" (U.S. House, 1983). The House report also stated that liens would complement the income withholding provisions of the 1984 law and be particularly helpful in enforcing support payments owed by noncustodial parents with substantial assets or income but who are not salaried employees.

The 1984 legislation required States to enact laws and implement "procedures under which liens are imposed against real property for amount of overdue support owed by an absent parent who resides or owns property in the State." Liens can apply to property such as land, vehicles, houses, antique furniture, and livestock. The law provides, however, that States need not use liens in cases in which, on the basis of guidelines that generally are available to the public, they determine that lien procedures would be inappropriate. This provision implicitly requires States to develop guidelines about use of liens.

Generally, a lien for delinquent child support is a statutorily created mechanism by which an obligee obtains a nonpossessory interest in property belonging to the noncustodial parent. The interest of the custodial parent is a slumbering interest that allows the noncustodial parent to retain possession of the property, but affects the noncustodial parent's ability to sell the property or transfer ownership to anyone else. A child support lien converts the custodial parent from an unsecured to a secured creditor. As such, it gives the custodial parent priority over unsecured creditors and subsequent secured creditors. In some States a lien is established automatically upon entry of a support order and the first incidence of

8-39

noncompliance by the obligor. Frequently, the mere imposition of a lien will motivate the delinquent parent to pay past-due support to remove the lien. When this is not the case, it may become necessary to enforce the lien. Liens are not self-executory. If a lien exists, a debtor must satisfy the judgment before the property may be sold or transferred. However, it is not necessary for the obligee to wait until the obligor tries to transfer the property before taking action. The obligee may enforce her judgment by execution and levy against the property if she believes the amount of equity in the property justifies execution.

A procedure developed by the IRS, known as Project 1099 (that is, the number of the IRS form used), has helped several States increase their use of liens by identifying individuals who possess appropriate assets. Initiated in 1984 to assist in location efforts, since the fall of 1988 Project 1099 has routinely provided wage and employer information as well as location and asset information on noncustodial parents. As noted earlier, Project 1099 operations were suspended in 2002; OSCE contends that the use of the National Directory of New Hires and the Financial Institution Data Match program are a more effective use of CSE resources.

The welfare reform legislation passed in 1996 (Public Law 104-193) required States to have procedures under which liens arise by operation of law against property for the amount of the past-due support. States must grant full faith and credit to liens of other States if the originating State agency or party has complied with procedural rules relating to the recording or serving of lien.

*Bonds, securities, and other guarantees*

The 1984 child support amendments required States to have in effect and use procedures under which noncustodial parents must post security, bond, or some other guarantee to secure payment of overdue child support. This technique is useful where significant assets exist although the noncustodial parent's income is sporadic, seasonal, or derived from self-employment. As in the case of liens, this procedure need not be used in cases found inappropriate under State guidelines. The State guidelines should define and target assets that can appropriately be sought to secure or guarantee payment without hindering the noncustodial parent from effectively pursuing his livelihood.

*IRS full collection process*

Since 1975, Congress has authorized the IRS to collect certain child support arrearages as if they were delinquent Federal taxes. This method is known as the IRS full collection process. It works as follows: The Secretary of HHS must, upon the request of a State, certify to the Secretary of Treasury any amounts identified by the State as delinquent child support. The Secretary of HHS may certify only the amounts delinquent under a court or administrative order, and only upon a showing by the State that it has made diligent and reasonable efforts to collect amounts due using its own collection mechanisms. States must reimburse the Federal

8-43

*Other provisions*

A February 27, 1995 Executive order established the executive branch of the Federal Government, including its civilian employees and the uniformed services members, as a model employer in promoting and facilitating the establishment and enforcement of child support. The Executive order states that the Federal Government is the Nation's largest single employer and as such should set an example of leadership and encouragement in ensuring that all children are properly supported. Among other measures, the order requires Federal agencies and the uniformed services to cooperate fully in efforts to establish paternity and child support orders and to enforce the collection of child and medical support. The order also requires Federal agencies to provide information to their personnel concerning the services that are available to them and to ensure that their children are provided the support to which they are legally entitled (Office of Child Support, 1995a).

The 1996 welfare reform law required States to implement expedited procedures to secure assets to satisfy arrearages by intercepting or seizing periodic or lump sum payments (such as unemployment and workers compensation), lottery winnings, awards, judgments, or settlements. States also must have expedited procedures to seize assets of the debtor parent held by public or private retirement funds and financial institutions.

## INTERSTATE ENFORCEMENT

The most difficult child support orders to enforce are interstate cases. States are required to cooperate in interstate child support enforcement, but problems arise from the autonomy of local courts. Family law traditionally has been under the jurisdiction of State and local governments, and citizens fall under the jurisdiction of the courts where they live.

During the 1930s and 1940s, such laws were used to establish and enforce support obligations when the noncustodial parent, custodial parent, and child lived in the same State. But when noncustodial parents lived out of State, enforcing child support was cumbersome and ineffective. Often the only option in these cases was to extradite the noncustodial parent and, when successful, to jail the person for nonsupport. This procedure, rarely used, generally punished the irresponsible parent, but left the abandoned family without financial support.

A University of Michigan study (Hill, 1988) of separated parents found that 12 percent lived in different States 1 year after divorce or separation. That proportion increased to 25 percent after 3 years, and to 40 percent after 8 years. Estimates based on the Federal income tax refund offset and other sources suggest that approximately 30 percent of all child support cases involve interstate residency of the custodial and noncustodial parents (Weaver & Williams, 1989, p. 510). According to the U.S. Census Bureau (1999) data, 13 percent of noncustodial

8-40

Government for any costs involved in making the collections. This full collection process is used only when there is a good chance that the IRS can make a collection and only for cases in which a child support obligation is delinquent and the amount owed has been certified to be at least $750. Use by the States of this regular IRS collection mechanism, which may include seizure of property, freezing of accounts, and use of other aggressive procedures, has been relatively infrequent. In fiscal year 1998, collections were made in 477 cases nationwide, for a total collection of $230,417. In fiscal year 2000, collections were made in 240 cases nationwide, for a total collection of $192,935.

### Withholding of passports and various types of licenses

The 1996 welfare reform law required States to implement procedures under which the State would have authority to withhold, suspend, or restrict use of driver's licenses, professional and occupational licenses, and recreational and sporting licenses of persons who owe past-due support or who fail to comply with subpoenas or warrants relating to paternity or child support proceedings. The law also authorized the Secretary of State to deny, revoke, or restrict passports of debtor parents whose child support arrearages exceed $5,000. According to HHS, in fiscal year 2000, the passport denial program collected more than $6.5 million in lump sum child support payments and currently is denying about 60 passports daily to delinquent noncustodial parents.

### Credit bureau reporting

The 1984 Federal child support legislation required States to develop procedures for providing child support debt information to credit reporting agencies (sometimes referred to as credit bureaus). The primary purposes for reporting delinquent child support payers to credit reporting agencies are to discourage noncustodial parents from not making their child support payments, to prevent the undeserved extension of credit, and to maintain the noncustodial parent's ability to pay his child support obligation. Other benefits include access by child support agencies to address, employment, and asset information.

The 1984 amendments required States to report overdue child support obligations exceeding $1,000 to consumer reporting agencies if such information is requested by the credit bureau. States have the option of reporting in cases in which the noncustodial parent is less than $1,000 in arrears. States must provide noncustodial parents with advance notice of intent to release information on their child support arrearage and an opportunity for them to contest the accuracy of the information. The child support agency may charge the credit bureau a fee for the information.

Public Law 102-537, the Ted Weiss Child Support Enforcement Act of 1992, amended the Fair Credit Reporting Act to require consumer credit reporting agencies to include in any consumer report information on child support delinquencies. The information is provided by or verified by State or local child

8-41

support agencies. Public Law 103-432, enacted in October 1994, included a provision that requires States to periodically report to consumer reporting agencies the name of parents owing at least 2 months of overdue child support, and the amount of the child support overdue.

In order to facilitate the access of child support officials to credit information, the 1996 welfare reform legislation stated that, in response to a request by the head of a State or local CSE agency or other authorized official, consumer credit agencies must release information if the person making the request makes all of the following certifications: that the consumer report is needed to establish an individual's capacity to make child support payments or determine the level of payments; that paternity has been established or acknowledged; that the consumer has been given at least 10 days notice by certified or registered mail that the report is being requested; and that the consumer report will be kept confidential, will be used solely for child support purposes, and will not be used in connection with any other civil, administrative, or criminal proceeding or for any other purpose. Consumer reporting agencies also must give reports to a CSE agency for use in setting an initial or modified award. These provisions amended the Fair Credit Reporting Act.

The 1996 law also required States to periodically report to consumer reporting agencies the name of any noncustodial parent who is delinquent in the payment of support and the amount of past-due support owed by the parent. Before such a report can be sent, the obligor must have been afforded all due process rights, including notice and reasonable opportunity to contest the claim of child support delinquency.

*Enforcement against Federal employees*

The 1975 child support legislation included a provision allowing garnishment of wages and other payments by the Federal Government for enforcement of child support and alimony obligations. The law also provided that moneys payable by the United States to any individual for employment are subject to legal proceedings brought for the enforcement of child support or alimony. The law sets forth in detail the procedures that must be followed for service of legal process and specifies that the term "based upon remuneration for employment" includes wages, periodic benefits for the payment of pensions, retirement pay including Social Security, and other kinds of Federal payments.

The 1996 welfare reform law substantially revised child support enforcement for Federal employees, including retirees and military personnel. As under prior law, Federal employees are subject to income withholding and other actions taken against them by State CSE agencies. However, every Federal agency is responsible for responding to a State CSE Program as if the Federal agency were a private business. The head of each Federal agency must designate an agent, whose name and address must be published annually in the Federal Register, to be responsible

8-42

for handling child support cases. The agency must respond to withholding notices and other matters brought to its attention by CSE officials. Child support claims are given priority in the allocation of Federal employee income.

### Enforcement against military personnel

Child support enforcement workers face unique difficulties when working on cases in which the absent parent is an active duty member of the military service. Learning to work through military channels can prove both challenging and frustrating, especially if the child support agency is not near a military base. As a result, military cases are often ignored or not given sufficient attention (Office of Child Support, 1991).

Public Law 97-248, the Tax Equity and Fiscal Responsibility Act of 1982, required allotments from the pay and allowances of any active duty member of the uniformed service who fails to make child or spousal support payments. This requirement arises when the service member fails to make support payments in an amount at least equal to the value of 2 months' worth of support. Provisions of the Federal Consumer Credit Protection Act apply, limiting the percentage of the member's pay that is subject to allotment. The amount of the allotment is the amount of the support payment, as established under a legally enforceable administrative or judicial order.

Since October 1, 1995, the Department of Defense has consolidated its garnishment operations at the Defense Finance and Accounting Service in Cleveland, Ohio. Support orders received by the Service are processed immediately and notices are sent to the appropriate military pay center to start payments in the first pay cycle (Office of Child Support, 1995c).

As a result of the 1996 welfare reform law, the Secretary of Defense must establish a central personnel locator service, which must be updated on a regular basis, that permits location of every member of the Armed Services. The Secretary of each branch of the military service must grant leave to facilitate attendance at child support hearings and other child support proceedings. The Secretary of each branch also must withhold support from retirement pay and forward it to State disbursement units.

### Small business loans

The Small Business Administration Reauthorization and Amendments Act of 1994 (Public Law 103-403), which included the requirement that recipients of financial assistance from the Small Business Administration, including direct loans and loan guarantees, must certify that the recipient is not more than 60 days delinquent in the payment of child support.

8-44

parents lived in a different State than their children, 3 percent lived overseas, and the residence of 10 percent of the noncustodial parents was unknown. According to an OCSE Information Memorandum dated January 22, 2003, the interstate caseload is about 25 percent of the total CSE caseload.

*Uniform Reciprocal Enforcement of Support Act (URESA)*

Starting in 1950, interstate cooperation was promoted through the adoption by the States of URESA. This act, which first was proposed by the National Conference of Commissioners on Uniform State Laws in 1950, has been enacted in all 50 States, the District of Columbia, Guam, Puerto Rico, and the Virgin Islands. The act was amended in 1952 and 1958 and revised in 1968. Thus, even though every State has passed some provisions of URESA, many provisions vary from State to State. URESA, in short, is uniform in name only.

The purpose of URESA was to provide a system for the interstate enforcement of support orders without requiring the person seeking support to go (or have her legal representative go) to the State in which the noncustodial parent resided. Where the URESA provisions between the two States are compatible, the law can be used to establish paternity, locate an absent parent, and establish, modify, or enforce a support order across State lines. However, some observers note that the use of URESA procedures often resulted in lower orders for both current support and arrearages. They also contend that few child support agencies attempted to use URESA procedures to establish paternity or to obtain a modification in a support order.

*Long arm statutes*

Unlike URESA, interstate cases established or enforced by long arm statutes use the court system in the State of the custodial parent rather than that of the noncustodial parent. When a person commits certain acts in a State of which he is not a resident, that person may be subjecting himself to the jurisdiction of that State. The long arm of the law of the State where the event occurs may reach out to grab the out-of-State person so that issues relating to the event may be resolved where it happened. Under the long arm procedure, the State must authorize by statute that the acts allegedly committed by the defendant are those that subject the defendant to the State's jurisdiction. An example is a paternity statute stating that if conception takes place in the State and the child lives in the State, the State may exercise jurisdiction over the alleged father even if he lives in another State. Long arm statute language usually extends the State's jurisdiction over an out-of-State defendant to the maximum extent permitted by the U.S. Constitution under the 14th amendment's due process clause. Long arm statutes may be used to establish paternity, establish support awards, and enforce support orders.

8-45

*Federal courts*

The 1975 child support law mandated that the State plan for child support require States to cooperate with other States in establishing paternity, locating absent parents, and securing compliance with court orders. Further, it authorized the use of Federal courts as a last resort to enforce an existing order in another State if that State were uncooperative.

Section 460 of the Social Security Act provides that the district courts of the United States shall have jurisdiction, without regard to any amount in controversy, to hear and determine any civil action certified by the Secretary of HHS under section 452(a)(8) of the act. A civil action under section 460 may be brought in any judicial district in which the claim arose, the plaintiff resides, or the defendant resides.   Section 452(a)(8) states that the Secretary of HHS shall receive applications from States for permission to use the courts of the United States to enforce court orders for support against noncustodial parents. The Secretary must approve applications if he finds both that a given State has not enforced a court order of another State within a reasonable time and that using the Federal courts is the only reasonable method of enforcing the order.

As a condition of obtaining certification from the Secretary, the child support agency of the initiating State must give the child support agency of the responding State at least 60 days to enforce the order as well as a 30-day warning of its intent to seek enforcement in Federal court. If the initiating State receives no response within the 30-day limit, or if the response is unsatisfactory, the initiating State may apply to the Office of Child Support Enforcement (OCSE) Regional Office for certification. The application must attest that all the requirements outlined above have been satisfied. Upon certification of the case, a civil action may be filed in the U.S. district court. Although this interstate enforcement procedure has been available since enactment of the child support program in 1975, there has been only one reported case of its use by a State (the initiating State was California; the responding State was Texas).

*Interstate income withholding*

Interstate income withholding is a process by which the State of the custodial parent seeks the help of the State in which the noncustodial parent's income is earned to enforce a support order using the income withholding mechanism. Pursuant to the child support amendments of 1984, income withholding was authorized for all valid instate or out-of-State orders issued or modified after October 1, 1985, and for all orders being enforced by the IV-D program, regardless of the date the order was issued. Although Federal law requires a State to enforce another State's valid orders through interstate withholding, there is no Federal mandate that interstate income withholding procedures be uniform. Approaches vary from the Model Interstate Income Withholding Act to URESA registration. The preferred way to handle an interstate income withholding request is to use the

8-46

interstate action transmittal form from one child support agency to another. In child support enforcement cases, Federal regulations required that by August 22, 1988, all interstate income withholding requests be sent to the enforcing State's central registry for referral to the appropriate State or local official. The actual wage withholding procedure used by the State in which the noncustodial parent lives is the same as that used in intrastate cases. In a 1992 report (U.S. General Accounting Office, 1992a, p. 4 & pp. 21-28), GAO indicated that the main reason for the failure of interstate income withholding was the lack of uniformity in its implementation.

The 1996 welfare law required the HHS Secretary, in consultation with State CSE directors, to issue forms by October 1, 1996 that States must use for income withholding, for imposing liens, and for issuing administrative subpoenas in interstate cases. States were required to begin using the forms by March 1, 1997.

*Full faith and credit*

One of the most significant barriers to improved interstate collections is that, because a child support order is not considered a final judgment, the full faith and credit clause of the U.S. Constitution does not preclude modification. Thus, the order is subject to modification upon a showing of changed circumstances by the issuing court or by another court with jurisdiction. Congress could prohibit inter- or intrastate modifications of child support orders, but many students of child support hold that a complete ban on modifications would be unrealistic and unfair. A more likely approach would be one under which States were required to give full faith and credit to each other's child support orders under most circumstances.

The Omnibus Budget Reconciliation Act of 1986, Public Law 99-509, took a step in this direction by requiring States to treat past due support obligations as final judgments entitled to full faith and credit in every State. Thus, a person who has a support order in one State does not have to obtain a second order in another State to obtain the money due should the debtor parent move from the issuing court's jurisdiction. The second State can modify the order prospectively if it finds that circumstances exist to justify a change, but the second State may not retroactively modify a child support order.

Public Law 103-383, the Full Faith and Credit for Child Support Orders Act of 1994, restricted a State court's ability to modify a child support order issued by another State unless the child and the custodial parent have moved to the State where the modification is sought or have agreed to the modification.

The full faith and credit rules of the 1996 welfare reform law clarified the definition of a child's home State, made several revisions to ensure that the rules can be applied consistently with the Uniform Interstate Family Support Act (UIFSA), and clarified the rules regarding which child support order States must honor when there is more than one order.

8-47

*Federal criminal penalties*

The Child Support Recovery Act of 1992 imposed a Federal criminal penalty for the willful failure to pay a past due child support obligation to a child who resides in another State and that has remained unpaid for longer than a year or is greater than $5,000. For the first conviction, the penalty is a fine of up to $5,000, imprisonment for not more than 6 months, or both; for a second conviction, the penalty is a fine of not more than $250,000, imprisonment for up to 2 years, or both.

In response to concerns of law enforcement officials and prosecutors that the 1992 law did not adequately address more serious instances of nonpayment of child support obligations, Congress passed the Deadbeat Parents Punishment Act of 1998 (Public Law 105-187). The law establishes two new categories of felony offenses, subject to a 2-year maximum prison term. The offenses are: (1) traveling in interstate or foreign commerce with the intent to evade a support obligation if the obligation has remained unpaid for more than 1 year or is greater than $5,000; and (2) willfully failing to pay a child support obligation regarding a child residing in another State if the obligation has remained unpaid for more than 2 years or is greater than $10,000. According to the U.S. Department of Health and Human Services (HHS), the Nation's criminal child support enforcement initiative, "Project Save Our Children," which began in 1998 has received and reviewed over 4,600 potential criminal nonsupport cases referred by State and county CSE agencies resulting in 273 federal arrests, 173 criminal convictions, and the payment of nearly $8 million in past-due child support payments (2002 data). In addition, 315 arrests have been made at the State level, resulting in 277 criminal convictions or civil adjudications and $10.7 million in court-ordered restitution. The Project Save Our Children initiative is conducted by officials from the HHS Office of Inspector General, the OCSE, the Department of Justice, State CSE agencies, and local law enforcement organizations working together to pursue chronic delinquent parents who owe large sums of child support.

*Uniform Interstate Family Support Act (UIFSA)*

UIFSA was drafted by the National Conference of Commissioners on Uniform State Laws and approved by the Commissioners in August 1992. It is designed to deal with desertion and nonsupport by instituting uniform laws in all 50 States and the District of Columbia. The core of UIFSA is limiting control of a child support case to a single State, thereby ensuring that only one child support order from one court or child support agency is in effect at any given time. It follows that the controlling State will be able to effectively pursue interstate cases, primarily through the use of long arm statutes, because its jurisdiction is undisputed. Many, perhaps most, child support officials believe UIFSA will help eliminate jurisdictional disputes between States and lead to substantial increases in interstate collections.

8-48

UIFSA allows: (1) direct income withholding by the controlling State without second State involvement; (2) administrative enforcement without registration; and (3) registered enforcement based on the substantive laws of the controlling State and the procedural laws of the registering State. The order cannot be adjusted if only enforcement is requested, and enforcement may begin upon registration (before notice and hearing) if the receiving State's due process rules allow such enforcement. The controlling State may adjust the support order under its own standards. In addition, UIFSA includes some uniform evidentiary rules to make interstate case handling easier, such as using telephonic hearings, easing admissibility of evidence requirements, and admitting petitions into evidence without the need for live or corroborative testimony to make a prima facie case.

The 1996 welfare reform law required all States to enact UIFSA, including all amendments, before January 1, 1998. States are not required to use UIFSA in all cases if they determine that using other interstate procedures would be more effective. All States and jurisdictions had adopted UIFSA by June 1998.

*Other procedures that aid interstate enforcement*

In 1948, the National Conference of Commissioners on Uniform State Laws and the American Bar Association approved the Uniform Enforcement of Foreign Judgments Act (UEFJA), which simplifies the collection of child support arrearages in interstate cases. Revised in 1964 and adopted in only 30 States, UEFJA provides that upon the filing of an authenticated foreign (i.e., out-of-State) judgment and notice to the obligor, the judgment is to be treated in the same manner as a local one. A judgment is the official decision or finding of a court on the respective rights of the involved parties. UEFJA applies only to final judgments. As a general rule, child support arrearages that have been reduced to judgment are considered final judgments and thus can be filed under UEFJA. An advantage of UEFJA is that it does not require reciprocity (i.e., it need only be in effect in the initiating State). A disadvantage is that UEFJA is limited to collection of arrearages; it cannot be used to establish an initial order or to enforce current orders. In fiscal year 2002, $1.203 billion was collected for interstate cases, up 163 percent from $457 million in fiscal year 1990.

*Expedited procedures*

Regardless of whether a State uses judicial processes, administrative processes, or a combination, the 1996 welfare reform law required States to adopt a series of procedures to expedite both the establishment of paternity and the establishment, enforcement, and modification of child support. These procedures must give the State CSE agency the authority to take several enforcement actions, subject to due process safeguards, without the necessity of obtaining an order from any other judicial or administrative tribunal. For example, States must have expedited procedures to secure assets to satisfy an arrearage by intercepting or

8-49

seizing periodic or lump sum payments (such as unemployment and workers compensation), lottery winnings, awards, judgments, or settlements, and assets of the debtor parent held by public or private retirement funds and financial institutions.

*Financial institution data match program*

The 1996 law also required States to enter into agreements with financial institutions conducting business within their State for the purpose of conducting a quarterly data match. The data match is intended to identify financial accounts (in banks, credit unions, money-market mutual funds, etc.) belonging to parents who are delinquent in the payment of their child support obligation. When a match is identified, State CSE programs may issue liens or levies (often referred to as "freeze and seize" procedures) on the accounts of that delinquent obligor to collect the past-due child support. In 1998 (P.L. 105-200), Congress made it easier for multi-State financial institutions to match records by allowing the OCSE through the Federal Parent Locator Service to assist States in conducting data matches with multi-State financial institutions. When matches are made, the information is sent to the States within 48 hours for placement of a lien on and seizure of all or part of the accounts identified. States are using their expedited procedures to seize the accounts and thereby force debtor noncustodial parents to meet their child support obligations.

With the introduction of FIDM (Financial Institution Data Match), CSE agencies must conduct quarterly matches with hundreds of single-State financial institutions operating within their State. State agencies also must participate in matching at the Federal level with thousands of multi-State financial institutions and process tens of thousands of matches resulting in collections through account seizures. State agencies also engage in interstate processing to identify and seize accounts located in another State. In addition, they engage in outreach to solicit the cooperation of financial institutions, perform customer services to address the concerns of delinquent obligors whose access to financial assets has been disrupted, and develop automated systems to routinely process and manage large numbers of cases.

In fiscal year 2001, the Financial Institution Data Match program found more than 1.4 million accounts belonging to more than 854,000 delinquent noncustodial parents nationwide with a value in excess of $3.2 billion.

*Summary information on collection methods*

Table 8-3 shows that 75 percent of the $23.8 billion in child support payments collected in fiscal year 2002 was obtained through four enforcement techniques: income withholding, Federal income tax refund offset, State income tax refund offset, and unemployment compensation intercept. The remaining 25 percent was collected from "other sources." The "other sources" category

8-50

includes collections from parents who have informal agreements, collections from noncustodial parents who voluntarily sent money for their children even though a support order never had been established (about 4 percent of all collections), and enforcement techniques such as liens against property, license and passport revocation, seizure of assets from financial institutions, posting of bonds or securities, and use of the full IRS collection procedure. By fiscal year 1991 income withholding had become the primary enforcement method, producing nearly 47 percent of all child support collections. By 2002, the percentage had increased even further, reaching 65 percent. (Note: income withholding includes CSE and non-CSE collections. Approximately $3.9 billion were non-CSE collections from income withholding.)

## PRIVATE COLLECTION ACTIVITIES

According to the OCSE, the Child Support Enforcement program handles about 60 percent of all child support cases. The rest are handled by private attorneys, private collection agencies, locally-funded public child support enforcement agencies, or through mutual agreements between the parents.

*Nonfederal CSE activities*

Some localities have chosen to operate a child support program using local funding sources and fees levied against noncustodial parents. A major complaint of these localities is that the enforcement tools (e.g., Federal and State tax refund intercepts, license sanctions, passport sanctions, data matches with financial institutions, reporting of delinquencies to credit bureaus) that now are available only to the Federal/State CSE program should be extended to the entities working outside the Federal/ State system and to private contractors as well. However, State child support agencies, advocates representing both noncustodial and custodial parents, and privacy rights organizations have voiced concerns about such an approach, particularly as it relates to private agencies.

*CSE privatization*

While doing business with public and private sector entities outside the CSE program for such things as laboratory testing for paternity establishment, service of process, and automated systems development is not new in the CSE program, contracting out all of the program's functions is new. This approach is usually referred to as privatization.

According to a December 1996 U.S. General Accounting Office (GAO) report, 15 States had turned to full-service privatization of selected local CSE offices as a way to improve performance that had been hampered by growing caseloads, resource constraints, and increased Federal requirements. For some localities, privatization is also a response to State restrictions on hiring additional

8-51

public employees. In its March 2002 report, the GAO identified 38 private firms in 16 states that regularly collected child support payments on behalf of individual parents (U.S. General Accounting Office, 2002.)

In many more States, the State or locality had a contract with a private entity to perform one or several services to supplement the efforts of the State or local program. Most commonly, States contract with the private sector for the collection of past-due support, especially support considered hard to collect. Under the terms of most collection contracts, States pay contractors only if collections are made and payments to contractors are often a fixed percentage of the recovered arrearage payments.

## STATE COLLECTION AND DISBURSEMENT OF SUPPORT PAYMENTS

One of the major child support provisions of the 1996 welfare reform legislation was the requirement that by October 1, 1998 State CSE agencies must operate a centralized, automated unit for collection and disbursement of payments on two categories of child support orders: those enforced by the CSE agency and those issued or modified after December 31, 1993 which are not enforced by the State CSE agency but for which the noncustodial parent's income is subject to withholding.

The State disbursement unit must be operated directly by the State CSE agency, by two or more State CSE agencies under a regional cooperative agreement, or by a contractor responsible directly to the State CSE agency. The State disbursement unit may be established by linking local disbursement units through an automated information network if the Secretary of HHS agrees that the system will not cost more, take more time to establish, or take more time to operate than a single State system. All States, including those that operate a linked system, must give employers one and only one location for submitting withheld income.

The disbursement unit must be used to collect and disburse support payments, to generate orders and notices of withholding to employers, to keep an accurate identification of payments, to promptly distribute money to custodial parents or other States, and to furnish parents with a record of the current status of support payments made after August 22, 1996. The disbursement unit must use automated procedures, electronic processes, and computer-driven technology to the maximum extent feasible, efficient, and economical.

The disbursement unit must distribute all amounts payable within 2 business days after receiving the money and identifying information from the employer or other source of periodic income if sufficient information identifying the payee is provided. The unit may retain arrearages in the case of appeals until they are resolved.

8-52

States must use their automated system to facilitate collection and disbursement including at least: (1) transmission of orders and notices to employers within 2 days after receipt of the withholding notice; (2) monitoring to identify missed payments of support; and (3) automatic use of enforcement procedures when payments are missed.

The collection and disbursement unit provisions went into effect on October 1, 1998. States that process child support payments through local courts were allowed to continue court payments until September 30, 1999.

Following enactment of this provision in August 1996, there was widespread misunderstanding about its breadth of application. Thus, it is useful to emphasize here that not all child support orders must be a part of the State disbursement unit. First, orders issued before 1994 that are not being enforced by the State Child Support Enforcement Agency are exempt. Second, parents can avoid both wage withholding and involvement in the child support enforcement system if at the time the original order is issued, the judge determines that private payment directly between parents is acceptable.

Because of the total loss of CSE funding plus possible loss of TANF Block Grant funding for States that are not in compliance with the State plan requirement related to State disbursement units, in November 1999, Congress passed legislation (Public Law 106-113) that imposes a lesser alternative penalty for these States. To qualify, States must have submitted a corrective compliance plan by April 1, 2000, that describes how, by when, and at what cost the State would achieve compliance with the State disbursement unit requirement. The Secretary of HHS is required to reduce the amount the State would otherwise have received in Federal child support payments by the penalty amount for the fiscal year. The penalty amount percentage is 4 percent in the case of the first fiscal year of noncompliance; 8 percent in the second year; 16 percent in the third year; 25 percent in the fourth year; and 30 percent in the fifth and subsequent years. If a State that is subject to a penalty achieved compliance on or before April 1, 2000, the Secretary of HHS was required to waive the first year penalty. If a State achieved compliance on or after April 1, 2000, and on or before September 30, 2000, the penalty percentage was 1. In addition, Public Law 106-113 provides that States that fail to implement both the CSE automated data processing requirement and the State disbursement unit requirement are subject to only one alternative penalty process.

## BANKRUPTCY AND CHILD SUPPORT ENFORCEMENT

Giving debtors a fresh start is the goal of this country's bankruptcy system. Depending on the type of bankruptcy, a debtor may be able to discharge a debt completely, pay a percentage of the debt, or pay the full amount of the debt over a longer period of time. However, several types of debts are not dischargeable,

8-53

including debts for child support and alimony (U.S. Commission on Interstate Child Support, 1992, p. 209).

The 1975 child support legislation included a provision stating that an assigned child support obligation was not dischargeable in bankruptcy. In 1978 this provision was incorporated into the uniform law on bankruptcy. The bankruptcy law also listed exceptions to discharge including alimony and maintenance or support due a spouse, former spouse, or child. In 1981, a provision stating that a child support obligation assigned to the State as a condition of eligibility for Aid to Families with Dependent Children (AFDC) is not dischargeable in bankruptcy was reinstated. In 1984, the provision was expanded so that child support obligations assigned to the State as part of the child support program may not be discharged in bankruptcy, regardless of whether the payments are to be made on behalf of a Temporary Assistance for Needy Families (TANF) or a non-TANF family and regardless of whether the debtor was married to the child's other parent.

Some noncustodial parents seek relief from their financial obligations in the U.S. bankruptcy courts. Although child support payments may not be discharged via a filing of bankruptcy, the filing may cause long delays in securing child support payments. Pursuant to Public Law 103-394, enacted in 1994, a filing of bankruptcy will not stay a paternity, child support, or alimony proceeding. In addition, child support and alimony payments are priority claims and custodial parents are able to appear in bankruptcy court to protect their interests without having to pay a fee or meet any local rules for attorney appearances.

The 1996 welfare reform legislation amends the U.S. Bankruptcy Code to ensure that any child support debt that is owed to a State and that is enforceable under the CSE Program cannot be discharged in bankruptcy proceedings.

## AUTOMATED SYSTEMS

In 1980, Congress authorized 90 percent Federal matching funds on an open-ended basis for States to design and implement automated data systems. Funds go to States that establish an automated data processing and information retrieval system designed to assist in administration of the State child support plan, and to control, account for, and monitor all factors in the enforcement, collection, and paternity determination processes. Funds may be used to plan, design, develop, and install or enhance the system. The Secretary of HHS must approve the State system as meeting specified conditions before matching is available.

In 1984, Congress made the 90-percent rate available to pay for the acquisition of computer hardware and necessary software. The 1984 legislation also specified that if a State met the Federal requirement for 90 percent matching, it could use its funds to pay for the development and improvement of income withholding and other procedures required by the 1984 law. In May 1986, OCSE established a transfer policy requiring States seeking the 90 percent Federal

8-54

matching rate to transfer existing automated systems from other States rather than to develop new ones, unless there were a compelling reason not to use the systems developed by other States.

In 1988, Congress required States without comprehensive statewide automated systems to submit an advance planning document to the OCSE by October 1, 1991, for the development of such a system. Congress required that all States have a fully operating system by October 1, 1995, at which time the 90 percent matching rate was to end. The 1988 law allowed many requirements for automated systems to be waived under certain circumstances. For instance, the Secretary of HHS could waive a requirement if a State demonstrated that it had an alternative system enabling it to substantially comply with program requirements.

As of September 30, 1995, OCSE had approved the automated data systems of only six States--Delaware, Georgia, Utah, Virginia, Washington, and West Virginia. Most observers agree that States were delayed primarily by the lateness of Federal regulations specifying the requirements for the data systems and by the complexity of getting their final systems into operation. Thus, on October 12, 1995, Congress enacted Public Law 104-35 which extended for 2 years, from October 1, 1995 to October 1, 1997, the deadline by which States were required to have statewide automated systems for their child support programs. On October 1, 1995, however, the 90 percent matching rate was ended; the Federal matching rate for State spending on data systems reverted back to the basic administrative rate of 66 percent.

The purpose of requiring States to operate statewide automated and computerized systems is to ensure that child support functions are carried out effectively and efficiently. These requirements include case initiation, case management, financial management, enforcement, security, privacy, and reporting. Implementing these requirements can facilitate locating noncustodial parents and monitoring child support cases. For example, by linking automated child support systems to other State databases, information can be obtained quickly and cheaply about a noncustodial parent's current address, assets, and employment status. Systems also can be connected to the court system to access information on child support orders (U.S. General Accounting Office, 1992b).

Under the 1996 welfare reform legislation, States are required to have a statewide automated data processing and information retrieval system which has the capacity to perform a wide variety of functions with a specified frequency. The State data system must be used to perform functions the Secretary of HHS specifies, including controlling and accounting for the use of Federal, State, and local funds and maintaining the data necessary to meet Federal reporting requirements. The automated system must maintain the requisite data for Federal reporting, calculate the State's performance for purposes of the incentive and penalty provisions, and have in place systems controls to ensure the completeness,

8-55

reliability, and accuracy of the data. Final regulations were issued by the Secretary in August 1998.

The 1996 welfare reform law stipulated that all automatic data processing requirements enacted on or before the date of enactment of the Family Support Act of 1988 (i.e., October 13, 1988) are to be met by October 1, 1997. Second, requirements enacted on or before August 22, 1996 must be met by October 1, 2000. The Federal Government continued the 90 percent matching rate in 1996 and 1997 for provisions outlined in advanced planning documents submitted before September 30, 1995.

Also, (pursuant to the 1996 welfare reform law) the Secretary was required to create procedures to cap payments to the States at $400 million for fiscal years 1996-2001. The Federal matching rate for the new requirements was 80 percent. Funds were to be distributed among States by a formula set in regulations which took into account the relative size of State caseloads and the level of automation needed to meet applicable automatic data processing requirements.

Until fiscal year 2001, the Federal Government paid 80-90 percent of approved State expenditures on developing and improving management information systems. Congress decided to pay this enhanced match rate because data management, the construction of large data bases containing information on location, income, and assets of child support obligors, and computer access to and manipulation of such large data bases were seen as the keys to a cost effective child support system. In spending the additional Federal dollars on these data systems, Congress hoped to provide an incentive for States to adopt and aggressively employ efficient data management technology.

Federal funding at the enhanced 80 percent rate (for capped funds) was available through fiscal year 2001. The 80 percent Federal matching rate for CSE automated systems expenditures was eliminated after September 30, 2001. For all CSE automated systems expenditures made on or after October 1, 2001, Federal funding is available at the 66 percent Federal matching rate.

The Child Support Performance and Incentive Act of 1998 (Public Law 105-200), gave the Secretary of HHS an alternative to assessing a 100 percent penalty (i.e., loss of all CSE funding) on States that failed to comply with the October 1, 1997 statewide automated system requirements. The alternative penalty is available to States that the Secretary determines have made and are continuing to make good faith efforts to comply with the automated system requirements (and have submitted a "corrective action plan" that describes how, by when, and at what cost the State will achieve compliance with the automated system requirements). The alternative percentage penalty is equal to 4, 8, 16, 25, and 30 percent respectively for the first, second, third, fourth, and fifth or subsequent years of failing to comply with the data processing requirements. The percentage penalty is to be applied to the amount payable to the State in the previous year as Federal administrative reimbursement under the child support program (i.e., the 66 percent

8-56

Federal matching funds). A State that fails to comply with the 1996 automated system requirements nonetheless may have its annual penalty reduced by 20 percent for each performance measure under the new incentive system for which it achieves a maximum score. Thus, for example, a State being penalized would have its penalty for a given year reduced by 60 percent if it achieved maximum performance on three of the five proposed performance measures. Further, the Secretary is to reduce the annual penalty amount by 90 percent in the year in which a State achieves compliance with the automated system requirements. These alternative penalties apply to all CSE automated system requirements (i.e., those required by both Public Law 100-485 and Public Law 104-193). However, Public Law 105-200 only allows the Secretary to impose one penalty in any given year. This means that if a State was not in compliance in fiscal year 2000 with either the 1988 automated system requirements or the 1996 requirements, it would be only penalized once. The 1998 law also stipulates that because States are subject to the alternative penalty procedures for violations of the CSE automated system requirements, they are exempt from the TANF penalty procedure for such violations.

As of March 2003, 4 jurisdictions had not been certified as meeting the 1988 Family Support Act CSE automated systems requirements; 2 States had not yet scheduled a certification review and were still in the planning phase (California and South Carolina) and 2 jurisdictions had a review pending (Michigan and the Virgin Islands).

As noted earlier, the 1996 welfare reform law required States to modify their automated systems to accommodate the 1996 law provisions. As of March 2003, 21 jurisdictions were certified as meeting the 1996 Personal Responsibility and Work Opportunity Reconciliation Act CSE automated systems requirements (Arkansas, Colorado, District of Columbia, Georgia, Hawaii, Indiana, Iowa, Kansas, Maryland, Missouri, Nevada, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Texas, Virginia, Washington, and Wyoming); 30 jurisdictions had a review scheduled or in progress; and 3 States did not have a review scheduled yet (California, Massachusetts, and South Carolina).

## AUDITS AND FINANCIAL PENALTIES

Audits are required at least every 3 years to determine whether the standards and requirements prescribed by law and regulations have been met by the child support program of every State. If a State fails the audit, Federal TANF funds must be reduced by an amount equal to at least 1 but not more than 2 percent for the first failure to comply, at least 2 but not more than 3 percent for the second failure, and at least 3 but not more than 5 percent for the third and subsequent failures.

8-57

If a penalty is imposed after a follow up review, a State may appeal the audit penalty to the HHS Departmental Appeals Board. Payment of the penalty is delayed while the appeal is pending. The appeals board reviews the written records which may be supplemented by informal conferences and evidentiary hearings.

The penalty may be suspended for up to 1 year to allow a State time to implement corrective actions to remedy the program deficiency. At the end of the corrective action period, a followup audit is conducted in the areas of deficiency. If the followup audit shows that the deficiency has been corrected, the penalty is rescinded. However, if the State remains out of compliance with Federal requirements, a graduated penalty, as provided by law, is assessed against the State. The actual amount of the penalty--between one and five percent of the State's TANF matching funds (see above)--depends on the severity and the duration of the deficiency. If a State is under penalty, a comprehensive audit is conducted annually until the cited deficiencies are corrected (Office of Child Support, 1994, pp. 17-19).

The 1996 welfare reform law required States to annually review and report to the Secretary of HHS, using data from their automatic data processing system, both information adequate to determine the State's compliance with Federal requirements for expedited procedures and case processing as well as the information necessary to calculate their levels of accomplishment and rates of improvement on the performance indicators.

The Secretary is required to determine the amount (if any) of incentives or penalties. He also must review State reports on compliance with Federal requirements and provide States with recommendations for corrective action. The purpose of the audits is to assess the completeness, reliability, and security of data reported for use in calculating the performance indicators and to assess the adequacy of financial management of the State program.

In addition to the 1-5 percent penalty for States that the Secretary of HHS has found, via an audit, to have failed to substantially comply with CSE State plan requirements, there is the possibility of complete elimination of CSE funding in cases in which a State's CSE program has been disapproved. The Secretary must disapprove the plans of States which fail to implement the CSE State plan requirements under sections 454 and 466 of the Social Security Act. Disapproval of a State's plan will result in the cessation of all Federal child support funding for the State. In addition, because operating an approved Child Support Enforcement program is a prerequisite to a State's receiving funds under the TANF program, a State's TANF funds also would be terminated. (See above sections on Automated Systems and State Collection and Disbursement of Support Payments for more details.)

As mentioned elsewhere in this chapter, there are two exceptions to the complete elimination of Federal funding rule. First, CSE law establishes an alternative penalty for a State's failure to meet the automated data systems

8-58

requirements. Second, CSE law (Public Law 106-113) establishes an alternative penalty for a State's failure to meet the automated centralized disbursement unit requirements.

## ASSIGNMENT AND DISTRIBUTION OF CHILD SUPPORT COLLECTIONS

Two parties have claims on child support collections made by the State. The children and custodial parent on behalf of whom the payments are made, of course, have a claim on payments by the noncustodial parent. However, in the case of families that have received public aid, taxpayers who paid to support the destitute family by providing a host of welfare benefits also have a legitimate claim on the money.

Since the child support program's inception, the rules determining the distribution of arrearage payments have been complex, but not nearly as complicated as they are currently. It is helpful to think of the rules in two categories. First, there are rules in both Federal and State law that stipulate who has a legal claim on the payments owed by the noncustodial parent. These are called assignment rules. Second, there are rules that determine the order in which child support collections are paid in accord with the assignment rules. These are called distribution rules.

### DISTRIBUTION OF PAYMENTS WHILE THE FAMILY RECEIVES PUBLIC ASSISTANCE

When a family applies for TANF, the custodial parent must assign to the State the right to collect both current child support payments and past-due child support obligations which accrue while the family is on the TANF rolls. Arrearages that accrued to the family before it went on public assistance are called "preassistance" arrearages; those that accrue while the family is on public assistance are called "permanently-assigned arrearages." While the family receives TANF benefits, the State is permitted to retain any current support and any arrearages it collects up to the cumulative amount of TANF benefits which has been paid to the family. Before the 1996 reforms, States were required by Federal law to pay (or "pass through") the first $50 of child support collections to the family. This provision was repealed by the 1996 legislation and States were given the right to decide for themselves how much, if any, of their collections would be passed through to the family, although they must pay the Federal share of collections. Thus, amounts passed through come entirely out of the State share of collections. States also have the right to decide whether they treat any child support passed through to the family as income, in which case the child support collections may reduce or even eliminate TANF payments to the family.

8-59

## DISTRIBUTION OF PAYMENTS AFTER THE FAMILY LEAVES PUBLIC ASSISTANCE

Distribution rules after the family leaves public assistance are far more complicated. Most of the problems stem from the requirements that preassistance arrears be assigned to the State, and that certain arrearages otherwise owed to the former welfare family are deemed to be owed to the State when the collection is made by Federal tax refund intercept.

When a family leaves welfare, States are required to keep track of six categories of arrearages: (1) permanently assigned; (2) temporarily assigned; (3) conditionally assigned; (4) never assigned; (5) unassigned during assistance; and (6) unassigned preassistance. On the computer, these different categories are called "buckets." The money shifts among the buckets according to the source of the collection, the family's status on or off assistance when the arrearage accrued, the amount of the unreimbursed public assistance balance, and the date of the assignment of support rights as well as the date the TANF case closed (because of phased-in implementation dates). Moreover, the distribution rules differ depending on whether the family went on welfare before or after October 1, 1997. Families that assigned their rights to preassistance arrearages to the State before October 1, 1997, have "permanently-assigned arrearages," which are owed to the State. Families that assign their rights to preassistance arrearages to the State on or after October 1, 1997, have "temporarily-assigned arrearages." Temporarily-assigned arrearages and permanently-assigned arrearages are treated differently after a family leaves public assistance. Temporarily-assigned arrearages become "conditionally-assigned arrearages" when the family leaves welfare or on October 1, 2000, whichever is later. These are called conditionally- assigned arrearages because, as will be seen below, if they are collected by Federal tax refund intercept, they will be paid to the State, not the family.

There are also categories for "never-assigned arrearages," which accrue after the family's most recent period of assistance ends. These can become temporarily-assigned arrearages if the family goes back on public assistance. In addition, there are "unassigned during assistance arrearages" and "unassigned preassistance arrearages." These are previously assigned arrearages which exceed the cumulative amount of unreimbursed assistance when the family leaves public assistance, and which accrued either during (unassigned during assistance arrearages) or prior to (unassigned preassistance arrearages) receipt of assistance.

When the family leaves public assistance, the order of distribution of any collection depends not only on when the arrearages accrued--preassistance, during-assistance, or postassistance--and when they were assigned, but also on when and how the past-due support was collected. If the collection was made by any means other than the Federal tax refund intercept, the collection is first paid to

8-60

the family up to the amount of the monthly child support obligation. Any remaining collection is distributed to certain categories of arrearages owed to the family (conditionally assigned, never assigned and unassigned preassistance), and then to arrearages owed to the State (permanently assigned), with the remainder to the family (unassigned during assistance).

Once current support is paid, collections on past-due support made between October 1, 1997, and September 30, 2000, or earlier at State option, are paid to the family to satisfy any arrearages that accrued to the family after leaving public assistance (never-assigned arrearages). Once never-assigned arrearages are satisfied, the collection is to be applied either to other arrearages owed to the family or to the State (permanently-assigned arrearages). A family that leaves welfare before October 1, 2000, maintains its permanently-assigned arrearages, that is, those which accrued before the family went on welfare and while the family received public assistance. These arrearages are always owed to the State and, unlike temporarily-assigned arrearages, never revert to the family.

On October 1, 2000, the rules changed again (although States could opt to implement these changes sooner). As noted above, the temporarily-assigned arrearages for a former welfare family that leaves public assistance on or after October 1, 2000, or when the case closes, whichever is later, become "conditionally-assigned arrearages." The distribution of these conditionally-assigned arrearages is "conditioned" upon whether the money is collected by Federal tax refund intercept or by some other method, such as levy of a bank account, a workers compensation lump sum payment, or a payment agreement to avoid a driver's license revocation. If the collection is from a tax refund intercept, it will be paid to the State rather than to the family, up to the cumulative amount of unreimbursed assistance. The distribution from any other method of collection is first made to the family, with current support being paid first and any balance allocated to any arrearages.

## FUNDING OF STATE PROGRAMS

The child support program conducted by States is financed by three major streams of money. The first and largest is the Federal Government's commitment to reimburse States for 66 percent of all allowable expenditures on child support activities. Allowable expenditures include outlays for locating parents, establishing paternity (with an exception noted below), establishing orders, and collecting payments.

There are two mechanisms through which Federal financial control of State expenditures is exercised. First, States must submit plans to the Secretary of HHS outlining the specific child support activities they intend to pursue. The State plan provides the Secretary with the opportunity to review and approve or disapprove child support activities that will receive the 66 percent Federal reimbursement.

TABLE 8-11--TOTAL DISTRIBUTED COLLECTIONS BY STATE,
FISCAL YEARS 1997, 1999, 2000, 2001, and 2002

| State | 1997 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Alabama | $170,581,427 | $185,929,914 | $192,136,827 | $200,240,037 | $210,793,885 |
| Alaska | 64,919,032 | 67,131,846 | 71,101,719 | 77,905,418 | 81,297,436 |
| Arizona | 132,048,847 | 169,232,529 | 196,761,640 | 212,384,196 | 229,628,128 |
| Arkansas | 91,457,022 | 108,480,840 | 120,493,465 | 122,150,043 | 128,845,269 |
| California | 1,174,214,624 | 1,604,173,701 | 2,059,472,938 | 1,987,761,937 | 1,761,395,793 |
| Colorado | 123,564,692 | 163,546,023 | 176,120,256 | 189,729,840 | 202,513,277 |
| Connecticut | 141,543,436 | 175,487,270 | 190,849,231 | 202,950,268 | 216,686,470 |
| Delaware | 38,616,387 | 44,962,003 | 49,010,326 | 53,405,899 | 59,507,990 |
| District of Columbia | 29,906,318 | 35,137,996 | 35,029,816 | 37,760,166 | 40,543,493 |
| Florida | 484,630,121 | 579,827,499 | 648,007,202 | 700,413,455 | 803,427,506 |
| Georgia | 278,059,999 | 330,631,555 | 361,895,069 | 383,496,014 | 415,190,279 |
| Guam | 6,681,544 | 7,660,532 | 7,701,905 | 7,451,417 | 7,923,440 |
| Hawaii | 55,015,639 | 60,520,055 | 66,547,674 | 69,349,488 | 73,490,476 |
| Idaho | 48,025,328 | 64,268,499 | 75,069,124 | 87,410,927 | 95,669,488 |
| Illinois | 267,359,518 | 325,562,478 | 361,276,437 | 424,100,350 | 460,100,983 |
| Indiana | 208,444,050 | 271,110,248 | 366,155,285 | 366,781,739 | 430,195,033 |
| Iowa | 166,155,139 | 201,219,305 | 218,721,976 | 236,936,971 | 255,489,996 |
| Kansas | 114,979,206 | 137,981,151 | 139,181,584 | 127,176,292 | 134,192,271 |
| Kentucky | 164,357,171 | 206,241,206 | 226,432,656 | 248,957,397 | 280,917,646 |
| Louisiana | 154,821,458 | 188,131,410 | 213,901,350 | 233,491,509 | 260,352,264 |
| Maine | 68,615,439 | 80,663,945 | 89,399,356 | 95,101,117 | 96,058,639 |
| Maryland | 322,363,403 | 350,165,942 | 367,930,051 | 379,403,201 | 396,325,538 |
| Massachusetts | 258,584,016 | 291,485,832 | 318,570,247 | 363,060,179 | 402,684,665 |
| Michigan | 1,092,176,097 | 1,274,637,793 | 1,347,410,776 | 1,385,225,776 | 1,443,730,382 |
| Minnesota | 355,371,919 | 442,657,451 | 477,367,932 | 512,122,192 | 537,089,362 |
| Mississippi | 97,017,611 | 128,877,572 | 144,398,420 | 158,091,621 | 169,034,476 |
| Missouri | 318,310,313 | 285,818,836 | 338,989,078 | 372,654,718 | 410,866,655 |
| Montana | 33,400,682 | 38,221,855 | 40,751,932 | 41,027,136 | 43,450,853 |

TABLE 8-12-- DISTRIBUTED COLLECTIONS OF CURRENT, FORMER
AND NEVER ASSISTANCE, BY STATE FY 2002-continued

| State | Total | Current Assistance [1] | Former Assistance | Never Assistance |
|---|---|---|---|---|
| Washington | 590,896,606 | 32,766,901 | 278,653,310 | 279,476,395 |
| West Virginia | 151,193,843 | 61,941,547 | 42,560,044 | 46,692,252 |
| Wisconsin | 574,178,130 | 10,809,699 | 376,563,504 | 186,804,927 |
| Wyoming | 46,608,491 | 306,342 | 22,996,109 | 23,306,040 |
| Total | $20,136,867,071 | $1,682,081,420 | $8,298,404,027 | $10,156,381,624 |

[1] Current assistance includes IV-A.

Source: Office of Child Support Enforcement, U.S. Department of Health and Human Services.

TABLE 8-13--DISTRIBUTED TANF/FOSTER CARE COLLECTIONS BY
STATE, FISCAL YEARS 1997, 1999, 2000, 2001, and 2002

| State | 1997 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Alabama | $23,360,517 | $18,036,476 | $12,299,023 | $13,407,464 | $13,070,953 |
| Alaska | 20,636,510 | 17,577,892 | 16,892,594 | 17,449,991 | 16,452,343 |
| Arizona | 26,030,525 | 23,341,886 | 26,352,856 | 24,748,562 | 28,509,842 |
| Arkansas | 19,876,008 | 10,811,654 | 10,131,870 | 9,729,977 | 15,741,586 |
| California | 544,639,364 | 620,161,467 | 750,717,372 | 695,488,696 | 582,988,895 |
| Colorado | 36,950,268 | 31,875,023 | 30,192,919 | 25,564,337 | 24,836,128 |
| Connecticut | 60,342,040 | 54,111,142 | 49,972,672 | 59,476,753 | 63,140,625 |
| Delaware | 7,962,068 | 7,423,602 | 7,181,976 | 9,750,595 | 7,169,614 |
| District of Columbia | 5,631,212 | 5,070,325 | 4,498,173 | 4,271,870 | 4,737,603 |
| Florida | 100,231,066 | 73,134,533 | 75,246,779 | 69,741,213 | 296,477,106 |
| Georgia | 77,172,899 | 47,776,366 | 43,828,552 | 41,404,893 | 43,164,775 |
| Guam | 1,320,394 | 1,641,036 | 1,369,273 | 1,277,846 | 1,583,590 |
| Hawaii | 11,510,438 | 10,351,413 | 11,709,742 | 12,612,151 | 12,248,433 |
| Idaho | 10,224,918 | 4,070,389 | 4,317,033 | 4,504,154 | 4,322,906 |
| Illinois | 77,682,722 | 72,846,716 | 81,333,731 | 55,965,762 | 49,700,941 |
| Indiana | 39,853,408 | 25,249,911 | 24,162,170 | 23,664,093 | 27,824,470 |
| Iowa | 40,772,612 | 44,115,571 | 43,711,127 | 50,909,642 | 87,456,333 |
| Kansas | 27,071,883 | 28,907,321 | 28,151,417 | 16,530,153 | 20,025,764 |
| Kentucky | 39,449,293 | 35,856,698 | 33,507,796 | 34,364,821 | 35,734,880 |
| Louisiana | 27,122,762 | 17,785,320 | 16,443,934 | 17,551,900 | 17,906,938 |
| Maine | 31,809,926 | 32,630,295 | 34,041,771 | 33,320,437 | 29,995,734 |
| Maryland | 38,008,067 | 25,145,281 | 25,310,057 | 22,364,732 | 21,567,764 |
| Massachusetts | 67,381,987 | 54,187,784 | 46,690,737 | 44,148,416 | 47,128,826 |
| Michigan | 161,658,369 | 129,076,627 | 130,035,891 | 96,577,009 | 140,231,850 |
| Minnesota | 64,572,484 | 60,737,596 | 56,704,024 | 55,827,990 | 57,196,977 |
| Mississippi | 21,856,876 | 11,021,320 | 8,320,790 | 8,230,646 | 8,277,905 |
| Missouri | 51,858,350 | 36,960,099 | 46,755,784 | 46,261,137 | 50,901,728 |
| Montana | 8,327,589 | 6,087,975 | 5,737,782 | 5,115,717 | 5,852,920 |
| Nebraska | 12,674,874 | 12,855,070 | 11,993,259 | 15,542,507 | 15,126,677 |
| Nevada | 8,432,985 | 7,393,901 | 8,432,493 | 6,094,051 | 6,176,779 |
| New Hampshire | 9,844,988 | 8,578,969 | 9,451,700 | 8,149,455 | 8,472,104 |
| New Jersey | 88,148,886 | 72,504,596 | 65,688,342 | 63,410,606 | 63,336,873 |

Case 1:18-cv-10393-RGS   Document 9-1   Filed 08/15/18   Page 104 of 148

8-89

TABLE 8-13--DISTRIBUTED TANF/FOSTER CARE COLLECTIONS BY
STATE, FISCAL YEARS 1997, 1999, 2000, 2001, and 2002-continued

| State | 1997 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| New Mexico | 9,498,319 | 10,820,954 | 7,859,138 | 7,728,252 | 8,947,173 |
| New York | 224,750,647 | 182,002,707 | 193,062,787 | 179,339,460 | 168,267,753 |
| North Carolina | 74,282,560 | 44,015,750 | 44,912,414 | 42,511,100 | 41,289,171 |
| North Dakota | 5,967,379 | 4,818,149 | 4,252,837 | 5,597,671 | 5,361,060 |
| Ohio | 123,514,504 | 93,853,641 | 99,524,653 | 82,082,514 | 79,975,326 |
| Oklahoma | 23,979,742 | 20,517,317 | 20,016,128 | 19,922,193 | 20,005,757 |
| Oregon | 29,283,418 | 23,796,596 | 22,940,519 | 22,087,898 | 25,350,822 |
| Pennsylvania | 123,349,974 | 97,359,317 | 95,291,974 | 98,932,246 | 98,729,901 |
| Puerto Rico | 2,814,548 | 2,123,303 | 2,740,130 | 2,359,269 | 2,187,325 |
| Rhode Island | 18,869,088 | 18,096,752 | 17,021,400 | 15,760,357 | 14,953,362 |
| South Carolina | 24,935,402 | 15,392,614 | 13,421,742 | 13,117,847 | 14,027,122 |
| South Dakota | 6,163,498 | 13,735,140 | 16,432,814 | 18,810,099 | 21,363,037 |
| Tennessee | 31,555,946 | 30,129,498 | 31,331,974 | 37,701,095 | 45,919,503 |
| Texas | 108,101,224 | 108,244,301 | 82,397,711 | 102,579,373 | 174,469,207 |
| Utah | 21,001,369 | 20,433,786 | 19,236,492 | 21,282,202 | 20,818,545 |
| Vermont | 8,379,338 | 8,367,119 | 8,800,878 | 7,900,909 | 6,272,797 |
| Virgin Islands | 628,005 | 453,703 | 811,966 | 503,161 | 941,382 |
| Virginia | 46,883,418 | 37,756,738 | 36,410,396 | 138,520,360 | 148,070,621 |
| Washington | 112,561,131 | 95,203,818 | 92,665,822 | 88,449,909 | 84,776,087 |
| West Virginia | 15,919,397 | 5,810,897 | 16,134,468 | 44,986,945 | 66,009,416 |
| Wisconsin | 63,592,279 | 37,722,653 | 43,234,336 | 44,452,462 | 34,738,477 |
| Wyoming | 4,233,252 | 3,733,912 | 3,403,167 | 3,444,365 | 3,272,291 |
| Total | $2,842,680,726 | $2,481,712,919 | $2,593,087,385 | $2,591,527,263 | $2,893,105,997 |

Source: Office of Child Support Enforcement, U.S. Department of Health and Human Services.

8-87

## TABLE 8-12-- DISTRIBUTED COLLECTIONS OF CURRENT, FORMER, AND NEVER ASSISTANCE, BY STATE, FY 2002

| State | Total | Current Assistance [1] | Former Assistance | Never Assistance |
|---|---|---|---|---|
| Alabama | $210,793,885 | $13,024,668 | $72,569,929 | $125,199,288 |
| Alaska | 81,297,436 | 6,676,478 | 41,607,301 | 33,013,657 |
| Arizona | 229,628,128 | 11,453,708 | 142,193,163 | 75,981,257 |
| Arkansas | 128,845,269 | 11,376,906 | 77,399,861 | 40,068,502 |
| California | 1,761,395,793 | 253,545,441 | 1,067,582,921 | 440,267,431 |
| Colorado | 202,513,277 | 16,452,230 | 99,683,496 | 86,377,551 |
| Connecticut | 216,686,470 | 34,505,914 | 136,160,356 | 46,020,200 |
| Delaware | 59,507,990 | 3,982,784 | 27,729,988 | 27,795,218 |
| District of Columbia | 40,543,493 | 2,927,355 | 16,194,540 | 21,421,598 |
| Florida | 803,427,506 | 255,522,141 | 304,068,512 | 243,836,853 |
| Georgia | 415,190,279 | 31,844,731 | 196,158,546 | 187,187,002 |
| Guam | 7,923,440 | 1,211,820 | 2,145,330 | 4,566,290 |
| Hawaii | 73,490,476 | 6,256,540 | 32,674,485 | 34,559,451 |
| Idaho | 95,669,488 | 994,155 | 32,280,917 | 62,394,416 |
| Illinois | 460,100,983 | 18,961,393 | 123,452,123 | 317,687,467 |
| Indiana | 430,195,033 | 13,917,819 | 70,500,055 | 345,777,159 |
| Iowa | 255,489,996 | 66,947,952 | 106,556,682 | 81,985,362 |
| Kansas | 134,192,271 | 7,934,865 | 73,085,432 | 53,171,974 |
| Kentucky | 280,917,646 | 17,294,335 | 258,822,157 | 4,801,154 |
| Louisiana | 260,352,264 | 7,333,281 | 129,514,713 | 123,504,270 |
| Maine | 96,058,639 | 16,194,613 | 53,065,332 | 26,798,694 |
| Maryland | 396,325,538 | 9,905,370 | 161,039,537 | 225,380,631 |
| Massachusetts | 402,684,665 | 28,172,054 | 197,133,469 | 177,379,142 |
| Maryland | 1,443,730,382 | 55,362,231 | 469,543,127 | 918,825,024 |
| Michigan | 537,089,362 | 32,631,530 | 265,493,680 | 238,964,152 |
| Mississippi | 169,034,476 | 4,594,992 | 53,296,956 | 111,142,528 |
| Missouri | 410,866,655 | 22,395,311 | 129,461,656 | 259,009,688 |
| Montana | 43,450,853 | 3,033,699 | 23,141,898 | 17,275,256 |
| Nebraska | 143,218,162 | 10,493,336 | 54,021,705 | 78,703,121 |
| Nevada | 91,416,297 | 2,566,505 | 19,622,135 | 69,227,657 |
| New Hampshire | 76,021,041 | 5,917,891 | 31,834,283 | 38,268,867 |
| New Jersey | 774,655,477 | 30,700,457 | 247,229,256 | 496,725,764 |
| New Mexico | 51,872,707 | 3,543,151 | 26,733,395 | 21,596,161 |
| New York | 1,289,224,609 | 86,898,853 | 529,021,884 | 673,303,872 |
| North Carolina | 468,742,468 | 20,257,016 | 264,244,146 | 184,241,306 |
| North Dakota | 50,844,528 | 2,032,084 | 15,347,345 | 33,465,099 |
| Ohio | 1,617,586,413 | 30,261,650 | 431,788,003 | 1,155,536,760 |
| Oklahoma | 131,791,800 | 5,545,063 | 68,803,905 | 57,442,832 |
| Oregon | 275,879,302 | 14,962,303 | 108,347,032 | 152,569,967 |
| Pennsylvania | 1,331,920,478 | 59,207,333 | 362,247,867 | 910,465,278 |
| Puerto Rico | 211,582,627 | 1,706,327 | 6,545,414 | 203,330,886 |
| Rhode Island | 53,269,669 | 11,724,497 | 31,559,905 | 9,985,267 |
| South Carolina | 224,346,732 | 9,686,360 | 26,816,526 | 187,843,846 |
| South Dakota | 50,621,425 | 19,416,871 | 19,926,629 | 11,277,925 |
| Tennessee | 318,253,081 | 35,020,706 | 131,018,507 | 152,213,868 |
| Texas | 1,346,898,110 | 122,247,745 | 674,614,805 | 550,035,560 |
| Utah | 133,052,785 | 10,268,429 | 49,385,052 | 73,399,304 |
| Vermont | 41,502,260 | 4,034,064 | 23,985,044 | 13,483,152 |
| Virgin Islands | 7,184,209 | 906,879 | 352,967 | 5,924,363 |
| Virginia | 436,704,128 | 134,405,095 | 91,629,093 | 210,669,940 |

TABLE 8-14--DISTRIBUTED NON-TANF COLLECTIONS BY STATE,
FISCAL YEARS 1997, 1999, 2000, 2001, and 2002

| State | 1997 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Alabama | $147,220,910 | $167,893,438 | $179,837,804 | $186,832,573 | $197,722,932 |
| Alaska | 44,282,522 | 49,553,954 | 54,209,125 | 60,455,427 | 64,845,093 |
| Arizona | 106,018,322 | 145,890,643 | 170,408,784 | 187,635,634 | 201,118,286 |
| Arkansas | 71,581,014 | 97,669,186 | 110,361,595 | 112,420,066 | 113,103,683 |
| California | 629,575,260 | 984,012,234 | 1,308,755,566 | 1,292,273,241 | 1,178,406,898 |
| Colorado | 86,614,424 | 131,671,000 | 145,927,337 | 164,165,503 | 177,677,149 |
| Connecticut | 81,201,396 | 121,376,128 | 140,876,559 | 143,473,515 | 153,545,845 |
| Delaware | 30,654,319 | 37,538,401 | 41,828,350 | 43,655,304 | 52,338,376 |
| District of Columbia | 24,275,106 | 30,067,671 | 30,531,643 | 33,488,296 | 35,805,890 |
| Florida | 384,399,055 | 506,692,966 | 572,760,423 | 630,672,242 | 506,950,400 |
| Georgia | 200,887,100 | 282,855,189 | 318,066,517 | 342,091,121 | 372,025,504 |
| Guam | 5,361,150 | 6,019,496 | 6,332,632 | 6,173,571 | 6,339,850 |
| Hawaii | 43,505,201 | 50,168,642 | 54,837,932 | 56,737,337 | 61,242,043 |
| Idaho | 37,800,410 | 60,198,110 | 70,752,091 | 82,906,773 | 91,346,582 |
| Illinois | 189,676,796 | 252,715,762 | 279,942,706 | 279,942,706 | 410,400,042 |
| Indiana | 168,590,642 | 245,860,337 | 341,993,115 | 343,117,646 | 402,370,563 |
| Iowa | 125,382,527 | 157,103,734 | 175,010,849 | 186,027,329 | 168,033,663 |
| Kansas | 87,907,323 | 109,073,830 | 111,030,167 | 110,646,139 | 114,166,507 |
| Kentucky | 124,907,878 | 170,384,508 | 192,924,860 | 214,592,576 | 245,182,766 |
| Louisiana | 127,698,696 | 170,346,090 | 197,457,416 | 215,939,609 | 242,445,326 |
| Maine | 36,805,513 | 48,033,650 | 55,357,585 | 61,780,680 | 66,062,905 |
| Maryland | 284,355,336 | 325,020,661 | 342,619,994 | 357,038,469 | 374,757,774 |
| Massachusetts | 191,202,029 | 237,298,048 | 271,879,510 | 318,911,763 | 355,555,839 |
| Michigan | 930,517,728 | 1,145,561,166 | 1,217,374,885 | 1,288,648,767 | 1,303,498,532 |
| Minnesota | 290,799,435 | 381,919,855 | 420,663,908 | 456,294,202 | 479,892,385 |
| Mississippi | 75,160,735 | 117,856,252 | 136,077,630 | 149,860,975 | 160,736,571 |

TABLE 8-15--NUMBER OF CASES IN WHICH A COLLECTION WAS MADE ON AN OBLIGATION BY
CURRENT, FORMER, AND NEVER ASSISTANCE, BY STATE, FISCAL YEAR 2002

| State | Total | Current Assistance | Former Assistance | Never Assistance |
|---|---|---|---|---|
| Alabama | 113,717 | 6,000 | 49,736 | 57,981 |
| Alaska | 29,733 | 3,244 | 15,933 | 10,556 |
| Arizona | 92,218 | 10,581 | 52,691 | 28,946 |
| Arkansas | 70,910 | 6,131 | 26,738 | 38,041 |
| California | 793,194 | 148,739 | 443,725 | 200,730 |
| Colorado | 62,653 | 15,496 | 31,568 | 15,589 |
| Connecticut | 84,369 | 7,732 | 55,046 | 21,591 |
| Delaware | 27,550 | 2,692 | 13,008 | 11,850 |
| District of Columbia | 16,910 | 2,870 | 6,285 | 7,755 |
| Florida | 353,708 | 21,670 | 214,740 | 117,298 |
| Georgia | 195,174 | 31,784 | 89,391 | 73,999 |
| Guam | 6,197 | 912 | 2,724 | 2,561 |
| Hawaii | 30,583 | 5,741 | 12,606 | 12,236 |
| Idaho | 45,410 | 1,406 | 18,629 | 25,375 |
| Illinois | 205,219 | 14,978 | 94,242 | 95,999 |
| Indiana | 143,180 | 10,976 | 71,036 | 61,168 |
| Iowa | 128,522 | 34,030 | 50,871 | 43,621 |
| Kansas | 65,341 | 6,860 | 32,308 | 26,173 |
| Kentucky | 132,399 | 13,155 | 77,297 | 41,947 |
| Louisiana | 123,955 | 6,950 | 67,580 | 49,425 |
| Maine | 41,201 | 7,951 | 24,137 | 9,113 |
| Maryland | 152,033 | 7,666 | 60,840 | 83,527 |
| Massachusetts | 110,235 | 12,908 | 58,621 | 38,706 |
| Michigan | 453,993 | 41,452 | 220,280 | 192,261 |
| Minnesota | 153,346 | 18,715 | 91,466 | 43,165 |
| Mississippi | 104,618 | 10,248 | 37,009 | 57,361 |
| Missouri | 172,333 | 19,922 | 67,413 | 84,998 |
| Montana | 24,148 | 2,253 | 15,078 | 6,817 |
| Nebraska | 57,606 | 4,798 | 26,516 | 26,292 |

| | | | | | |
|---|---|---|---|---|---|
| Missouri | 266,451,963 | 248,858,737 | 292,233,294 | 326,393,581 | 359,964,927 |
| Montana | 25,073,093 | 32,133,880 | 35,014,150 | 35,911,419 | 37,597,933 |
| Nebraska | 95,948,783 | 97,710,241 | 130,458,324 | 144,344,295 | 128,091,485 |
| Nevada | 51,630,309 | 84,727,984 | 70,876,569 | 77,956,091 | 85,239,518 |
| New Hampshire | 44,623,745 | 57,587,158 | 61,938,760 | 65,076,306 | 67,548,937 |
| New Jersey | 465,564,109 | 562,612,381 | 613,506,004 | 661,271,921 | 711,318,604 |
| New Mexico | 24,919,064 | 24,073,721 | 31,683,856 | 35,866,570 | 42,925,534 |
| New York | 579,075,242 | 727,752,342 | 908,918,890 | 969,461,424 | 1,120,956,856 |
| North Carolina | 224,625,118 | 303,954,230 | 350,685,554 | 387,834,908 | 427,453,297 |
| North Dakota | 26,241,786 | 36,060,612 | 37,575,477 | 42,030,997 | 45,483,468 |
| Ohio | 960,028,509 | 1,207,457,380 | 1,311,684,316 | 1,379,294,421 | 1,537,611,087 |
| Oklahoma | 55,802,386 | 75,674,586 | 87,166,209 | 96,323,345 | 111,786,043 |
| Oregon | 168,627,460 | 208,078,736 | 225,265,114 | 248,960,916 | 250,528,480 |
| Pennsylvania | 883,509,609 | 1,010,327,734 | 1,072,130,503 | 1,153,269,775 | 1,233,190,577 |
| Puerto Rico | 139,740,867 | 163,898,250 | 180,100,826 | 193,523,091 | 209,395,302 |
| Rhode Island | 19,955,449 | 26,207,953 | 31,424,375 | 33,167,979 | 38,316,307 |
| South Carolina | 110,721,651 | 158,363,889 | 174,812,437 | 195,037,835 | 210,319,610 |
| South Dakota | 24,724,186 | 24,588,226 | 27,086,343 | 28,653,167 | 29,258,388 |
| Tennessee | 141,266,958 | 194,115,632 | 216,863,461 | 238,635,969 | 272,333,578 |
| Texas | 509,964,328 | 694,666,917 | 882,537,533 | 1,071,645,557 | 1,172,428,903 |
| Utah | 63,540,723 | 86,902,420 | 98,863,281 | 106,088,694 | 112,234,240 |
| Vermont | 19,498,431 | 26,513,236 | 29,937,144 | 32,796,563 | 35,229,463 |
| Virgin Islands | 5,293,265 | 5,688,216 | 6,721,158 | 6,668,580 | 6,242,827 |
| Virginia | 245,946,361 | 275,020,251 | 311,353,442 | 264,644,267 | 288,633,507 |
| Washington | 339,168,963 | 420,655,675 | 456,009,030 | 484,452,715 | 506,120,519 |
| West Virginia | 82,228,557 | 103,568,700 | 104,214,712 | 92,246,140 | 85,184,427 |
| Wisconsin | 396,289,836 | 494,779,762 | 525,811,313 | 539,269,863 | 539,439,653 |
| Wyoming | 24,449,398 | 34,728,358 | 38,493,079 | 41,270,111 | 43,336,200 |
| Total | $10,521,290,976 | $13,419,488,158 | $15,261,184,137 | $16,366,069,846 | $17,243,761,074 |

Source: Office of Child Support Enforcement, U.S. Department of Health and Human Services.

TABLE 8-11--TOTAL DISTRIBUTED COLLECTIONS BY STATE,
FISCAL YEARS 1997, 1999, 2000, 2001, and 2002-continued

| State | 1997 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Nebraska | 108,623,657 | 110,565,311 | 142,451,583 | 159,886,802 | 143,218,162 |
| Nevada | 60,063,294 | 92,121,885 | 79,309,062 | 84,050,142 | 91,416,297 |
| New Hampshire | 54,468,733 | 66,166,127 | 71,390,460 | 73,225,761 | 76,021,041 |
| New Jersey | 553,712,995 | 635,116,977 | 679,194,346 | 724,682,527 | 774,655,477 |
| New Mexico | 34,417,383 | 34,894,675 | 39,542,994 | 43,594,822 | 51,872,707 |
| New York | 803,825,889 | 909,755,049 | 1,101,981,677 | 1,148,800,884 | 1,289,224,609 |
| North Carolina | 298,907,678 | 347,969,980 | 395,597,968 | 430,346,008 | 468,742,468 |
| North Dakota | 32,209,165 | 40,878,761 | 41,828,314 | 47,628,668 | 50,844,528 |
| Ohio | 1,083,543,013 | 1,301,311,021 | 1,411,208,969 | 1,461,376,935 | 1,617,586,413 |
| Oklahoma | 79,782,128 | 96,191,903 | 107,182,337 | 116,245,538 | 131,791,800 |
| Oregon | 197,910,878 | 231,875,332 | 248,205,633 | 271,048,814 | 275,879,302 |
| Pennsylvania | 1,006,859,583 | 1,107,687,051 | 1,167,422,477 | 1,252,202,021 | 1,331,920,478 |
| Puerto Rico | 142,555,415 | 166,021,553 | 182,840,956 | 195,882,360 | 211,582,627 |
| Rhode Island | 38,824,537 | 44,304,705 | 48,445,775 | 48,928,336 | 53,269,669 |
| South Carolina | 135,657,053 | 173,756,503 | 188,234,179 | 208,155,682 | 224,346,732 |
| South Dakota | 30,887,684 | 38,323,366 | 43,519,157 | 47,463,266 | 50,621,425 |
| Tennessee | 172,822,904 | 224,245,130 | 248,195,435 | 276,337,064 | 318,253,081 |
| Texas | 618,065,552 | 802,911,218 | 964,935,244 | 1,174,224,930 | 1,346,898,110 |
| Utah | 84,542,092 | 107,336,206 | 118,099,773 | 127,370,896 | 133,052,785 |
| Vermont | 27,877,769 | 34,880,355 | 38,738,022 | 40,697,472 | 41,502,260 |
| Virgin Islands | 5,921,270 | 6,141,919 | 7,533,124 | 7,171,741 | 7,184,209 |
| Virginia | 292,829,779 | 312,776,989 | 347,763,838 | 403,164,627 | 436,704,128 |
| Washington | 451,730,094 | 515,859,493 | 548,674,852 | 572,902,624 | 590,896,606 |
| West Virginia | 98,147,954 | 109,379,597 | 120,349,180 | 137,233,085 | 151,193,843 |
| Wisconsin | 459,882,115 | 532,502,415 | 569,045,649 | 583,722,322 | 574,178,130 |
| Wyoming | 28,682,650 | 38,462,270 | 41,986,246 | 44,714,476 | 46,608,491 |
| Total | $13,363,971,702 | $15,901,201,077 | $17,854,271,522 | $18,957,597,108 | $20,136,867,071 |

Source: Office of Child Support Enforcement, U.S. Department of Health and Human Services.

8-86

8-73

in each case by far less than the rate of growth in the number of demographically eligible mothers. Equally discouraging, while a slightly higher percentage of women were awarded child support (63.0 percent in 2001 versus 59.1 percent in 1978), the percentage of women who received full payment remained virtually unchanged (25 percent in 2001 versus 24 percent in 1978).

In summary, it appears that the performance of the Nation's child support system is modest and that only a few performance measures have improved over two decades. However, as shown in Table 8-1, the Federal-State child support program has shown improved performance on a number of important measures virtually every year since 1978. To compare performance changes in the IV-D program with overall national trends in child support performance, Table 8-9 summarizes measures from both the IV-D program as revealed in reports from the Office of Child Support Enforcement (OCSE) and the national system of child support as revealed in U.S. Census Bureau Surveys. The data are surprising and, at first, confusing. As shown in the top panel, the Federal-State program is showing impressive improvement on every measure. Total collections, parents located, paternities established, and awards established are up over 275 percent since 1978.

TABLE 8-7--CHILD SUPPORT PAYMENTS FOR ALL WOMEN, WOMEN ABOVE THE POVERTY LEVEL, AND WOMEN BELOW THE POVERTY LEVEL, SELECTED YEARS 1978-2001

| Category of Women | 1978 | 1981 | 1989 | 1993[3] | 1997 | 1999 | 2001 |
|---|---|---|---|---|---|---|---|
| **All women:** | | | | | | | |
| Total (in thousands) | 7,094 | 8,387 | 9,955 | 11,505 | 11,872 | 11,499 | 11,291 |
| Percent awarded [1] | 59.1 | 59.2 | 57.7 | 59.8 | 59.6 | 62.2 | 63.0 |
| Percent received payment | 34.6 | 34.6 | 37.4 | 39.1 | 40.4 | 39.8 | 41.1 |
| Percent received full payment | 23.6 | 22.5 | 25.6 | 18.9 | 24.8 | 24.5 | 25.0 |
| **Women above poverty level:** | | | | | | | |
| Total (in thousands) | 5,121 | 5,821 | 6,749 | 7,271 | 8,062 | 8,194 | 8,468 |
| Percent awarded [1] | 67.3 | 67.9 | 64.6 | 64.4 | 62.8 | 66.1 | 65.4 |
| Percent received payment | 41.1 | 41.4 | 43.1 | 44.4 | 45.7 | 44.9 | 44.3 |
| **Women below poverty level:** | | | | | | | |
| Total (in thousands) | 1,973 | 2,566 | 3,206 | 4,234 | 3,810 | 3,305 | 2,823 |
| Percent awarded [1] | 38.1 | 39.7 | 43.3 | 51.9 | 53.0 | 52.3 | 55.7 |
| Percent received payment | 17.8 | 19.3 | 25.4 | 30.1 | 29.3 | 27.2 | 31.3 |
| Aggregate payment (in billions of dollars): [2] | | | | | | | |
| Child support due | 17.1 | 18.4 | 22.5 | 28.8 | 32.0 | 34.3 | 34.9 |
| Child support received | 11.1 | 11.3 | 15.4 | 18.8 | 21.3 | 20.2 | 21.9 |
| Aggregate child support deficit | 6.0 | 7.1 | 7.1 | 10.0 | 10.7 | 14.1 | 13.0 |

[1] Survey conducted in spring 1979, 1982, 1990, 1994, 1998, 2000, and 2002 for prior years.
[2] In 2001 dollars based on Consumer Price Index Research Series using current methods (CPI-U-RS).
[3] Data for 1993 are not directly compatible with prior years because of changes to survey questions.
Note—Payments for women with own children under age 21.
Source: U.S. Census Bureau (various years).

By contrast, the measures of overall national trends show little improvement. In fact, the likelihood of having an award, being legally entitled to a payment, and

8-79

interstate income withholding cases, the imposition of liens, and administrative subpoenas across State lines.

Sec. 325--Grants authority to State IV-D programs to order genetic testing for paternity establishment, issue a subpoena for financial or other information, and require all entities to respond to requests for information "without the necessity of obtaining an order from any other judicial or administrative tribunal, but subject to due process safeguards as appropriate." Grants States access to public records such as vital statistics of marriage, birth and divorce, State and local tax records, real and titled personal property, license records, employment security records, public assistance programs, motor vehicle records, and corrections records. Also grants access to certain private records such as public utility and cable television records and financial institution data, among other administrative measures.

Sec. 331--Streamlines the legal processes for establishment of paternity, allows establishment of paternity anytime before a child turns 18, and provides for mandatory genetic testing in contested cases, among other provisions.

Sec. 332--Mandates that State programs publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support.

Sec. 333--Requires States to determine whether recipients of aid under the TANF program or Medicaid are cooperating with the State in conducting child support activities against the noncustodial parent.

Sec. 341--Requires the Secretary of HHS to develop a new cost-neutral incentive system by March 1, 1997 which provides additional payments to any State based on such State's performance. Increases the mandatory IV-D paternity establishment percentage in graduated phases from 75 to 90 percent.

Sec. 342--Changes the audit process to be based on performance measures and requires the Secretary to ensure that State data meets high standards of accuracy and completeness.

Sec. 343--Requires States to collect and report program data in a uniform manner as a State plan requirement.

Sec. 344--Creates additional requirements for the State automated data processing systems, and sets a deadline of October 1, 2000 for implementation. Contains a new implementation timetable that extends to October 1, 1997 the deadline by which a State must have an automated case tracking and monitoring system meeting all Federal IV-D requirements up through the enactment of the Family Support Act of 1988. Caps aggregate spending on the new automated system at $400,000,000 and requires the Secretary to devise a formula for distributing these funds among the States. The Federal Government will pay 80 percent of State costs of meeting the new requirements.

Sec. 345--Sets aside 1 percent of the Federal share of reimbursed public assistance for information, training, and related technical assistance concerning State automated systems and research, demonstration, and special projects of

8-80

regional or national significance. An additional 2 percent is set aside for the operation of the FPLS.

*Sec. 346*--Clarifies data collection requirements and eliminates requirements for unnecessary or duplicate information. Several new data reports are to be included in the annual report to Congress, including information about State compliance.

*Sec. 351*--Requires processes for periodic modification of all child support orders, with review occurring every 3 years, upon request.

*Sec. 352*--Expands access and use of consumer reports by child support agencies for establishing and modifying child support.

*Sec. 353*--Specifies that depository institutions are not liable for disclosing financial information to the Child Support Enforcement Agency; the Child Support Enforcement Agency is prohibited from disclosing information obtained except for child support purposes.

*Sec. 361*--Makes technical corrections to the Social Security Act section on Internal Revenue Service (IRS) collection of arrearages.

*Sec. 362*--Eliminates separate withholding rules for all Federal employees. Establishes procedures by which Federal agencies must aggressively pursue child support collections from Federal employees.

*Sec. 363*--Establishes procedures by which all branches of the armed forces must aggressively pursue child support collections from Federal employees.

*Sec. 364*--Requires States to have laws that prevent obligor from transferring income or property to avoid paying child support.

*Sec. 365*--Requires State child support officials to have the authority to seek a judicial or administrative order that requires any individual owing past-due support to pay such support in accordance with a plan approved by the court or participate in work activities.

*Sec. 366*--Provides a definition of a support order.

*Sec. 367*--Requires all child support delinquencies and their amounts to be reported to credit bureaus.

*Sec. 368*--Requires liens on real and personal property and the extension of full faith and credit to liens arising in another State in cases of past-due child support.

*Sec. 369*--Requires States to have laws providing for the suspension of driver's, professional, occupational, and recreational licenses.

*Sec. 370*--Establishes a process by which the U.S. Department of Health and Human Services can submit the names of delinquent obligors who are at least $5,000 in arrears to the State Department for the denial of their passports.

*Sec. 371*--Authorizes Federal officials to declare any foreign country to be a foreign reciprocating country for purposes of establishment and collection of child support obligations.

*Sec. 372*--Requires States to enter agreements with financial institutions

8-81

doing business in the State to develop a data match system by which records on individuals having accounts with the financial institution are matched against the list of child support obligors who have overdue payments.

*Sec. 373*--Adds a State option that a child support order of a child of minor parents, if the mother is receiving cash assistance, may be enforceable against parents of the noncustodial parent of the child.

*Sec. 374*--Clarifies that child support assigned to a State in assistance cases is not dischargeable in bankruptcy.

*Sec. 375*--Allows States to enter cooperative agreements with Indian tribes; allows the Secretary to make direct Federal funding to Indian tribes meeting certain criteria.

*Sec. 381*--Requires the application of the Employee Retirement Income Security Act (ERISA) to support orders that are judgments, decrees or orders issued by any court of competent jurisdiction or through a State administrative process.

*Sec. 382*--Adds a new State law requirement providing that the State IV-D agency have procedures for notifying a new employer of an absent parent, when the absent parent was providing health care coverage of the child in the previous job, of the medical support obligation.

*Sec. 391*--Provides $10 million per year to the Secretary to award grants to States for the purpose of establishing programs to facilitate noncustodial parents' access to and visitation of their children.

## 105th CONGRESS

Public Law 105-33, the Balanced Budget Act of 1997, made 28 technical changes to the 1996 welfare reform law (Public Law 104-193).

Public Law 105-187, the Deadbeat Parents Punishment Act of 1998, established two new categories of felony offenses, subject to a 2-year maximum prison term: (1) traveling in interstate or foreign commerce with the intent to evade a support obligation if the obligation has remained unpaid for more than 1 year or is greater than $5,000; and (2) willfully failing to pay a child support obligation regarding a child residing in another State if the obligation has remained unpaid for more than 2 years or is greater than $10,000.

Public Law 105-200, the Child Support Performance and Incentive Act of 1998, established a new cost/budget-neutral incentive system based on five performance measures that create strong incentives for States to operate efficient and effective programs. The law also imposed less severe financial penalties on States that failed to meet the October 1997 deadline for implementing a statewide CSE automated data processing and information retrieval system. It also included provisions related to medical support and privacy protections, and makes other minor changes.

Public Law 105-306, the Noncitizen Benefit Clarification and Other

8-82

Technical Amendments Act of 1998, included a correction to Public Law 105-200 that allows a State that failed to comply with the 1996 child support data processing requirements to have its annual penalty reduced by 20 percent for each of the five performance measures under the child support incentive system for which it achieves a maximum score. In addition, the provision clarified the date by which States must pass laws implementing medical child support provisions to allow time for State legislatures that meet biennially to pass laws after final Federal regulations are issued in year 2000.

## 106th CONGRESS

Public Law 106-113, the Fiscal Year 2000 Consolidated Appropriations Bill, provided an alternative penalty for States that are not in compliance with the centralized State disbursement unit requirement, but which have submitted a corrective compliance plan by April 1, 2000, that describes how, by when, and at what cost the State would achieve compliance with the State disbursement unit requirement. The Secretary of HHS is required to reduce the amount the State would otherwise have received in Federal child support payments by the penalty amount for the fiscal year. The penalty amount percentage is 4 percent in the case of the first fiscal year of noncompliance; 8 percent in the second year; 16 percent in the third year; 25 percent in the fourth year; or 30 percent in the fifth or any subsequent year. In addition, the law provides for coordination of the alternative disbursement unit penalty with the automated systems penalty so that States that fail to implement both the automated data processing requirement and the State disbursement unit requirement are subject to only one alternative penalty.

Public Law 106-169, the Foster Care Independence Act of 1999, limited the hold harmless requirement of current law by stipulating that States would only be entitled to hold harmless funds if the State's share of child support collections are less than they were in fiscal year 1995 and the State has distributed and disregarded to welfare families at least 80 percent of child support collected on their behalf in the preceding fiscal year or the State has distributed to former welfare recipients the State share of child support payments collected via the Federal Income Tax Offset Program. If these conditions are met, the State's share of child support collections would be increased by 50 percent of the difference between what the State would have received in fiscal year 1995 and its share of child support collections in the pertinent fiscal year. Public Law 106-169 repealed the hold harmless provision effective October 1, 2001.

TABLE 8-19--CHILDREN IN THE IV-D CASELOAD FOR WHOM PATERNITY WAS ESTABLISHED OR
ACKNOWLEDGED, BY STATE, FISCAL YEARS 1998-2002

| State | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Alabama | 5,418 | 6,618 | 6,689 | 6,806 | 7,016 |
| Alaska | 1,806 | 622 | 745 | 663 | 970 |
| Arizona | 14,544 | 14,064 | 13,929 | 16,107 | 14,098 |
| Arkansas | 9,273 | 3,297 | 2,324 | 3,694 | 3,310 |
| California | 210,340 | 186,620 | 204,661 | 144,347 | 56,346 |
| Colorado | 5,065 | 4,180 | 3,534 | 3,044 | 3,141 |
| Connecticut | 7,082 | 7,936 | 6,058 | 5,022 | 13,860 |
| Delaware | 2,946 | 4,234 | 2,845 | 1,930 | 5,774 |
| District of Columbia | 2,364 | 5,491 | 3,520 | 3,630 | 4,856 |
| Florida | 48,385 | 20,452 | 48,966 | 39,548 | 42,803 |
| Georgia | 9,970 | 25,172 | 22,467 | 30,624 | 30,051 |
| Guam | 526 | 993 | 1,219 | 1,026 | 1,203 |
| Hawaii | 1,671 | 2,085 | 3,608 | 4,781 | 5,282 |
| Idaho | 2,910 | 4,147 | 3,526 | 4,708 | 8,598 |
| Illinois | 50,456 | 20,927 | 26,510 | 34,327 | 32,346 |
| Indiana | 2,260 | 15,595 | 25,921 | 20,527 | 9,330 |
| Iowa | 614 | 3,800 | 3,776 | 3,871 | 4,297 |
| Kansas | 10,404 | 415 | 1,225 | 9,603 | 11,422 |
| Kentucky | 9,345 | 11,133 | 10,940 | 10,925 | 12,094 |
| Louisiana | 22,391 | 11,258 | 10,525 | 9,912 | 11,357 |
| Maine | 2,243 | 2,292 | 2,228 | 1,690 | 1,765 |
| Maryland | 38,392 | 14,503 | 17,578 | 13,056 | 10,790 |
| Massachusetts | 10,047 | 9,990 | 9,693 | 7,929 | 2,672 |
| Michigan | 13,443 | 16,740 | 15,727 | 18,366 | 16,204 |
| Minnesota | 4,510 | 7,531 | 15,468 | 8,041 | 8,462 |
| Mississippi | 13,218 | 30,863 | 19,420 | 19,111 | 17,836 |
| Missouri | 23,970 | 8,366 | 15,194 | 15,921 | 17,118 |
| Montana | 1,187 | 1,181 | 1,216 | 1,028 | 1,274 |
| Nebraska | 3,536 | 2,853 | 2,126 | 1,869 | 1,947 |
| Nevada | 2,293 | 2,817 | 18,765 | 2,081 | 2,851 |

8-98

| | | | | | |
|---|---|---|---|---|---|
| New Hampshire | 920 | 754 | 946 | 968 | 860 |
| New Jersey | 11,273 | 17,615 | 13,623 | 14,009 | 13,648 |
| New Mexico | 9,563 | 45,237 | 3,372 | 3,380 | 5,186 |
| New York | 38,001 | 34,666 | 41,692 | 37,818 | 37,236 |
| North Carolina | 30,592 | 23,431 | 29,875 | 36,309 | 30,117 |
| North Dakota | 1,699 | 6,486 | 5,687 | 5,019 | 5,027 |
| Ohio | 37,784 | 59,272 | 31,499 | 15,982 | 16,845 |
| Oklahoma | 7,124 | 8,324 | 4,614 | 4,122 | 4,293 |
| Oregon | 3,674 | 5,040 | 6,343 | 3,726 | 4,462 |
| Pennsylvania | 30,555 | 25,852 | 30,517 | 41,307 | 46,211 |
| Puerto Rico | 33 | 59 | 50 | 65 | 59 |
| Rhode Island | 3,585 | 3,187 | 3,747 | 3,314 | 3,175 |
| South Carolina | 13,941 | 13,552 | 11,687 | 12,987 | 12,744 |
| South Dakota | 725 | 703 | 724 | 716 | 803 |
| Tennessee | 6,785 | 36,126 | 21,919 | 16,506 | 21,320 |
| Texas | 71,571 | 63,443 | 74,482 | 78,117 | 78,427 |
| Utah | 1,985 | 2,257 | 2,478 | 3,014 | 2,648 |
| Vermont | 978 | 731 | 737 | 754 | 1,871 |
| Virgin Islands | 31 | NA | NA | NA | 14 |
| Virginia | 11,793 | 15,326 | 15,588 | 14,365 | 11,414 |
| Washington | 13,726 | 12,781 | 14,228 | 16,065 | 15,014 |
| West Virginia | 6,964 | 1,790 | 2,391 | 1,801 | 2,197 |
| Wisconsin | 13,361 | 21,673 | 29,429 | 21,449 | 23,639 |
| Wyoming | 906 | 725 | 1,060 | 934 | 832 |
| Total | 848,178 | 845,205 | 867,091 | 776,914 | 697,904 |

NA – Not available.
Source: Office of Child Support Enforcement, U.S. Department of Health and Human Services.

**STATISTICAL TABLES**
**TABLE 8-10--STATE PROFILE OF COLLECTIONS AND EXPENDITURES, FY 2002**

| State | Total Distributed Collections | TANF Collections | Non-TANF Collections | Total CSE Expenditures | CSE Cost Effectiveness Ratio | Incentive Payments (Estimated) |
|---|---|---|---|---|---|---|
| Alabama | $210,793,885 | $13,070,953 | $197,722,932 | $62,813,312 | $3.64 | $3,000,000 |
| Alaska | 81,297,436 | 16,452,343 | 64,845,093 | 20,964,504 | 4.49 | 2,564,875 |
| Arizona | 229,628,128 | 28,509,842 | 201,118,286 | 61,488,020 | 4.25 | 3,404,209 |
| Arkansas | 128,845,269 | 15,741,586 | 113,103,683 | 53,325,544 | 2.66 | 1,616,428 |
| California | 1,761,395,793 | 582,988,895 | 1,178,406,898 | 967,850,687 | 1.91 | 43,264,939 |
| Colorado | 202,513,277 | 24,836,128 | 177,677,149 | 63,345,963 | 3.66 | 5,155,207 |
| Connecticut | 216,686,470 | 63,140,625 | 153,545,845 | 62,248,498 | 3.76 | 6,000,000 |
| Delaware | 59,507,990 | 7,169,614 | 52,338,376 | 18,490,612 | 3.66 | 1,320,000 |
| District of Columbia | 40,543,493 | 4,737,603 | 35,805,890 | 18,355,923 | 2.69 | 0 |
| Florida | 803,427,506 | 296,477,106 | 506,950,400 | 228,940,447 | 4.03 | 19,547,520 |
| Georgia | 415,190,279 | 43,164,775 | 372,025,504 | 109,974,793 | 4.24 | 7,776,712 |
| Guam | 7,923,440 | 1,583,590 | 6,339,850 | 5,180,595 | 1.64 | 245,495 |
| Hawaii | 73,490,476 | 12,248,433 | 61,242,043 | 12,204,056 | 6.53 | 1,960,000 |
| Idaho | 95,669,488 | 4,322,906 | 91,346,582 | 19,943,957 | 5.29 | 1,178,155 |
| Illinois | 460,100,983 | 49,700,941 | 410,400,042 | 175,628,019 | 2.80 | 4,769,908 |
| Indiana | 430,195,033 | 27,824,470 | 402,370,563 | 57,415,767 | 7.80 | 948,201 |
| Iowa | 255,489,996 | 87,456,333 | 168,033,663 | 47,746,323 | 5.63 | 4,884,330 |
| Kansas | 134,192,271 | 20,025,764 | 114,166,507 | 57,070,901 | 2.61 | 1,408,098 |
| Kentucky | 280,917,646 | 35,734,880 | 245,182,766 | 62,855,131 | 4.71 | 4,500,000 |
| Louisiana | 260,352,264 | 17,906,938 | 242,445,326 | 57,086,791 | 4.87 | 2,397,750 |
| Maine | 96,058,639 | 29,995,734 | 66,062,905 | 23,605,032 | 4.28 | 3,250,000 |
| Maryland | 396,325,538 | 21,567,764 | 374,757,774 | 101,356,950 | 4.19 | 4,410,000 |
| Massachusetts | 402,684,665 | 47,128,826 | 355,555,839 | 73,157,946 | 5.77 | 7,515,351 |
| Michigan | 1,443,730,382 | 140,231,850 | 1,303,498,532 | 317,969,745 | 4.59 | 19,631,000 |
| Minnesota | 537,089,362 | 57,196,977 | 479,892,385 | 136,841,446 | 4.05 | 13,330,000 |
| Mississippi | 169,034,476 | 8,277,905 | 160,756,571 | 25,093,407 | 7.12 | 2,000,000 |
| Missouri | 410,866,655 | 50,901,728 | 359,964,927 | 93,519,925 | 4.63 | 7,800,000 |

8-96

## TABLE 8-17--FEDERAL INCOME TAX REFUND OFFSET PROGRAM COLLECTIONS, BY STATE, 1997-2001[1]

| State | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| Rhode Island | 2,437,548 | 2,642,309 | 2,800,320 | 3,386,661 | 3,686,740 |
| South Carolina | 10,153,207 | 10,249,119 | 11,361,237 | 12,114,068 | 14,953,252 |
| South Dakota | 3,239,328 | 3,110,950 | 3,705,048 | 3,810,803 | 4,382,575 |
| Tennessee | 19,970,700 | 24,906,948 | 27,228,139 | 23,144,219 | 35,161,329 |
| Texas | 78,613,496 | 95,288,651 | 120,271,738 | 115,570,121 | 130,020,156 |
| Utah | 5,803,963 | 6,226,694 | 8,487,332 | 8,540,594 | 10,100,937 |
| Vermont | 2,127,452 | 2,211,102 | 2,982,024 | 3,195,285 | 3,364,153 |
| Virgin Islands | 306,445 | 276,671 | 313,170 | 539,672 | 414,478 |
| Virginia | 22,028,222 | 21,940,696 | 22,709,031 | 25,366,420 | 31,672,609 |
| Washington | 26,012,026 | 27,720,085 | 32,811,548 | 35,039,700 | 38,885,074 |
| West Virginia | 8,741,096 | 8,638,219 | 10,875,064 | 12,023,698 | 12,145,040 |
| Wisconsin | 27,955,698 | 27,295,925 | 32,638,935 | 34,810,686 | 37,771,376 |
| Wyoming | 3,216,689 | 2,887,657 | 4,012,771 | 4,302,580 | 5,357,845 |
| Total | $1,082,309,276 | $1,133,888,039 | $1,342,254,381 | $1,458,567,112 | $1,647,910,099 |

[1] Year is processing year, i.e. the year the collection actually took place.

Source: Federal Parent Locator Service (FPLS).

## TABLE 8-18—COST EFFECTIVENESS RATIO UNDER THE CHILD SUPPORT PERFORMANCE INCENTIVE ACT OF 1998 FISCAL YEARS 1999-2002

| State | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| Alabama | $3.78 | $3.66 | $4.01 | $3.64 |
| Alaska | 4.41 | 3.89 | 4.14 | 4.49 |
| Arizona | 3.29 | 3.72 | 4.12 | 4.25 |
| Arkansas | 3.28 | 3.28 | 2.83 | 2.66 |
| California | 2.78 | 3.23 | 2.61 | 1.91 |
| Colorado | 3.65 | 3.23 | 3.58 | 3.66 |
| Connecticut | 4.96 | 3.75 | 3.86 | 3.76 |
| Delaware | 2.97 | 3.19 | 2.93 | 3.66 |
| District of Columbia | 3.27 | 2.64 | 2.26 | 2.69 |
| Florida | 3.53 | 3.45 | 3.60 | 4.03 |
| Georgia | 4.16 | 3.72 | 3.96 | 4.24 |
| Guam | 2.25 | 2.67 | 1.33 | 1.64 |
| Hawaii | 3.25 | 4.54 | 6.16 | 6.53 |
| Idaho | 7.09 | 4.32 | 4.62 | 5.29 |
| Illinois | 2.52 | 2.42 | 2.50 | 2.80 |
| Indiana | 7.45 | 7.69 | 6.34 | 7.80 |
| Iowa | 5.01 | 4.24 | 5.27 | 5.63 |
| Kansas | 2.98 | 2.91 | 2.51 | 2.61 |
| Kentucky | 3.90 | 4.02 | 4.08 | 4.71 |
| Louisiana | 4.41 | 4.92 | 4.38 | 4.87 |
| Maine | 4.87 | 4.90 | 6.01 | 4.28 |
| Maryland | 4.42 | 3.60 | 4.22 | 4.19 |
| Massachusetts | 4.07 | 3.50 | 5.14 | 5.77 |
| Michigan | 7.81 | 5.52 | 4.82 | 4.59 |
| Minnesota | 4.06 | 4.11 | 4.13 | 4.05 |
| Mississippi | 4.53 | 4.92 | 5.96 | 7.12 |

8-106

better than we think. New Federalism: Issues and options for States (Series A, No. A-31). Washington, DC: Urban Institute.

U.S. Census Bureau. (1981). Child support and alimony: 1978. Current Population Reports, Series P-60-112. Washington, DC: U.S. Government Printing Office.

U.S. Census Bureau. (1983). Child support and alimony: 1981. Current Population Reports, Series P-60-124. Washington, DC: U.S. Government Printing Office.

U.S. Census Bureau. (1985). Child support and alimony: 1983. Current Population Reports, Series P-60-141. Washington, DC: U.S. Government Printing Office.

U.S. Census Bureau. (1987). Child support and alimony: 1985. Current Population Reports, Series P-60-152. Washington, DC: U.S. Government Printing Office.

U.S. Census Bureau. (1990). Child support and alimony: 1987. Current Population Reports, Series P-60-167. Washington, DC: U.S. Government Printing Office.

U.S. Census Bureau. (1991). Child support and alimony: 1989. Current Population Reports, Series P-60-173. Washington, DC: U.S. Government Printing Office.

U.S. Census Bureau. (1994). Household and family characteristics: March 1994. Washington, DC: U.S. Government Printing Office.

U.S. Census Bureau. (1995). Child support for custodial mothers and fathers: 1991. Current Population Reports, Series P-60-187. Washington, DC: U.S. Government Printing Office.

U.S. Census Bureau. (1998). Poverty in the U.S.: 1998. Current Population Reports, Series P-60-207. Washington, DC: U.S. Government Printing Office.

U.S. Census Bureau. (1999). Child support for custodial mothers and fathers: 1995. Current Population Reports, Series P-60-196. Washington, DC: U.S. Government Printing Office.

U.S. Census Bureau. (in press). Child support and alimony: 1997. Current Population Reports, Series P-60.

U.S. Census Bureau (2001). America's Families and Living Arrangements: 2000, by Jason Fields and Lynn Casper. Current Population Reports, Series P-20-537. Washington, DC.

U.S. Census Bureau (2002a). Custodial Mothers and Fathers and Their Child Support (1999), by Timothy Grall. Series P-60-217. Washington, DC.

U.S. Census Bureau (2002b). Poverty in the United States (2001), by Bernadette D. Proctor and Joseph Dalaker, Current Population Reports, Series P-60-219. Washington, DC.

U.S. Census Bureau (2003). Custodial Mothers and Fathers and Their Child

8-107

Support (2001), by Timothy Grall. Series p-6-217. Washington, D.C. http://www.census.gov/hhes/www/chldsupt.html

U.S. Commission on Interstate Child Support. (1992). Supporting our children: A blueprint for reform. Washington, DC: U.S. Government Printing Office.

U.S. General Accounting Office. (1987). Child support: Need to improve efforts to identify fathers and obtain support orders (HRD-87-37). Washington, DC: Author.

U.S. General Accounting Office. (1992a). Interstate child support: Wage withholding not fulfilling expectations (HRD-92-65BR). Washington, DC: Author.

U.S. General Accounting Office. (1992b). Child support enforcement--timely action needed to correct system development problems (IMTEC-92-46). Washington, DC: Author.

U.S. General Accounting Office. (1996). Child support enforcement: Early results on comparability of privatized and public offices. (HEHS-97-4). Washington, DC: Author.

U.S. General Accounting Office. (2002). Child support enforcement: Clear guidance would help ensure proper access to information and use of wage withholding by private firms,  GAO-02-349. Washington, DC:  U.S. Government Printing Office.

U.S. House of Representatives. (1983). Child support enforcement amendments of 1983 (House Report No. 98-527). Washington, DC:  U.S. Government Printing Office.

Weaver, R.L., & Williams, R.G. (1989, May). Problems with URESA: Interstate child support enforcement isn't working but could. Paper presented at the American Bar Association Third National Child Support Conference, Washington, DC.

Wheaton, L., & Sorensen, E. (1998). Reducing welfare costs and dependency: How much bang for the child support buck? Georgetown Public Policy Review, 4(1), 23-37.

Williams, R.G. (1994). Implementation of the child support provisions of the Family Support Act: Child support guidelines, updating of awards, and routine income withholding (pp. 93-132). In I. Garfinkel, S. McLanahan, & P. Robins (Eds.), Child support and child well-being. Washington, DC: Urban Institute.

TABLE 8-4—FINANCING OF THE FEDERAL/STATE CHILD SUPPORT ENFORCEMENT PROGRAM,
FY 2002

[In Thousands of Dollars]

| State | Federal Administrative Payments | State Share Collections | Federal Incentive Payments | State Administrative Expenditures | State Net | Collections to Costs Ratio |
|---|---|---|---|---|---|---|
| Alabama | $41,772,350 | $3,229,488 | $3,000,000 | $62,813,312 | -$14,811,474 | $3.64 |
| Alaska | 13,850,492 | 7,518,695 | 2,564,875 | 20,964,504 | $2,969,558 | 4.49 |
| Arizona | 40,633,973 | 9,789,966 | 3,404,209 | 61,488,020 | -$7,659,872 | 4.25 |
| Arkansas | 35,292,028 | 2,095,960 | 1,616,428 | 53,325,544 | -$14,321,128 | 2.66 |
| California | 640,414,803 | 261,181,208 | 43,264,939 | 967,850,687 | -$22,989,737 | 1.91 |
| Colorado | 42,203,602 | 12,026,384 | 5,155,207 | 63,345,963 | -$3,960,770 | 3.66 |
| Connecticut | 41,137,173 | 24,188,649 | 6,000,000 | 62,248,498 | $9,077,324 | 3.76 |
| Delaware | 12,220,632 | 2,929,957 | 1,320,000 | 18,490,612 | -$2,020,023 | 3.66 |
| District of Columbia | 12,123,785 | 2,331,315 | 0 | 18,355,923 | -$3,900,823 | 2.69 |
| Florida | 151,549,303 | 35,144,031 | 19,547,520 | 228,940,447 | -$22,699,593 | 4.03 |
| Georgia | 72,856,621 | 12,581,988 | 7,776,712 | 109,974,793 | -$16,759,472 | 4.24 |
| Guam | 3,423,657 | 374,204 | 245,495 | 5,180,595 | -$1,137,239 | 1.64 |
| Hawaii | 8,075,600 | 4,693,441 | 1,960,000 | 12,204,056 | $2,524,985 | 6.53 |
| Idaho | 13,195,260 | 1,239,743 | 1,178,155 | 19,943,957 | -$4,330,799 | 5.29 |
| Illinois | 116,658,654 | 22,273,967 | 4,769,908 | 175,628,019 | -$31,925,490 | 2.80 |
| Indiana | 38,171,773 | 10,184,188 | 948,201 | 57,415,767 | -$8,111,605 | 7.80 |
| Iowa | 31,562,743 | 14,152,532 | 4,884,330 | 47,746,323 | $2,853,282 | 5.63 |
| Kansas | 37,673,723 | 7,563,762 | 1,408,098 | 57,070,901 | -$10,425,318 | 2.61 |
| Kentucky | 41,644,637 | 10,507,704 | 4,500,000 | 62,855,131 | -$6,202,790 | 4.71 |
| Louisiana | 38,010,816 | 4,752,990 | 2,397,750 | 57,086,791 | -$11,925,235 | 4.87 |
| Maine | 15,608,293 | 8,391,405 | 3,250,000 | 23,605,032 | $3,644,666 | 4.28 |
| Maryland | 66,972,127 | 10,679,676 | 4,410,000 | 101,356,950 | -$19,295,147 | 4.19 |
| Massachusetts | 48,348,358 | 23,365,515 | 7,715,351 | 73,157,946 | $6,271,278 | 5.77 |
| Michigan | 209,999,856 | 48,552,323 | 19,631,000 | 317,969,745 | -$39,786,566 | 4.59 |
| Minnesota | 90,481,729 | 23,862,365 | 13,330,000 | 136,841,446 | -$9,167,352 | 4.05 |
| Mississippi | 16,746,999 | 1,844,752 | 2,000,000 | 25,093,407 | -$4,501,656 | 7.12 |
| Missouri | 62,026,337 | 19,287,506 | 7,800,000 | 93,519,925 | -$4,406,082 | 4.63 |
| Montana | 8,272,313 | 1,530,600 | 1,200,000 | 12,488,346 | -$1,485,433 | 4.10 |

8-61

Second, as discussed previously, HHS conducts a financial audit of State expenditures.

In addition to the general matching rate of 66 percent, the Federal Government provides 90 percent matching for one especially important child support activity. Congress provides 90 percent funding for laboratory costs incurred in determining paternity. Congress justified enhanced funding of paternity tests because paternity establishment is an activity vital to successful child support enforcement. Historically, establishing paternity in cases of births outside marriage has proven to be surprisingly difficult. Especially since the 1960s, more and more children have been born outside marriage; today a third of all children are born to unwed mothers, and nearly 50 percent of these babies wind up on welfare. Thus, establishing paternity has become more and more important because a growing fraction of the welfare caseload is children whose paternity has not been established. Congress hopes to stimulate the use of blood or DNA tests as a way of improving State performance in establishing paternity, especially given that recent experience in the States shows that many men voluntarily acknowledge paternity once blood or DNA tests reveal a high probability of their paternity.

In addition to the Federal administrative matching payments, the second stream of financing for State programs is child support collections. As we have seen, when mothers apply for welfare, they assign the child's claim rights against the father to the State. As long as the family receives TANF payments, the State can retain all child support payments. As explained in detail above in the section on distribution of child support payments, States retain the right to pursue repayment for TANF benefits from the parent who owes child support even after the family leaves welfare.

Recovered payments are split between the State and the Federal Government in accord with the percentage of Federal reimbursement of Medicaid benefits. In the Medicaid Program, the Federal Government pays States a percentage of their expenditures that varies inversely with State per capita income--poor States have a high Federal reimbursement percentage; wealthy States have a lower Federal reimbursement percentage. Mississippi, for example, one of the poorest States, receives a reimbursement of about 77 percent for its Medicaid expenditures. By contrast, States like California and New York that have high per capita income receive the minimum Federal reimbursement of 50 percent.

Though TANF is not a matching grant program, the Federal Government and the States still share the costs of providing help to needy families with children. TANF includes a maintenance-of-effort (MOE) requirement that requires States to expend at least 75 percent (80 percent if they fail to meet TANF work requirements) of what they spent under prior law programs in fiscal year 1994 on families with children that meet TANF eligibility requirements. The fact that the Federal Government and the States split the costs of TANF explains why States are required to split child support collections from TANF cases with the Federal

8-62

Government. The rate at which States reimburse the Federal Government is the Federal Medicaid matching rate. The details of this cost-recovery procedure mean that poorer States are rewarded less for their CSE efforts than wealthier States.

The third stream of child support financing is Federal incentive payments. The current incentive system is designed to encourage States to collect child support from both TANF and non-TANF cases.

Public Law 105-200, the Child Support Performance and Incentive Act of 1998 (enacted July 16, 1998), replaced the old incentive payment system with a new cost-neutral system of incentive payments that provides: (1) incentive payments based on a percentage of the State's collections (with no cap on non-TANF collections); (2) incorporation of five performance measures related to establishment of paternity and child support orders, collections of current and past-due support payments, and cost-effectiveness; (3) mandatory reinvestment of incentive payments into the CSE Program; and (4) an incentive payment formula weighted in favor of TANF and former TANF families.

The new incentive system was phased in between fiscal year 2000 and fiscal year 2002. The system caps the Federal incentive pool, thereby forcing States for the first time to compete against each other for incentive dollars. Under the new incentive system, a State may be eligible to receive an incentive payment for good performance. The total amount of the incentive payment received by a State depends on four factors: (1) the total amount of money available in a given fiscal year from which to make incentive payments; (2) the State's success in making collections on behalf of its caseload; (3) the State's performance in five areas (mentioned earlier); and (4) the relative success or failure of other States in making collections and meeting these performance criteria.

The incentive payment no longer comes out of the gross Federal share of child support collected on behalf of TANF families. Instead, Public Law 105-200 required the Secretary of HHS to make incentive payments to States.  This law stipulated that the incentive payment pool could not exceed $422 million for fiscal year 2000; $429 million for fiscal year 2001; $450 million for fiscal year 2002; $461 million for fiscal year 2003; $454 million for fiscal year 2004; $446 million for fiscal year 2005; $458 million for fiscal year 2006; $471 million for fiscal year 2007; and $483 million for fiscal year 2008. For years after fiscal year 2008, the incentive pool is increased to reflect changes in inflation in the previous year as measured by the Consumer Price Index.

Given this overview of the three streams of money that support State CSE programs, we can now examine the basic financial operations of the child support system. Table 8-4 summarizes both child support income and expenditures for every State. The first three columns show State income from each of three funding streams just described; the fourth column shows State spending on child support. As demonstrated in the fifth column, the sum of the three streams of income exceeded expenditures in some 8 States in fiscal year 2002. In other words, some

TABLE 8-4--FINANCING OF THE FEDERAL/STATE CHILD SUPPORT ENFORCEMENT PROGRAM,
FY 2002-continued

[In Thousands of Dollars]

| State | Federal Administrative Payments | State Share Collections | Federal Incentive Payments | State Administrative Expenditures | State Net | Collections to Costs Ratio |
|---|---|---|---|---|---|---|
| Nebraska | 34,022,260 | 4,174,032 | 2,085,000 | 51,452,821 | -$11,171,529 | 2.87 |
| Nevada | 26,508,244 | 2,845,197 | 1,405,265 | 40,122,603 | -$9,363,897 | 2.87 |
| New Hampshire | 12,598,325 | 4,206,036 | 1,223,270 | 18,740,756 | -$713,125 | 4.37 |
| New Jersey | 112,259,046 | 30,557,770 | 17,100,000 | 169,893,050 | -$9,976,234 | 4.83 |
| New Mexico | 26,199,265 | 2,202,487 | 720,002 | 39,663,969 | -$10,542,215 | 1.46 |
| New York | 202,847,433 | 76,443,949 | 23,000,000 | 306,731,258 | -$4,439,876 | 4.49 |
| North Carolina | 75,961,551 | 15,227,706 | 9,180,000 | 114,731,870 | -$14,362,613 | 4.43 |
| North Dakota | 7,789,975 | 1,592,621 | 764,611 | 11,793,383 | -$1,646,176 | 4.71 |
| Ohio | 228,191,923 | 29,385,100 | 18,560,384 | 344,634,577 | -$68,497,170 | 4.81 |
| Oklahoma | 34,841,729 | 5,767,732 | 3,100,000 | 52,282,771 | -$8,573,310 | 2.80 |
| Oregon | 34,060,493 | 9,463,432 | 5,319,000 | 51,552,166 | -$2,709,241 | 5.85 |
| Pennsylvania | 132,475,460 | 39,174,104 | 13,745,000 | 200,473,876 | -$15,079,312 | 6.85 |
| Puerto Rico | 23,141,964 | 394,741 | 528,000 | 34,938,437 | -$10,873,732 | 6.27 |
| Rhode Island | 8,376,742 | 7,049,864 | 2,400,000 | 12,692,034 | $5,134,572 | 4.52 |
| South Carolina | 26,701,035 | 2,924,397 | 1,800,000 | 40,281,284 | -$8,855,852 | 5.87 |
| South Dakota | 4,925,871 | 1,454,306 | 1,565,866 | 7,434,866 | $511,177 | 7.59 |
| Tennessee | 50,968,814 | 7,696,055 | 1,200,000 | 76,715,673 | -$16,850,804 | 4.50 |
| Texas | 176,302,824 | 35,044,013 | 24,165,275 | 265,126,381 | -$29,614,269 | 5.41 |
| Utah | 24,327,960 | 5,354,932 | 1,984,582 | 36,816,553 | -$5,149,079 | 3.89 |
| Vermont | 7,383,287 | 2,290,376 | 1,289,696 | 11,146,668 | -$183,309 | 3.93 |
| Virgin Islands | 3,496,995 | 57,978 | 45,000 | 5,289,924 | -$10,873,732 | 1.58 |
| Virginia | 50,490,635 | 17,751,367 | 6,600,000 | 76,276,031 | $5,134,572 | 6.34 |
| Washington | 83,990,215 | 41,865,136 | 14,676,000 | 127,203,755 | $13,327,596 | 4.95 |
| West Virginia | 21,755,127 | 3,316,222 | 2,272,681 | 32,855,073 | -$5,511,043 | 4.87 |
| Wisconsin | 64,429,060 | 16,730,618 | 7,530,000 | 97,279,925 | -$8,570,247 | 6.11 |
| Wyoming | 6,757,440 | 1,232,826 | 467,936 | 10,223,927 | -$1,765,725 | 5.00 |
| Total | $3,431,731,310 | $950,477,311 | $338,025,746 | 55,183,316,271 | -$463,081,904 | $4.13 |

[1] The collections-to-costs ratio is the ratio that will be used pursuant to the Child Support Performance and Incentive Act of 1998 (CSPIA).
Source: Office of Child Support Enforcement, Annual Reports to Congress.

8-64

States still make a profit on their child support program. States are free to spend the State share of collections in any manner the State sees fit, but States must spend Federal incentive payments solely on the CSE program or on activities approved by the Secretary of HHS which contribute to the effectiveness or efficiency of the CSE program.

The method of financing child support enforcement has received considerable attention in recent years. One of the most important issues is that States have little incentive to control their administrative spending. The last column of Table 8-4 presents a measure of State program efficiency obtained by dividing total collections by total administrative expenses. The table shows the dramatic differences among States in how much child support is collected for each dollar of administrative expenditure--a crude measure of efficiency-- ranging from only $0.96 in New Mexico to $6.91 in South Dakota. Fifteen States, including States that spend up to two times as much per dollar of collections as more efficient States, still make a profit on the program.

Table 8-5 shows one consequence of child support's financing system. The first two columns of the table show the net impact of program financing on the Federal and State governments respectively. The Federal Government has spent more money on child support every year since 1979, with spending rising from $43 million in 1979 to $2.327 billion in 2001, and dropping slightly to $2.252 billion in 2002.

State governments until recently always made a profit on the program. Beginning in fiscal year 2000 they too have experienced aggregate losses every year. In 1979, the first year for which data are available, States in the aggregate cleared $244 million. In 1993, the peak year, States cleared $482 million. In fiscal year 2000, States in the aggregate lost $87 million; in 2001, States lost $272 million; and in 2002, States lost $463 million.

The last column in Table 8-5 portrays an unfortunate historical progression in child support financing. Beginning in the very first year of the child support program and for nearly a decade thereafter, the net impact of Federal spending and State profits was a net savings for taxpayers. Thus, in 1979, State savings more than made up for Federal spending. As a result, from a public finance perspective, taxpayers were ahead by $201 million (see last column). Total Federal and State child support expenditures, in other words, were more than offset by collections from parents whose children had been supported by AFDC payments. These AFDC collections were retained and used to reimburse the Federal and State governments for previous AFDC expenditures. The savings produced in this manner exceeded overall expenditures.

However, net public savings declined over the years. A major explanation for the negative public savings was that beginning in 1985, as explained above, new Federal legislation required States to give the first $50 per month of collections in welfare cases to the custodial parent. This $50 pass through had an immediate

8-66

TABLE 8-5--FEDERAL AND STATE SHARE OF CHILD SUPPORT
"SAVINGS," SELECTED FISCAL YEARS 1980-2002

[In Millions of Dollars]

| Fiscal Year | Federal Share of Child Support Savings [1] | State Share of Child Support Savings [1] | Net Public Savings [1] |
|---|---|---|---|
| 1980 | -103 | 230 | 127 |
| 1985 | -231 | 317 | 86 |
| 1990 | -528 | 338 | -190 |
| 1991 | -586 | 385 | -201 |
| 1992 | -605 | 434 | -170 |
| 1993 | -740 | 462 | -278 |
| 1994 | -978 | 482 | -496 |
| 1995 | -1,273 | 421 | -852 |
| 1996 | -1,147 | 409 | -738 |
| 1997 | -1,282 | 469 | -813 |
| 1998 | -1,424 | 286 | -1,139 |
| 1999 | -1,758 | 66 | -1,692 |
| 2000 | -2,038 | -87 | -2,125 |
| 2001 | -2,327 | -272 | -2,599 |
| 2002 | -2,252 | -463 | -2,715 |

[1] Negative "savings" are costs.
Note: Numbers may not add due to rounding.
Source: Office of Child Support Enforcement, Annual Reports to Congress.

impact; in its first year (1985), combined Federal- State savings fell to $86 million from $261 million the previous year. By 1989 the overall "savings" in the combined program went negative. For the first time that year, Federal expenditures exceeded State gains--by $77 million. The net losses have increased almost every year, reaching $852 million in 1995 before declining somewhat to $738 million in 1996. In 2002, the net loss had reached $2.715 billion.

Reflecting on these numbers, two perspectives should be considered. One perspective, the finance perspective, attends simply to the measurable costs and benefits of the child support program. But a second, broader perspective includes more diffuse social benefits of child support that are difficult to measure.

From the finance perspective, perhaps the most important question about child support financing is why the Federal Government should provide such a high reimbursement level for State expenditures when some States still make a profit on their child support program. In the past, this issue has prompted Congress to reduce the basic administrative reimbursement rate on several occasions. As a result, the rate has declined from its original level of 75 percent to 66 percent. But some Members of Congress have suggested that, because some States are still making a profit while the Federal Government is losing money, Congress should reduce the Federal administrative reimbursement rate below 66 percent. Defenders of child support financing respond by pointing out that allowing States to profit from the program makes it very popular with State policymakers who control funding of the State share of expenditures. Without financing arrangements favorable to State interests, according to this view, the child support program would not have posted

8-67

the impressive gains that have characterized the program since its inception in 1975. Moreover, many defenders of the current financing structure view retained collections as reimbursement for a portion of a State's welfare expenditures, rather than "income" to the State. In fiscal year 2001 the State's share of retained collections accounted for just 6 percent of all States' expenditures on TANF.

The 66 percent Federal reimbursement of State administrative expenditures raises a second issue of program financing: Why is such a large percentage of State expenditures financed without regard to performance? Even if States spend a great deal of money on activities of dubious value in collecting child support, they can nonetheless count on 66 percent reimbursement from the Federal Government. The flat 66 percent reimbursement rate may provide States with an incentive to spend money inefficiently. A potential solution would be for the Federal Government to provide States with less money based on gross spending and relatively more money based on performance.

However, some critics of child support financing question whether incentives should be provided for non-TANF collections. With regard to program financing, there is a striking difference between the TANF and non-TANF programs; namely, government retains part of TANF collections but non-TANF collections are given entirely to the family. When Congress enacted the Child Support Enforcement program in 1975, the floor debate shows that members of the House and Senate supported the program primarily because retaining welfare collections would help offset welfare expenditures.

But program trends since 1975 show that the non-TANF program is actually much bigger than the TANF program and grows faster each year than the TANF program. As shown in Table 8-1 above, welfare collections increased from about $0.5 billion in 1978 to a high point of $2.9 billion in 1996, a growth factor of five. Between 1996 and 2002, welfare collections actually declined somewhat (to $2.5 billion in 1999) and then increased back to $2.9 billion in 2002. But non-TANF collections have grown steadily from about $0.6 billion to $17.2 billion over the period 1978-2002, for a growth factor of about 28.

The point here is that non-TANF collections are growing much faster than TANF collections and probably will continue to do so in light of the 1996 welfare reforms. And since the State and Federal Governments receive virtually no direct reimbursement for non-TANF expenditures, the child support program loses more and more money every year. Why, then, critics ask, should the Federal Government encourage greater expenditures by providing incentives for non-TANF collections. Ignoring for the moment possible social benefits from the non-TANF program and based entirely on a finance perspective, some critics argue that non-TANF incentives encourage inefficiency.

Another issue regarding program financing is whether government should pay such a high percentage of costs in the non-TANF program. States must charge an application fee that can be no more than $25 for the non-TANF program, but this

8-68

amount doesn't even pay the full cost of opening a case file. In 2001, a little more than 3.2 million non-TANF families (i.e., families that had never been on TANF) received services resulting in child support collections that averaged around $3,130 per case. By collecting this money, government is providing a useful service to millions of families, many of which are not poor. Rather than have taxpayers pick up the cost of this service, some critics argue that families receiving the services should pay more of the costs. Federal law allows States to charge additional fees, but few do so. States argue that, because many of the non-TANF families are poor or low-income, charging them for child support services would decrease their already tenuous financial stability. States also argue that setting up an administrative system to establish and collect the fees would cost more money than the fees actually collected.  Additionally, others have pointed out that child support collections often represent the enforcement of court orders, and the public is not directly charged for other forms of law enforcement.

The account of child support from the finance perspective given above relies on measurable spending and collections. However, defenders of the current child support program argue that it may produce social benefits that are not captured by mere spending and collections data. These program defenders claim that a strong child support program produces "cost avoidance" by demonstrating to noncustodial parents who would try to avoid child support that the system will eventually catch up with them.

Although currently there is only modest evidence that would allow an estimate of the cost avoidance effect (Wheaton & Sorensen, 1998; see also: Barnow, Dall, Nowak, Dannhausen, 2000), there is nonetheless good reason to believe that at least some noncustodial parents make child support payments in part because they fear detection and prosecution. Even more to the point, a strong child support program may change the way society thinks about child support. As in the cases of civil rights and smoking, a persistent effort over a period of years may convince millions of Americans, both those who owe child support and those concerned with the condition of single-parent families, that making payments is a moral and civic duty. Those who avoid it would then be subject to something even more potent than legal prosecution--social ostracism.

To the extent that this reasoning is correct, the public and policymakers may come to regard child support enforcement as a long-term investment similar in many respects to education, job training, and other policies that help families support their children. In each of these cases, there is the expectation that society will be better off in the long run because the government invests in helping individuals and families. But the expectation that investments will lead to immediate payoffs, or even that we can devise evaluation methods that adequately capture the long-term payoffs, is a much lower criterion of success than the expectation of immediate and measurable payoffs that characterizes the kind of public finance reasoning outlined above. Of course, even if the public is willing to

8-69

continue paying for child support enforcement as a social investment, Congress and child support administrators may nonetheless find it desirable to intensify their efforts to make the program as efficient as possible.

## HOW EFFECTIVE IS CHILD SUPPORT ENFORCEMENT?

Since the inception of the Federal-State child support program in 1975, there appears to have been growing public awareness of the problem of nonpayment of child support and increased willingness by taxpayers to spend money trying to improve child support enforcement. As measured either by expenditures or total collections, the Federal-State program has grown rapidly since 1978. To the extent that private arrangements fail to ensure child support payments, our laws and, increasingly, our practices bring child support cases into the public domain. In view of these changes in law and practice, it seems useful to provide a broad assessment of the performance of the Nation's child support system in general and of the CSE program (Title IV-D of the Social Security Act) in particular.

## IMPACT ON TAXPAYERS

One useful measure of the Federal-State program is the impact of collections on TANF costs. As outlined above, States retain and split with the Federal Government child support collections from parents whose children are on TANF. In addition, States often can retain part of collections from parents whose children were on TANF in the past as repayment for taxpayer-provided TANF benefits. As shown in Table 8-1 above, after a long period of steady growth TANF collections declined from a high of nearly $2.9 billion in 1996 to $2.5 billion in fiscal year 1999 and increased back to $2.9 billion in fiscal year 2002. Despite its many successes, the overall financial impact of the child support program on taxpayers is negative. As shown in Table 8-5, program expenses totaled $2.7 billion in 2002.

## IMPACT ON POVERTY

In 2001, about 23 percent of the 13.4 million women and men rearing children alone had incomes below the poverty level. By comparison, 19 percent of the custodial parents who received child support payments had incomes below the poverty level (U.S. Census Bureau, 2003a, detailed Table 4). Thus, child support appears to be associated with a modest reduction in poverty. If the child support program could collect support for a substantial fraction of the additional 7.3 million single parents who did not receive payments in 2001, the antipoverty impact of the program could be substantially improved.

Despite the modest impact of child support on poverty, many families on welfare have received enough of a financial boost from child support payments that

they were able to leave the rolls. In 2001, 330,000 families with child support collections, representing about 16 percent of the welfare caseload, became ineligible for TANF. Similarly, about 3 percent of families in the non-TANF child support program were lifted out of poverty by child support payments. This 3 percent figure is more impressive than it appears at first because a substantial fraction of the non-TANF caseload had incomes above the poverty level before receiving any child support payments. For most of these nonpoor families, incomes and standards of living were improved by child support payments. Presumably, even poor families that received child support but remained in poverty had their standard of living improved by the child support payments.

## IMPACT ON NATIONAL CHILD SUPPORT PAYMENTS

Perhaps the most important measure of the Federal-State program is its impact on overall national rates of paying child support. Although the original intent of Congress in creating the child support program was primarily to offset welfare payments, both Congress and the American public have come to see the program as a means of improving the Nation's system of ensuring that all parents who no longer live with their children continue to provide for their financial support.

The U.S. Census Bureau periodically collects national survey information on child support. By interviewing a random sample of single-parent families, the Census Bureau is able to generate a host of numbers that can be used to assess the performance of noncustodial parent in paying child support.

Table 8-6 provides detailed information for 2001, the most recent year for which national data are available, on child support payments by fathers to families headed by mothers. Although the 2001 survey, like 1999, 1997, 1995, 1993, and 1991 surveys, included custodial fathers, the following discussion is focused solely on custodial mothers. Several points bear emphasis, the most important of which is that many female-headed families do not receive child support. As shown in the bottom row of the upper panel in Table 8-6, of the 11.3 million female-headed families eligible for support, only 63 percent even had a support award. Most observers would say that a major failure of the Nation's child support system is that entirely too many mothers do not have a child support award.

Of the 6.2 million mothers who had an award and who were supposed to receive payments in 2001, 75 percent actually received at least one payment (Table 8-6). However, as shown in Table 8-7, only about 41 percent of the total of 11.3 million women who did not live with their children's father in 2001 actually received at least one payment and only 25 percent received everything due.  So in addition to its failure to get orders for 37 percent of eligible mothers, critics assert that a second failure of the child support system is that a large proportion of the money owed is not paid.

8-71

### TABLE 8-6--CHILD SUPPORT PAYMENTS AWARDED AND RECEIVED BY WOMEN WITH CHILDREN PRESENT, BY SELECTED CHARACTERISTICS, 2001 [1]

| Characteristics | Total Custodial Mothers (Thousands) | Percent of Custodial Mothers Awarded Child Support | Total Custodial Mothers with Support Order (Thousands) | Custodial Mothers Receiving Support in 2001 | | |
|---|---|---|---|---|---|---|
| | | | | Percent | Mean Child Support | Mean Income |
| **All Women** | | | | | | |
| Current marital status: | | | | | | |
| Married | 2,715 | 68 | 1,682 | 79 | $4,126 | $25,963 |
| Divorced | 3,587 | 72 | 2,300 | 79 | 5,148 | 34,974 |
| Separated | 1,349 | 56 | 599 | 74 | 4,417 | 26,801 |
| Widowed [2] | 116 | 72 | 61 | 77 | [4] | [4] |
| Never married | 3,524 | 52 | 1,570 | 64 | 2,864 | 19,978 |
| Race and Hispanic origin: | | | | | | |
| White | 7,843 | 67 | 4,624 | 78 | 4,592 | 29,576 |
| Black | 3,010 | 54 | 1,400 | 64 | 3,043 | 23,445 |
| Hispanic origin [3] | 1,689 | 52 | 755 | 73 | 4,014 | 19,557 |
| Years of school completed: | | | | | | |
| Less than high school grad | 1,915 | 48 | 762 | 60 | 2,934 | 12,282 |
| High school grad or GED | 4,280 | 63 | 2,376 | 74 | 3,831 | 21,518 |
| Some college | 2,552 | 68 | 1,505 | 77 | 4,219 | 25,423 |
| Associate degree | 1,016 | 69 | 616 | 77 | 4,131 | 32,786 |
| Bachelors degree or more | 1,528 | 70 | 953 | 82 | 6,239 | 54,414 |
| **Total** | 11,291 | 63 | 6,212 | 75 | 4,274 | 28,258 |
| **Women Below Poverty** | | | | | | |
| Current marital status: | | | | | | |
| Married | 216 | 59 | 107 | 74 | 2,664 | 3,593 |
| Divorced | 763 | 64 | 424 | 73 | 3,767 | 8,036 |
| Separated | 479 | 48 | 184 | 69 | 3,663 | 7,941 |
| Widowed [2] | 23 | 87 | 20 | 30 | [4] | [4] |
| Never married | 1,343 | 52 | 605 | 60 | 2,389 | 7,955 |
| Race: | | | | | | |
| White | 1,645 | 60 | 845 | 73 | 3,263 | 7,617 |
| Black | 1,063 | 49 | 444 | 52 | 2,463 | 7,888 |
| Hispanic origin [3] | 553 | 47 | 217 | 74 | 2,887 | 6,504 |
| **Total** | 2,823 | 56 | 1,339 | 66 | 3,078 | 7,604 |

[1] Award status as of spring 2002.
[2] Widowed women whose previous marriage ended in divorce.
[3] Persons of Hispanic origin may be of any race.
[4] Sample too small to produce reliable estimate.
Note: Women with own children under 21 years of age present from an absent father as of spring 2002.
Source:  U.S. Census Bureau (2003)

8-72

Table 8-6, which also summarizes child support information by ethnic group, by years of schooling, and by poverty level, suggests a number of interesting and important features of child support payments. White mothers are more likely to have a support order than black or Hispanic mothers (67 percent versus 54 percent for blacks and 52 percent for Hispanics). Similarly, mothers with a bachelors degree have a 70 percent chance of having an order as compared with 48 percent for high school dropouts and 63 percent for high school graduates. As for payments, white mothers receive $4,592 per year on average as compared with $3,043 for black mothers and $4,014 for Hispanic mothers. Mothers with a bachelor's degree receive $6,239 per year in support as compared with $2,934 and $3,831 for high school dropouts and graduates respectively.

Clearly, mothers who are already financially worse off get less from child support than mothers who are financially better off. This generalization is made especially clear by two further pieces of information depicted in the table. First, never-married mothers, one of the poorest demographic groups in the Nation, are less likely to have an award than divorced mothers (52 percent versus 72 percent); even never-married mothers who actually receive support get considerably less than divorced mothers ($2,864 versus $5,148). Second, as shown by the data at the bottom of the table, poor mothers are less likely to have orders and receive less money than non-poor mothers. Table 8-8 shows similar data for the award of health insurance. While demonstrating that about 59 percent of all mothers have health insurance included in their award, the table also shows that the probability of health insurance coverage is greatly reduced for never-married women (43 percent), black (40 percent) and Hispanic women (50 percent), and women with less schooling (i.e., high school dropouts, 44 percent).

Table 8-7, which summarizes several child support measures for selected years from 1978 to 2001, complements and puts into context the conclusions drawn from the 2001 data.[3] The pattern of poor women being less likely to have an order and receive support is nothing new; but the years since 1978 show a narrowing of the difference. The percentage of poor women who had an order was up 46 percent over the 23-year period, compared with a decline of 3 percent among women above the poverty level. Similarly, the percentage of poor women who received child support payments increased 76 percent from 1978 to 2001, compared to an increase of 8 percent among non-poor women. The percentage of all women with an award and the percentage that actually receive any payment have grown only slightly, and

[3]The Census Bureau changed its interview procedures before obtaining the 1991 data. Specifically, Census asked whether adults had any children under age 21 in their household who had a parent living elsewhere. This question may have excluded some mothers who would have answered the child support questions in previous surveys. In the interviews for the years 1978 through 1989, all never-married mothers were asked the child support questions. Because of this and other differences in procedure, the Census Bureau recommends "extreme caution" (U.S. Census Bureau, 1995, p. 40) in comparing data from the 1992 interview with data from previous interviews. We present the data from most of the surveys and recommend that readers draw their own conclusions.

8-74

receiving at least one payment have been nearly stagnant. Moreover, the percentage of mothers who received the full amount due has decreased from 49 percent to 45 percent. On the other hand, total collections (for custodial mothers) increased by 78 percent. This increase, however, is dwarfed by the 631 percent increase in IV-D collections. The increase must also be interpreted in view of the fact that the number of single mothers demographically eligible for child support increased by over 59 percent over the same period.

### TABLE 8-8 CHILD SUPPORT AWARD STATUS AND INCLUSION OF HEALTH INSURANCE IN AWARD, BY SELECTED CHARACTERISTICS OF WOMEN, 2001

[Numbers in Thousands]

| Characteristic | Total | Supposed to Receive Child Support Payments in 2001 | | |
| --- | --- | --- | --- | --- |
| | | Total | Health Insurance Included in Child Support Award | |
| | | | Number | Percent of Total Awarded |
| Current marital status: [1] | | | | |
| Married | 2,715 | 1,682 | 1,212 | 66 |
| Divorced | 3,587 | 2,300 | 1,769 | 68 |
| Separated | 1,349 | 599 | 386 | 51 |
| Never married | 3,524 | 1,570 | 796 | 43 |
| Race and Hispanic origin: | | | | |
| White | 7,843 | 4,624 | 3,459 | 66 |
| Black | 3,010 | 1,400 | 640 | 40 |
| Hispanic[2] | 1,689 | 755 | 442 | 50 |
| Age: | | | | |
| 15-17 years | 50 | 23 | 4 | 17 |
| 18-29 years | 2,973 | 1,365 | 790 | 50 |
| 30-39 years | 4,394 | 2,638 | 1,807 | 61 |
| 40 years and over | 3,875 | 2,187 | 1,615 | 63 |
| Years of school completed: | | | | |
| Less than high school | 1,915 | 762 | 402 | 44 |
| High school graduate or | 4,280 | 2,376 | 1,554 | 58 |
| Some college, no degree | 2,552 | 1,505 | 1,090 | 63 |
| Associate degree | 1,016 | 616 | 459 | 65 |
| Bachelors degree or more | 1,528 | 953 | 711 | 66 |
| Number of own children present from an absent father: | | | | |
| One | 6,354 | 3,156 | 2,223 | 61 |
| Two | 3,268 | 2,102 | 1,438 | 62 |
| Three | 1,261 | 742 | 451 | 52 |
| Four or more | 408 | 211 | 103 | 42 |
| Total | 11,291 | 6,212 | 4,216 | 59 |

[1] Excludes a small number of currently widowed women whose previous marriage ended in divorce.
[2] Persons of Hispanic origin may be of any race.
Note -- Women 15 years and older with own children under 21 years of age present from absent fathers as of spring 2002.
Source: U.S. Census Bureau, 2002.

Clearly, although the IV-D program has been growing steadily since 1978, and its performance on many measures has been improving, the improvement

8-75

appears to have had only modest impact on the national picture. How can these two trends be reconciled?

The last panel of Table 8-9 suggests an answer as it shows collections by the Federal-State program as a percentage of overall national child support payments. In 1978, less than one-fourth of child support payments were collected through the IV-D program. By 2001, the percentage had grown to 87 percent. The implication of this trend is that the IV-D program may be recruiting more and more cases from the private sector, bringing them into the public sector, providing them with subsidized services (or substituting Federal spending for State and local spending), but not greatly improving overall collections. Whatever the explanation, it seems that improved effectiveness of the CSE program has not led to significant improvement of the Nation's child support performance.

Two additional statistics must be considered in any general assessment of national child support payments. First, according to Sorensen (1997), noncustodial parents owe over $30 billion in overdue child support. Some perspective on the magnitude of this figure is provided by recalling that the entire Federal outlay on the Temporary Assistance for Needy Families (TANF) welfare program in 1999 was about $16.5 billion.

But many critics of the child support system contend that this figure on arrearages, which is based on child support orders currently in place, is actually an underestimate of the shortcomings of the Nation's child support system. These critics hold that too few noncustodial parents have orders, that the amount of orders is too low, and that not enough of the amount owed is actually paid. Considerations of this sort have led to several studies of what might be called "child support collections potential," the amount that could be collected by a perfectly efficient child support system.

The most recent of these studies, conducted by researchers at the Urban Institute (Sorensen, 1997), produced the estimate that $51 billion could be collected in child support each year. The assumptions underlying this estimate are that all custodial parents had an order, that payments were made in accordance with the Wisconsin guidelines (17 percent for one child, 25 percent for two children, 29 percent for three children, 31 percent for four children, and 34 percent for five or more children), and that the full amount of every order was actually paid. Of course, no one expects any program to be perfectly efficient. Even so, comparing the $51 billion that could be generated by a perfect system with the actual payments of around $19 billion in 2001 provides a useful index of how far we need to go as a

TABLE 8-9--COMPARISON OF MEASURES OF IV-D EFFECTIVENESS WITH CENSUS CHILD SUPPORT DATA, SELECTED YEARS 1978-2001

| Measure | 1978 | 1981 | 1985 | 1989 | 1991[3] | 1993 | 1995 | 1997 | 1999 | 2001 | Percent change, 1978-2001 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total IV-D collections (2001 dollars, in billions)[1] | 2.6 | 3.0 | 4.2 | 7.2 | 8.7 | 10.7 | 12.5 | 14.7 | 16.9 | 19.0 | 631 |
| Parents located (thousands) | 454 | 696 | 878 | 1,624 | 2,577 | 3,777 | 4,950 | 6,585 | NA | NA | NA |
| Paternities established (thousands) | 111 | 164 | 232 | 339 | 472 | 554 | 659 | 848 | 845 | 777 | 600 |
| Awards established | 315 | 414 | 669 | 936 | 821[3] | 1,026 | 1,051 | 1,156 | 1,220 | 1,181 | 275 |
| Total collections (2001 dollars, in billions)[1] | NA | NA | NA | NA | 15.1 | 18.8 | 21.5 | 21.3 | 20.2 | 21.9 | NA |
| Collections for custodial mothers(2001 dollars, in billions)[1,2] | 11.1 | 11.3 | 11.3 | 15.4 | 14.2 | 17.0 | 19.5 | 19.4 | 18.7 | 19.8 | 78 |
| Of demographically eligible: | | | | | | | | | | | |
| Percent with awards | 59 | 59 | 61 | 58 | 56 | 60 | 61 | 60 | 62 | 63 | 7 |
| Percent supposed to receive payment | 48 | 48 | 50 | 50 | 49 | 51 | 54 | 53 | 53 | 55 | 15 |
| Percent who received some payment | 35 | 35 | 37 | 37 | 38 | 39 | 41 | 40 | 40 | 41 | 17 |
| Of mothers supposed to receive payment: Percent who received full amount | 49 | 47 | 48 | 51 | 52 | 37 | 43 | 46 | 46 | 45 | -8 |
| IV-D collections as a percent of total collections | 23 | 27 | 38 | 47 | 58 | 57 | 58 | 69 | 84 | 87 | 278 |

NA – Not Available.

[1] The Census Bureau collected data on custodial fathers for the first time for 1991; only the data on custodial mothers is included here.

[2] In 2001 dollars based on Consumer Price Index Research Series Using Current Methods (CPI-U-RS).

[3] The definition of support orders established changed in 1991.

[4] Note: For 1978-1989, total national collections only include custodial mothers--during that time data on custodial fathers was not collected. "Demographically eligible" means women with own children under 21 years of age living with them from an absent parent. Sources: Office of Child Support Enforcement, Annual Reports to Congress, 1994 and various years; U.S. Census Bureau (various years).

8-77

Nation if we are to provide custodial parents and children with the measure of financial security that is the major goal of our child support system.

Finally, there does appear to be one area in which the Federal-State program is having some success. As discussed in detail in Appendix M, Nonmarital births have exploded since the 1960s. These cases are the most difficult ones in which to establish a child support order and make collections. Because there are more and more of these difficult cases each year, improved performance with other types of cases is being masked to some degree. Despite the difficulty of those cases, the Federal-State program has increased the probability of collections for never-married mothers from 4 percent in 1976 to 18 percent in 1997 (Sorensen and Halpern, 1999). Even so, the huge increase in these cases in recent decades has served to reduce the overall effectiveness of the Federal-State program.

## LEGISLATIVE HISTORY

(Note: For legislative history before 1996, see previous editions of the Green Book)

### 104th CONGRESS

Title III of the 1996 welfare reform law (Public Law 104-193) was devoted to major reforms of the Child Support Enforcement program. A section-by-section summary of these reforms follows:

*Sec. 301*--Imposes a State obligation to provide child support enforcement services for each child receiving assistance under IV-A (TANF), IV-E (foster care and adoption), and title XIX (Medicaid). Services must also be provided for others who apply, including families ceasing to receive assistance (no application is permitted for this group).

*Sec. 302*--Changes distribution priorities to provide that families leaving welfare receive priority in payment of arrears. Changes are effective October 1, 1997 for postassistance arrears and October 1, 2000 for preassistance arrears. Exception is made for collections from the Federal Tax Refund Offset Program. Provides a hold harmless provision so that States are protected if the amount they lose because of changes in distribution exceeds what they gain from the elimination of the $50 passthrough (eliminated October 1, 1996).

*Sec. 303*--Protects privacy rights with respect to confidential information.

*Sec. 304*--Requires States to have procedures for providing notices of proceedings and copies of orders to recipients of program services or parties to cases being served under title IV-D.

*Sec. 311*--Specifies requirements for the central State registry, including maintaining and updating a payment record and extracting data for matching with other databases. Allows automated linkages of local registries.

*Sec. 312*--Specifies requirements for the centralized collection and disbursement of support payments, including the monitoring of payments,

8-78

generating wage withholding notices, and automatic use of administrative enforcement remedies. Under some circumstances, permits linkages of local disbursement units to form centralized State disbursement unit for collection and disbursement of child support payments. Requires distribution within 2 business days of receipt of collection; requires transmission of withholding orders to employers within 2 business days of notice of income source subject to withholding.

*Sec. 313*--Requires employers and labor organizations to report name, address, Social Security number (SSN), and employer identification number of new hires to State directory of new hires within 20 days of hire (in the case of an employer transmitting reports magnetically or electronically, reports may be made by two monthly transmissions); requires the report to be the W-4 or equivalent at option of the employer with penalties assessed for failure to report. State directory must perform database matching using SSNs and report findings to any State; directory must also report information to the National directory within 3 business days, and issue withholding notices within 2 business days of match, among other requirements.

*Sec. 314*--Strengthens and expands income withholding from wages to pay child support by reducing the time for employers to remit withheld wages to 7 business days and adding a State law requirement that allows issuance of electronic withholding orders by State agency and without notice to obligor.

*Sec. 315*--Includes requirements for access by State child support agency to locator information from State motor vehicle and law enforcement systems.

*Sec. 316*--Expands the authority of FPLS to obtain information and locate individuals. Permits access to the Federal Parent Locator Service (FPLS) for the enforcement of child custody and visitation orders but specifies that requests must come through courts or child support agencies. Requires establishment of a Federal case registry of child support orders, and details guidelines for the National directory of new hires. Allows disclosure of certain information, including Federal tax offset amounts, to child support enforcement agents.

*Sec. 317*--Requires use of SSNs on applications for professional licenses, commercial driver's licenses, occupational license or marriage licenses, and in records for divorce decrees, support orders, paternity determinations or acknowledgments and death certificates.

*Sec. 321*--Mandates adoption by all States of the Uniform Interstate Family Support Act.

*Sec. 322*--Clarifies priorities for recognition of orders.

*Sec. 323*--Requires States to respond within 5 business days to a request from another State to enforce a support order; electronic means are allowed for transmitting requests.

*Sec. 324*--Calls for the promulgation of forms, developed by the Secretary of the U.S. Department of Health and Human Services (DHHS), to be used in

| | | | |
|---|---|---|---|
| Nevada | 39,079 | 5,039 | 8,402 | 25,638 |
| New Hampshire | 26,961 | 2,744 | 12,608 | 11,609 |
| New Jersey | 227,583 | 21,028 | 103,898 | 102,657 |
| New Mexico | 23,890 | 2,551 | 12,576 | 8,763 |
| New York | 445,833 | 53,600 | 235,970 | 156,263 |
| North Carolina | 245,796 | 19,809 | 147,958 | 78,029 |
| North Dakota | 21,223 | 1,576 | 7,604 | 12,043 |
| Ohio | 490,479 | 22,202 | 166,792 | 301,485 |
| Oklahoma | 70,905 | 6,077 | 39,457 | 25,371 |
| Oregon | 115,226 | 14,369 | 51,765 | 49,092 |
| Pennsylvania | 421,739 | 37,391 | 163,846 | 220,502 |
| Puerto Rico | 98,606 | 4,521 | 5,382 | 88,703 |
| Rhode Island | 21,198 | 5,188 | 12,623 | 3,387 |
| South Carolina | 101,586 | 12,360 | 53,531 | 35,695 |
| South Dakota | 23,170 | 1,598 | 12,265 | 9,307 |
| Tennessee | 142,947 | 20,425 | 60,094 | 62,428 |
| Texas | 497,260 | 35,920 | 223,232 | 238,108 |
| Utah | 57,731 | 6,651 | 31,865 | 19,215 |
| Vermont | 15,753 | 3,879 | 8,202 | 3,672 |
| Virgin Islands | 3,757 | 202 | 327 | 3,228 |
| Virginia | 199,862 | 14,890 | 78,022 | 106,950 |
| Washington | 236,592 | 23,188 | 134,513 | 78,891 |
| West Virginia | 59,173 | 4,434 | 28,469 | 26,270 |
| Wisconsin | 220,246 | 7,552 | 130,919 | 81,775 |
| Wyoming | 22,384 | 1,153 | 10,167 | 11,064 |
| Total | 7,819,434 | 806,207 | 3,768,001 | 3,245,226 |

NA - Not Available.
Source: Office of Child Support Enforcement, U.S. Department of Health and Human Services.

8-93

8-94

## TABLE 8-16--NUMBER OF CASES IN WHICH A COLLECTION WAS MADE ON AN OBLIGATION, BY STATE, FISCAL YEARS 1999-2002

| State | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| Alabama | 105,565 | 107,547 | 110,222 | 113,717 |
| Alaska | 27,489 | 28,402 | 29,030 | 29,733 |
| Arizona | 77,157 | 84,772 | 89,688 | 92,218 |
| Arkansas | 66,871 | 69,477 | 73,418 | 70,910 |
| California | 766,733 | 797,793 | 781,260 | 793,194 |
| Colorado | 83,851 | 76,684 | 70,782 | 62,653 |
| Connecticut | 75,326 | 80,114 | 80,871 | 84,369 |
| Delaware | 25,808 | 27,140 | 27,349 | 27,550 |
| District of Columbia | 16,145 | 15,650 | 15,716 | 16,910 |
| Florida | 284,287 | 305,078 | 326,243 | 353,708 |
| Georgia | 198,966 | 182,781 | 186,813 | 195,174 |
| Guam | 3,200 | 3,360 | 5,686 | 6,197 |
| Hawaii | 25,491 | 28,017 | 29,353 | 30,583 |
| Idaho | 28,553 | 39,663 | 42,490 | 45,410 |
| Illinois | 162,782 | 175,048 | 192,627 | 205,219 |
| Indiana | 130,225 | 141,194 | 143,071 | 143,180 |
| Iowa | 97,536 | 117,942 | 123,407 | 128,522 |
| Kansas | 45,351 | 63,990 | 64,166 | 65,341 |
| Kentucky | 104,035 | 112,505 | 125,988 | 132,399 |
| Louisiana | 108,763 | 114,500 | 118,774 | 123,955 |
| Maine | 39,787 | 41,463 | 42,089 | 41,201 |
| Maryland | 143,430 | 144,310 | 147,738 | 152,033 |
| Massachusetts | 98,586 | 103,882 | 108,387 | 110,235 |
| Michigan | 538,596 | 476,416 | 434,814 | 453,993 |
| Minnesota | 138,087 | 145,540 | 151,692 | 153,346 |
| Mississippi | 89,274 | 96,260 | 102,366 | 104,618 |
| Missouri | 144,876 | 155,895 | 163,727 | 172,333 |
| Montana | 23,105 | 24,076 | 23,690 | 24,148 |
| Nebraska | 42,667 | 55,098 | 56,971 | 57,606 |
| Nevada | 28,336 | 35,703 | 37,876 | 39,079 |
| New Hampshire | 25,961 | 26,451 | 26,702 | 26,961 |
| New Jersey | 212,632 | 218,259 | 222,025 | 227,583 |
| New Mexico | 20,126 | 19,378 | 21,631 | 23,890 |
| New York | 400,521 | 441,369 | 442,034 | 445,833 |
| North Carolina | 155,197 | 220,954 | 233,756 | 245,796 |
| North Dakota | 15,853 | 18,915 | 20,197 | 21,223 |
| Ohio | 218,234 | 435,480 | 481,723 | 490,479 |
| Oklahoma | 32,718 | 62,538 | 64,748 | 70,905 |
| Oregon | 107,452 | 111,285 | 112,404 | 115,226 |
| Pennsylvania | 395,073 | 397,253 | 413,840 | 421,739 |
| Puerto Rico | 86,081 | 92,439 | 95,053 | 98,606 |
| Rhode Island | 19,663 | 20,270 | 20,382 | 21,198 |
| South Carolina | 89,581 | 93,585 | 99,538 | 101,586 |
| South Dakota | 3,701 | 21,300 | 22,120 | 23,170 |
| Tennessee | 117,900 | 122,360 | 128,737 | 142,947 |
| Texas | 251,679 | 303,686 | 347,535 | 497,260 |
| Utah | 51,803 | 55,686 | 57,076 | 57,731 |
| Vermont | 15,124 | 15,989 | 16,304 | 15,753 |
| Virgin Islands | NA | NA | NA | 3,757 |
| Virginia | 170,857 | 181,736 | 195,227 | 199,862 |
| Washington | 214,798 | 226,921 | 232,809 | 236,592 |

8-95

TABLE 8-16--TOTAL NUMBER OF CASES IN WHICH A COLLECTION
WAS MADE ON AN OBLIGATION, BY STATE, FISCAL YEARS
1999-2002-continued

| State | 1999 | 2000 | 2001 | 2002 |
|-------|------|------|------|------|
| West Virginia | 51,522 | 52,287 | 57,382 | 59,173 |
| Wisconsin | 204,663 | 223,967 | 221,592 | 220,246 |
| Wyoming | 17,919 | 19,846 | 21,340 | 22,384 |
| Total | 6,599,936 | 7,232,254 | 7,460,459 | 7,819,434 |

NA - Not available.
Source: Office of Child Support Enforcement, U.S. Department of Health and Human Services.

TABLE 8-17--FEDERAL INCOME TAX REFUND
OFFSET PROGRAM COLLECTIONS, BY STATE, 1997-2001[1]

| State | 1997 | 1998 | 1999 | 2000 | 2001 |
|-------|------|------|------|------|------|
| Alabama | $25,207,976 | $25,894,332 | $24,090,459 | $24,638,355 | $24,707,633 |
| Alaska | 2,916,897 | 4,053,435 | 3,868,250 | 3,921,427 | 4,351,656 |
| Arizona | 12,923,158 | 11,554,450 | 20,945,877 | 25,111,485 | 30,156,853 |
| Arkansas | 12,175,810 | 13,612,153 | 15,089,808 | 14,912,875 | 15,510,819 |
| California | 132,837,753 | 153,176,190 | 200,963,590 | 241,130,230 | 273,395,833 |
| Colorado | 13,931,621 | 14,806,851 | 18,118,678 | 16,872,297 | 18,108,182 |
| Connecticut | 14,034,124 | 14,819,137 | 17,917,582 | 19,900,847 | 22,939,161 |
| Delaware | 3,424,237 | 3,694,623 | 4,124,589 | 3,966,775 | 3,686,865 |
| District of Columbia | 2,831,602 | 2,984,312 | 4,041,138 | 3,491,209 | 4,002,306 |
| Florida | 51,708,934 | 53,296,570 | 61,916,563 | 66,976,220 | 75,842,867 |
| Georgia | 31,895,028 | 31,230,286 | 36,533,066 | 38,612,575 | 40,239,518 |
| Guam | 98,579 | 276,666 | 319 | 722,670 | 657,151 |
| Hawaii | 4,567,040 | 5,475,196 | 5,541,815 | 8,379,354 | 8,541,261 |
| Idaho | 4,441,441 | 4,872,607 | 6,690,572 | 6,584,840 | 7,963,961 |
| Illinois | 37,063,693 | 39,587,150 | 39,601,568 | 47,586,601 | 52,047,841 |
| Indiana | 26,128,824 | 23,723,109 | 33,930,579 | 30,335,141 | 36,106,147 |
| Iowa | 15,189,453 | 18,051,295 | 18,921,698 | 21,992,829 | 24,260,883 |
| Kansas | 13,625,662 | 13,308,114 | 16,165,804 | 16,896,149 | 18,085,848 |
| Kentucky | 18,097,478 | 17,952,310 | 21,368,417 | 23,463,533 | 30,836,506 |
| Louisiana | 21,695,543 | 19,536,574 | 17,908,455 | 20,826,460 | 26,026,418 |
| Maine | 7,405,638 | 7,928,158 | 9,242,949 | 9,686,794 | 11,082,659 |
| Maryland | 23,833,299 | 22,636,713 | 19,951,907 | 21,942,981 | 26,284,260 |
| Michigan | 59,784,330 | 61,367,111 | 67,919,449 | 74,626,204 | 90,778,675 |
| Minnesota | 13,607,091 | 9,595,970 | 15,961,291 | 17,566,908 | 21,396,380 |
| Mississippi | 15,958,928 | 16,851,588 | 15,917,211 | 18,229,960 | 19,532,884 |
| Missouri | 26,813,712 | 27,309,570 | 28,790,237 | 33,013,939 | 38,065,746 |
| Montana | 2,712,292 | 2,854,313 | 3,664,627 | 3,361,295 | 3,947,257 |
| Nebraska | 5,411,190 | 5,139,788 | 6,841,600 | 8,119,357 | 8,694,074 |
| Nevada | 5,144,326 | 5,240,671 | 7,315,582 | 7,926,120 | 9,271,201 |
| New Hampshire | 3,844,925 | 4,108,137 | 4,896,194 | 4,818,710 | 5,588,489 |
| New Jersey | 27,199,550 | 26,970,401 | 32,086,625 | 33,122,338 | 33,400,141 |
| New Mexico | 5,468,306 | 5,277,170 | 5,501,333 | 6,006,936 | 4,912,943 |
| New York | 49,517,204 | 49,262,418 | 59,784,586 | 63,915,548 | 67,685,281 |
| North Carolina | 30,001,986 | 27,421,654 | 28,365,569 | 32,394,624 | 33,274,501 |
| North Dakota | 2,715,459 | 2,876,842 | 3,814,114 | 3,131,504 | 5,117,348 |
| Ohio | 60,170,639 | 63,972,649 | 77,210,517 | 91,736,682 | 97,362,537 |
| Oklahoma | 12,469,128 | 12,661,373 | 15,865,004 | 16,355,895 | 16,718,557 |
| Oregon | 10,450,619 | 11,486,379 | 17,942,643 | 16,157,625 | 20,669,643 |
| Pennsylvania | 47,174,470 | 47,394,360 | 51,073,074 | 55,198,332 | 62,955,904 |
| Puerto Rico | 3,996,795 | 3,172,321 | 2,928,593 | 5,735,849 | 5,934,767 |

8-97

TABLE 8-18-- COST EFFECTIVENESS RATIO UNDER THE CHILD
SUPPORT PERFORMANCE INCENTIVE ACT OF 1998
FISCAL YEARS 1999-2002-continued

| State | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| Missouri | 3.26 | 3.37 | 3.81 | 4.63 |
| Montana | 3.87 | 3.58 | 3.91 | 4.10 |
| Nebraska | 3.61 | 3.78 | 3.35 | 2.87 |
| Nevada | 3.08 | 2.52 | 3.24 | 2.87 |
| New Hampshire | 4.24 | 4.82 | 5.40 | 4.37 |
| New Jersey | 4.86 | 4.60 | 5.27 | 4.83 |
| New Mexico | 1.18 | 1.31 | 1.07 | 1.46 |
| New York | 4.58 | 4.90 | 5.07 | 4.49 |
| North Carolina | 2.93 | 3.86 | 4.04 | 4.43 |
| North Dakota | 4.42 | 4.61 | 4.19 | 4.71 |
| Ohio | 4.91 | 4.82 | 4.23 | 4.81 |
| Oklahoma | 3.37 | 2.83 | 2.90 | 2.80 |
| Oregon | 6.08 | 5.54 | 6.63 | 5.85 |
| Pennsylvania | 6.21 | 6.05 | 6.98 | 6.85 |
| Puerto Rico | 5.77 | 6.31 | 5.51 | 6.27 |
| Rhode Island | 4.36 | 4.44 | 4.23 | 4.52 |
| South Carolina | 5.06 | 5.08 | 4.60 | 5.87 |
| South Dakota | 6.75 | 6.95 | 7.72 | 7.59 |
| Tennessee | 4.69 | 4.85 | 4.99 | 4.50 |
| Texas | 4.23 | 4.96 | 5.23 | 5.41 |
| Utah | 3.24 | 3.47 | 3.69 | 3.89 |
| Vermont | 4.15 | 4.02 | 3.90 | 3.93 |
| Virgin Islands | 2.86 | 1.63 | 1.12 | 1.58 |
| Virginia | 4.74 | 5.00 | 6.12 | 6.34 |
| Washington | 4.68 | 4.53 | 4.55 | 4.95 |
| West Virginia | 4.09 | 4.15 | 4.64 | 4.87 |
| Wisconsin | 5.64 | 6.51 | 6.06 | 6.11 |
| Wyoming | 4.84 | 4.33 | 4.09 | 5.00 |
| Total | $4.11 | $4.23 | $4.21 | $4.13 |

Source: Office of Child Support Enforcement, U.S. Department of Health and Human Services.

8-100

## TABLE 8-20-- NUMBER OF PATERNITIES ESTABLISHED OR ACKNOWLEDGED, BY STATE, FISCAL YEARS 1997-2001

| State | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| Alabama | 12,096 | 9,995 | 13,236 | 6,689 | 6,806 |
| Alaska | 3,228 | 3,228 | 2,811 | 3,055 | 2,995 |
| Arizona | 23,350 | 23,350 | 39,105 | 43,515 | 48,287 |
| Arkansas | 12,436 | 12,436 | 3,799 | 3,062 | 10,411 |
| California | 286,133 | 286,133 | 326,051 | 306,508 | 277,307 |
| Colorado | 12,733 | 12,733 | 15,559 | 13,745 | 15,480 |
| Connecticut | 10,589 | 10,589 | 18,816 | 16,687 | 17,189 |
| Delaware | 6,128 | 6,128 | 5,821 | 4,611 | 3,881 |
| District of Columbia | 5,800 | 5,800 | 9,710 | 7,863 | 3,630 |
| Florida | 29,645 | 29,645 | 65,836 | 98,004 | 91,299 |
| Georgia | 13,934 | 13,934 | 47,163 | 22,467 | 62,450 |
| Guam | 461 | 461 | 2,162 | 1,905 | 2,619 |
| Hawaii | 1,761 | 1,761 | 3,710 | 3,937 | 5,198 |
| Idaho | 3,395 | 3,395 | 6,747 | 6,071 | 7,399 |
| Illinois | 76,736 | 76,736 | 49,336 | 71,696 | 82,706 |
| Indiana | 19,857 | 19,857 | 15,595 | 25,921 | 20,527 |
| Iowa | 6,524 | 6,524 | 10,364 | 10,561 | 10,117 |
| Kansas | 15,197 | 15,197 | 7,347 | 8,571 | 17,454 |
| Kentucky | 12,991 | 12,991 | 14,600 | 16,000 | 16,318 |
| Louisiana | 29,581 | 29,581 | 26,851 | 20,496 | 15,206 |
| Maine | 2,274 | 2,274 | 3,504 | 3,372 | 2,688 |
| Maryland | 22,709 | 22,709 | 28,458 | 32,959 | 29,016 |
| Massachusetts | 24,367 | 24,367 | 24,518 | 25,197 | 23,887 |
| Michigan | 38,407 | 38,407 | 49,026 | 49,878 | 52,659 |
| Minnesota | 18,289 | 18,289 | 19,594 | 26,875 | 20,399 |
| Mississippi | 20,279 | 20,279 | 40,349 | 19,420 | 19,111 |
| Missouri | 29,556 | 29,556 | 23,652 | 31,880 | 32,843 |
| Montana | 2,267 | 2,267 | 2,669 | 3,288 | 2,894 |
| Nebraska | 7,432 | 7,432 | 6,446 | 5,886 | 6,028 |
| Nevada | 1,832 | 1,832 | 2,817 | 18,765 | 2,081 |
| New Hampshire | 3,164 | 3,164 | 936 | 1,411 | 1,398 |
| New Jersey | 32,727 | 32,727 | 41,811 | 36,987 | 37,538 |
| New Mexico | 2,774 | 2,774 | 52,380 | 10,992 | 11,814 |
| New York | 92,439 | 92,439 | 90,711 | 102,368 | 102,104 |
| North Carolina | 42,445 | 42,445 | 23,431 | 29,875 | 36,309 |
| North Dakota | 1,337 | 1,337 | 8,194 | 7,478 | 6,839 |
| Ohio | 38,239 | 38,239 | 96,813 | 67,223 | 53,602 |
| Oklahoma | 6,295 | 6,295 | 17,961 | 13,694 | 13,995 |
| Oregon | 13,257 | 13,257 | 14,567 | 16,239 | 13,496 |
| Pennsylvania | 83,860 | 83,860 | 56,051 | 61,300 | 72,091 |
| Puerto Rico | 21,968 | 21,968 | 59 | 90 | 186 |
| Rhode Island | 4,518 | 4,518 | 3,187 | 3,747 | 3,314 |
| South Carolina | 13,378 | 13,378 | 17,867 | 16,853 | 18,906 |
| South Dakota | 2,728 | 2,728 | 2,701 | 2,964 | 3,100 |
| Tennessee | 22,551 | 22,551 | 50,908 | 37,343 | 34,718 |
| Texas | 82,397 | 82,397 | 126,187 | 126,940 | 144,468 |
| Utah | 7,425 | 7,425 | 7,892 | 7,869 | 9,234 |
| Vermont | 886 | 886 | 731 | 737 | 754 |
| Virgin Islands | NA | NA | NA | NA | NA |
| Virginia | 21,827 | 21,827 | 36,417 | 35,086 | 34,822 |
| Washington | 23,888 | 23,888 | 27,901 | 27,700 | 30,083 |
| West Virginia | 11,617 | 11,617 | 6,653 | 7,286 | 6,593 |
| Wisconsin | 13,776 | 13,776 | 29,265 | 29,429 | 21,449 |
| Wyoming | 627 | 627 | 1,704 | 1,945 | 1,811 |

8-101

TABLE 8-20-- NUMBER OF PATERNITIES ESTABLISHED OR
ACKNOWLEDGED, BY STATE, FISCAL YEARS 1997-2001-continued

| State | 1997 | 1998 | 1999 | 2000 | 2001 |
|-------|------|------|------|------|------|
| Total | 1,294,230 | 1,294,230 | 1,599,979 | 1,554,440 | 1,567,509 |

NA - Not available.
Source: Office of Child Support Enforcement, U.S. Department of Health and Human Services.

TABLE 8-21--OUT-OF-WEDLOCK BIRTHS, BY STATE,
FISCAL YEARS 1999-2001

| State | 1999 | 2000 | 2001 |
|-------|------|------|------|
| Alabama | 20,693 | 21,696 | 20,777 |
| Alaska | 3,301 | 3,291 | 3,281 |
| Arizona | 31,463 | 33,475 | 33.776 |
| Arkansas | 12,932 | 13,490 | 13,378 |
| California | 170,372 | 174,050 | 172,764 |
| Colorado | 15,818 | 16,369 | 16,732 |
| Connecticut | 12,562 | 12,591 | 12,433 |
| Delaware | 4,147 | 4,193 | 4,290 |
| District of Columbia | 4,642 | 4,626 | 4,376 |
| Florida | 73,824 | 78,068 | 80,221 |
| Georgia | 46,328 | 49,058 | 49,834 |
| Guam | NA | 2,064 | 1,985 |
| Hawaii | 5,593 | 5,658 | 5,632 |
| Idaho | 4,302 | 4,392 | 4,557 |
| Illinois | 62,088 | 63,852 | 63,449 |
| Indiana | 29,640 | 30,409 | 30,676 |
| Iowa | 10,330 | 10,711 | 10,824 |
| Kansas | 11,098 | 11,497 | 11,628 |
| Kentucky | 16,540 | 17,377 | 17,317 |
| Louisiana | 30,109 | 30,980 | 30,267 |
| Maine | 4,260 | 4,222 | 4,369 |
| Maryland | 25,083 | 25,726 | 25,198 |
| Massachusetts | 21,476 | 21,654 | 21,641 |
| Michigan | 44,184 | 45,354 | 45,742 |
| Minnesota | 17,065 | 17,468 | 17,782 |
| Mississippi | 19,606 | 20,267 | 19,582 |
| Missouri | 25,737 | 26,436 | 26,235 |
| Montana | 3,232 | 3,378 | 3,440 |
| Nebraska | 6,181 | 6,692 | 6,870 |
| Nevada | 10,483 | 11,213 | 11,679 |
| New Hampshire | 3,399 | 3,603 | 3,542 |
| New Jersey | 32,556 | 33,464 | 33,807 |
| New Mexico | 12,272 | 12,401 | 12,552 |
| New York | 93,613 | 94,594 | 90,746 |
| North Carolina | 37,814 | 40,118 | 40,507 |
| North Dakota | 2,099 | 2,173 | 2,127 |
| Ohio | 52,038 | 53,864 | 53,239 |
| Oklahoma | 16,252 | 17,054 | 17,637 |
| Oregon | 13,750 | 13,793 | 13,764 |
| Pennsylvania | 47,865 | 47,839 | 48,536 |
| Puerto Rico | NA | 29,507 | 28,529 |
| Rhode Island | 4,242 | 4,435 | 4,543 |
| South Carolina | 21,441 | 22,341 | 22,343 |

8-102

TABLE 8-21--OUT-OF-WEDLOCK BIRTHS,
BY, STATE, FISCAL YEARS 1999-2001-continued

| State | 1999 | 2000 | 2001 |
|---|---|---|---|
| South Dakota | 3,348 | 3,462 | 3,516 |
| Tennessee | 26,981 | 27,505 | 27,974 |
| Texas | 109,244 | 110,985 | 113,420 |
| Utah | 7,722 | 8,186 | 8,327 |
| Vermont | 1,901 | 1,827 | 1,972 |
| Virgin Islands | NA | 1,043 | 1,115 |
| Virginia | 28,334 | 29,617 | 29,930 |
| Washington | 22,335 | 22,852 | 22,880 |
| West Virginia | 6,581 | 6,608 | 6,638 |
| Wisconsin | 19,906 | 20,327 | 20,686 |
| Wyoming | 1,778 | 1,802 | 1,813 |
| Total | 1,308,560 | 1,381,657 | 1,382,879 |

NA – Not available.
Source: National Vital Statistics.

TABLE 8-22--PERCENTAGE OF CHILD SUPPORT PATERNITIES
ESTABLISHED, BY STATE, FISCAL YEARS1999-2001

| State | 1999 | 2000 | 2001 |
|---|---|---|---|
| Alabama | 47.25 | 56.89 | 58.25 |
| Alaska | 92.26 | 99.07 | 87.77 |
| Arizona | 22.41 | 69.26 | 54.68 |
| Arkansas | 82.98 | 70.03 | 81.46 |
| California | 179.58 | 60.38 | 142.48 |
| Colorado | 89.14 | 103.39 | 103.15 |
| Connecticut | 68.14 | 76.20 | 78.63 |
| Delaware | 67.79 | 66.97 | 68.26 |
| District of Columbia | 87.28 | 65.32 | NA |
| Florida | 79.52 | 82.93 | 85.64 |
| Georgia | 34.50 | 54.35 | NA |
| Guam | 92.35 | 86.75 | 136.47 |
| Hawaii | 180.89 | 232.72 | 100.50 |
| Idaho | 72.13 | 85.32 | 94.93 |
| Illinois | 59.54 | 86.14 | 108.55 |
| Indiana | 55.36 | 45.73 | 62.13 |
| Iowa | 101.80 | 92.70 | 94.58 |
| Kansas | 1.37 | 79.69 | 77.21 |
| Kentucky | 72.39 | 75.47 | 70.59 |
| Louisiana | 23.10 | 50.20 | 53.10 |
| Maine | 90.81 | 90.95 | 92.24 |
| Maryland | 108.94 | 149.86 | 119.97 |
| Massachusetts | 107.93 | 106.20 | 92.19 |
| Michigan | 85.45 | 91.92 | 119.06 |
| Minnesota | 88.58 | 86.48 | 79.57 |
| Mississippi | 54.19 | 65.74 | 69.22 |
| Missouri | 86.73 | 84.28 | 86.74 |
| Montana | 70.77 | 105.30 | 104.30 |
| Nebraska | 93.60 | 88.29 | 90.21 |
| Nevada | 67.07 | 61.75 | NA |
| New Hampshire | 52.97 | 95.85 | NA |
| New Jersey | 119.30 | 110.09 | 113.40 |
| New Mexico | 64.47 | 99.60 | 130.31 |

8-103

### TABLE 8-22--PERCENTAGE OF CHILD SUPPORT PATERNITIES ESTABLISHED, BY STATE, 1999-2001-continued

| State | 1999 | 2000 | 2001 |
|-------|------|------|------|
| New York | 100.69 | 103.37 | 95.40 |
| North Dakota | 74.22 | 65.89 | 84.35 |
| Ohio | 106.83 | 109.37 | 108.89 |
| Oklahoma | 73.19 | 81.35 | 86.34 |
| Oregon | 84.22 | 89.36 | 85.73 |
| Pennsylvania | 251.69 | 118.92 | 137.09 |
| Rhode Island | 57.55 | 59.14 | 69.74 |
| South Carolina | 50.97 | 69.42 | 76.80 |
| South Dakota | 73.78 | 95.60 | 93.86 |
| Tennessee | 78.81 | 68.10 | 73.79 |
| Texas | 103.84 | 104.57 | 81.81 |
| Utah | 98.40 | 92.82 | 99.91 |
| Vermont | 66.20 | 101.52 | 101.51 |
| Virgin Islands | 122.59 | 95.32 | 110.71 |
| Virginia | 76.85 | 83.79 | 85.97 |
| Washington | 109.48 | 94.41 | 98.73 |
| West Virginia | 108.97 | 89.97 | 89.38 |
| Wisconsin | 83.10 | 69.93 | 86.57 |
| Wyoming | 52.92 | 102.85 | 79.53 |
| Total | 64.39 | 68.98 | 82.85 |

Note: May not be comparable to previous years' data.  May exceed 100 percent due to establishment of paternity for births in prior years.
Source: Office of Child Support Enforcement, IV-D or statewide paternity establishment percentage as selected by the State.

### TABLE 8-23--STATES USING THE INCOME SHARES AND PERCENTAGE OF INCOME APPROACHES TO ESTABLISHING CHILD SUPPORT GUIDELINES

| Income Shares | | |
|---|---|---|
| Alabama | Maine | Oklahoma |
| Arizona | Maryland | Oregon |
| California | Michigan | Pennsylvania |
| Colorado | Missouri | Rhode Island |
| Connecticut | Montana | South Carolina |
| Florida | Nebraska | South Dakota |
| Idaho | New Hampshire | Utah |
| Indiana | New Jersey | Vermont |
| Iowa | New Mexico | Virginia |
| Kansas | North Carolina | Washington |
| Kentucky | Ohio | Wyoming |
| Louisiana | | |

| Percentage of Income | | |
|---|---|---|
| Alaska | Minnesota | Tennessee |
| Arkansas | Mississippi | Texas |
| Georgia | Nevada | Wisconsin |
| Illinois | New York | |
| Iowa | North Dakota | |

Source: See www.supportguidelines.com (2003).

8-104
# REFERENCES

American Institutes for Research. (1999). State child access and visitation programs: A preliminary report, Fiscal Year 1997 Funding. Washington, DC: U.S. Department of Health and Human Services.

Automatic Data Processing, Inc., (2001). Employer Reimbursement Guide for Child Support and Garnishment Processing. Roseland, New Jersey.

Barnow, Dall, Nowak, Dannhausen. (2000). The Potential of the Child Support Enforcement Program to Avoid Costs to Public Programs: A Review and Synthesis of the Literature, Final Report. Washington, DC.

Bumpass, L. (1984). Children and marital disruption: A replication and update. Demography, 21, 71-82.

Bureau of Labor Statistics and Census Bureau. (2002). Annual Demographic Survey, March Supplement, table 17.   [http://ferret.bls.census.gov /macro/032002/pov/new17_003.htm]

Cooper, P., & Johnson, A. (1993, April). Employment-related health insurance in 1987 (AMCPR Pub. No. 93-0044). Rockville, MD: Public Health Service.

Federal Register. (1992, December 28). Regulations for updating child support orders. 57(249).

Garfinkel, I., McLanahan, S., & Robins, P.K. (1994). Child support and child well-being. Washington, DC: Urban Institute Press.

Garfinkel, I., Melli, M.S., & Robertson, J.G. (1994, Spring). Child support orders: A perspective on reform (pp. 88-93). In R.E. Behrman (Ed.), The future of children: Children and divorce, 4(1). Los Altos, California: Packard Foundation.

Georgeson, L.M. (1989, May). DNA in paternity cases. Paper presented at the American Bar Association Third National Child Support Conference, Arlington, VA.

Gordon, A.R. (1994). Implementation of the income withholding and medical support provisions of the 1984 child support enforcement amendments (pp. 86-87). In I. Garfinkel, S. McLanahan, & P. Robins (Eds.), Child support and child well-being. Washington, DC: Urban Institute.

Hill, M.S. (1988, May). The role of economic resources and dual-family status in child support payments. Ann Arbor, MI: Institute for Social Research, University of Michigan.

McKillop, L.T. (1981). Benefits of establishing paternity. Washington, DC: Office of Child Support Enforcement.

Morgan, Laura W. (1996). Child Support Guidelines: Interpretation and Application. http://www.suportguidelines.com/book/chap1a.html

National Center for Health Statistics. (1995, September). Advance report of final natality statistics: 1993 Monthly Vital Statistics Report, 44(3, Supplement).

8-105

Office of Child Support Enforcement. (1986). Employer fees for wage withholding. Child Support Report, 8(10), p. 7.

Office of Child Support Enforcement. (1987, September).  Development of guidelines for child support orders: Advisory panel recommendations and final report. Washington, DC: Author.

Office of Child Support Enforcement. (1990). Paternity establishment (3d ed.). Washington, DC: Author.

Office of Child Support Enforcement. (1991, June). Child   support enforcement in the military. Washington, DC: Author.

Office of Child Support Enforcement. (1992). Uniform Interstate Family Support Act proposed to replace URESA. Child Support Report, 14(8), pp. 4-5.

Office of Child Support Enforcement. (1994). Annual Report to Congress (for period ending September 30, 1994). Washington, DC: Author.

Office of Child Support Enforcement. (1995a). President Clinton signs executive order: Federal agencies to facilitate support order establishment and enforcement. Child Support Report, 17(3), pp. 1-2.

Office of Child Support Enforcement. (1995b). DOD consolidates garnishment operation. Child Support Report, 17(3), p. 3.

Office of Child Support Enforcement. (1996 and various years). Annual Report to Congress (21 annual reports for the years 1976-96). Washington, DC: Author

Office of Child Support Enforcement. (2002a). Re: 1099 Request, DCL-02-22 (Dear Colleague Letter). Washington, DC.

Office of Child Support Enforcement. (2002b). Child Access and Visitation Grants: State Profiles (FY1999). Washington, DC.

Office of Child Support Enforcement. (2002c). Essentials for Attorneys (3d ed.). Washington, D.C.

Office of Child Support Enforcement. (2003a). FY 2001 Annual Statistical Report. Washington, DC: Author.
http://www.acf.hhs.gov/programs/cse/pubs/2003/reports/statistical_report/

Office of Child Support Enforcement. (2003b).  FY 2002 Preliminary Data Report. Washington, DC:  Author. http://www.acf.dhhs.gov/programs/cse/pubs/2003/reports/prelim_datareport/

Pirog, M.A., Klotz, M., & Buyers, K.V. (1997). Interstate comparisons of child support awards using State guidelines, 1997. Bloomington, IN: Institute for Family and Social Responsibility, Indiana University.

Shulman, G.A. (1994). Qualified medical child support order handbook. New York: Wiley Law Publications.

Smith, M.R. (2000). More money for former welfare moms: Simplify the distribution rules. Child Support Quarterly, 32(1), pp. 10-12.

Sorensen, E. (1997, November). A national profile of nonresident fathers and their ability to pay child support. Journal of Marriage and the Family, 59, 785-97.

Sorensen, E., & Halpern, A. (1999, April). Child support enforcement is working